**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail:  jpafiti@pomlaw.com

**Attorneys for Plaintiff**
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MULQUIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) ) **CLASS ACTION COMPLAINT** |
| NEKTAR THERAPEUTICS, HOWARD W. ROBIN, and GIL M. LABRUCHERIE, | ) ) ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) ) |

Plaintiff John Mulquin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nektar Therapeutics ("Nektar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Nektar securities between November 11, 2017 through October 2, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Nektar is a research-based biopharmaceutical company that discovers and develops innovative medicines in areas of high unmet medical need. Nektar's research and development pipeline of new investigational drugs includes treatments for cancer, autoimmune disease and chronic pain. Nektar purports to leverage its proprietary and proven chemistry platform to discover and design new drug candidates. These drug candidates utilize the Company's advanced polymer conjugate technology platforms, which are designed to enable the development of new molecular entities that target known mechanisms of action.

3.      NKTR-214, is the Company's lead immune-oncology ("I-O") candidate, is a biologic with biased signaling through one of the IL-2 receptor subunits (CD 122) that can stimulate proliferation and growth of tumor-killing immune cells in the tumor micro-environment and increase expression of PD-1 on these immune cells.

4.      The Company's Common Stock is listed and traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "NKTR".   Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) prior studies which attempted to pegylate IL-2 failed; (ii) NKTR-214's extended half-

life was unlikely to result in efficacy and created additional high-dosing safety concerns; (iii) NKTR-214 was less effective than IL-2 alone; (iv) the combination of NKTR-214 with nivolumab has not yet demonstrated significant positive results; and (v) as a result, Nektar's public statements as set forth above were materially false and misleading at all relevant times.

5.    On October 1, 2018, Plainview LLC ("Plainview") published a report entitled "NKTR-214: Pegging the Value at Zero".  The report addressed the efficacy of Nektar's lead clinical-stage drug NKTR-214, which the Company has touted as "a promising treatment for cancer, particularly in combination with checkpoint inhibitors."  The Plainview report stated that "Nektar hypothesized that IL-2 [a naturally occurring cytokine] could be improved by adding polyethylene glycol molecules to it (pegylating it) to extend the half-life and block interaction with" a specific receptor, but that "[u]nfortunately, the anticipated benefits did not materialize and pegylation has proved to be a drag on efficacy."  The Plainview report asserted that the core concept of Nektar's plan to develop NKTR-214 into "a new universal cancer treatment" "has never worked in practice", and further asserted that Nektar's decision to only disclose certain trial results represented "an unprecedented level of data opacity."

6.    Following publication of the Plainview report, Nektar's stock price fell $5.63 per share, or 9.24%, over the following two trading sessions, closing at $55.33 per share on October 2, 2018.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Nektar's principal executive offices are located within this Judicial District.

11.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

12.      Plaintiff, as set forth in the attached Certification, acquired Nektar securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.      Defendant Nektar is incorporated in Delaware, with principal executive offices located at 455 Mission Bay Boulevard South, San Francisco, California 94158. Nektar's Common Stock is traded on the NASDAQ, under the symbol "NKTR".

14.      Defendant Howard W. Robin ("Robin") has served at all relevant times as the Company's Chief Executive Officer and Director.

15.     Defendant Gil M. Labrucherie ("Labrucherie") has served at all relevant times as the Company's Chief Financial Officer.

16.     The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Nektar is a research-based biopharmaceutical company that discovers and develops innovative medicines in areas of high unmet medical need. Nektar's research and development pipeline of new investigational drugs includes treatments for cancer, autoimmune disease and chronic pain. Nektar purports to leverage its proprietary and proven chemistry platform to discover and design new drug candidates. These drug candidates utilize the Company's advanced polymer conjugate technology platforms, which are designed to enable the development of new molecular entities that target known mechanisms of action.

19.     Nektar touts its self as the leader in the polymer conjugation field (referred to as PEGylation). PEGylation is the process whereby biological molecules are modified by covalent conjugation with polyethylene glycol (PEG), a non-toxic, non-immunogenic polymer, and is used as a strategy to overcome disadvantages associated with some biopharmaceuticals. PEGylation changes the physical and chemical properties of the biomedical molecule, such as its conformation, electrostatic binding, and hydrophobicity, and is intended to result in an improvement in the pharmacokinetic behavior of the drug.

20.     NKTR-214, the Company's lead I-O candidate, is a pegylated version of the cytokine IL-2 which "pegs" six polymers to it.  IL-2 is a naturally occurring cytokine that was first discovered in 1976 and approved for treating cancer in 1992.  IL-2, however, has a short half-life and also is known to have unintended biologic consequences.  Nektar hypothesized that IL-2 could be improved by adding polyethylene glycol molecules to it (*i.e.* pegylation) to extend the half-life and cause less side-effects than IL-2 alone.

21.     In the last half of 2017, the Company completed enrollment in the dose-escalation phase of the NKTR-214 study evaluating NKTR-214 in combination with Opdivo® (nivolumab) in patients with melanoma, renal cell carcinoma and non-small cell lung cancer. The study is referred to as the PIVOT-02 study.

22.     IL-2 is typically dosed in cycles, where a patient receives up to 14 doses of 0.037 mg/kg of IL-2 over five days, rests for nine days, and then receives up to 14 additional doses of IL-2. In comparison, due to the extended half-life of NKTR-214 the PIVOT-02 study dosed patients with NKTR-214 once every three weeks at 0.006 mg/kg.

**Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on November 11, 2017, when the Company issued a press release announcing "First Data for NKTR-214 in Combination with OPDIVO® (nivolumab) for Patients with Stage IV Melanoma, Renal Cell Carcinoma and Non-Small Cell Lung Cancers, Including Patients with PD-L1 Negative Status, Revealed at SITC 2017", which was also attached as Exhibit 99.1 to a Form 8-K filed with the SEC on that same day. The press release stated in relevant part:[1]

> NATIONAL HARBOR, Md., Nov. 11, 2017 /PRNewswire/ -- Nektar Therapeutics (Nasdaq: NKTR) and Bristol-Myers Squibb (NYSE: BMY) today announced the first presentation of data from the PIVOT-02 Phase 1/2 Study, which is designed to evaluate the combination of Bristol-Myers Squibb's *Opdivo* (nivolumab) with Nektar's investigational medicine, NKTR-214. The initial results presented at the 2017 Society for Immunotherapy of Cancer (SITC) Annual Meeting reported both safety and efficacy data for patients enrolled in the dose-escalation phase of the trial.
>
> ***"These initial findings underscore the potential benefit of the combination of Opdivo and NKTR-214 across several tumor types,"* said Fouad Namouni, M.D., Head of Oncology Development, Bristol-Myers Squibb. *"We believe that a combination regimen which utilizes two different, complementary, and non-overlapping mechanisms designed to harness the body's own immune system to fight cancer has the potential to benefit patients and should be the subject of additional research*."
>
> *Opdivo* is a PD-1 immune checkpoint inhibitor designed to overcome immune suppression. NKTR-214 is an investigational immuno-stimulatory therapy designed to expand and activate specific cancer-fighting T cells and natural killer (NK) cells directly in the tumor micro-environment and increase expression of cell-surface PD-1 on these immune cells.
>
> "In the dose-escalation stage of the PIVOT trial, we've observed important response rates across all three tumor types - melanoma, renal cell carcinoma and non-small lung cancer - in both PD-L1 positive and PD-L1 negative patients," said Mary Tagliaferri, M.D., Senior Vice President of Clinical Development at Nektar Therapeutics. "All patients with responses in the trial continue on treatment. Of note, we observed responses in 3 of 4 Stage IV non-small cell lung cancer patients whose tumors did not express PD-L1 and who had progressed on prior chemotherapy, including one patient who experienced a complete response. In the combination treatment, there were no Grade 3 or higher immune-mediated adverse events at the recommended Phase 2 dose or below. ***Nektar and Bristol are now actively enrolling patients in the Phase 2 expansion part of the PIVOT study in 5 different tumor types.*"**

---

[1] Emphasis added, unless otherwise noted.

*     *     *

A total of 38 patients were enrolled in the dose-escalation phase of the ongoing PIVOT study in a number of dose cohorts. Responses were measured per RECIST 1.1 for efficacy-evaluable ( $\geq$ 1 on treatment scan) patients as of November 2, 2017.

Highlights from the oral presentation include:

- Advanced Treatment-Naïve 1L Melanoma Patients (Stage IV):

  ○ Responses were observed in 7/11 (63%) efficacy-evaluable patients (2 CR and 5 PR) ◊. Median time to response was 1.7 months. DCR, also known as disease control rate (CR + PR + 3 SD), was 91%. All 7 patients with responses continue on treatment in the trial.

- Advanced Treatment-Naïve 1L Renal Cell Carcinoma Patients (Stage IV):

  ○ For patients with one or more baseline scans, responses were observed in 6/13 patients (46%) (1 CR+ and 5 PR). DCR (CR + PR + 5 SD) was 85%. Median time to response in these patients was 1.9 months. For patients with two or more scans available, responses were observed in 6/10 patients (60%) (1 CR, 5 PR, 2 SD). All 11 patients with disease control (CR, PR or SD) continue on treatment in the trial.

- Advanced 2L Renal Cell Carcinoma Patients (Stage IV, I-O Naïve)

  ○ For patients with one or more baseline scans, responses were observed in 1/7 patients (14%) (1 PR). DCR (CR + PR + 6 SD) was 100%. Median time to response was 3.5 months. All 7 patients with disease control (PR or SD) continue on treatment in the trial.

- Advanced 2L PD-L1 Negative Non-Small Cell Lung Cancer Patients (Stage IV, I-O Naïve)

  ○ Responses were observed in 3/4 patients (75%) (1 CR± and 2 PR). DCR (CR + PR) was 75%. Median time to response was 1.7 months. All 3 patients with responses continue on treatment in the trial.

- Robust expansion of ICOS+ CD4 and CD8+ T cells in the blood and increased ICOS gene expression in the tumor were both observed with the combination of NKTR-214 and nivolumab.

- The most common grade 1-2 adverse events were fatigue (74%), flu-like symptoms (68%), rash (60%) and pruritus (42%). There were no treatment discontinuations due to adverse events (AEs) or study deaths.

- There were no grade 3 or higher immune-mediated AEs (such as colitis, dermatitis, hepatitis, pneumonitis or endocrinopathies) at the recommended Phase 2 dose or below

- A recommended Phase 2 dose of NKTR-214 0.006 mg/kg q3w + nivolumab 360 mg q3w was established and is being evaluated in expansion cohorts in over 10 patient populations with melanoma, renal cell carcinoma, non-small cell lung cancer, bladder, and triple-negative breast cancers (n=~330).

*Nektar and Bristol-Myers Squibb entered into a clinical collaboration in September of 2016 to evaluate the potential for the combination of Opdivo and NKTR-214 to show improved and sustained efficacy and tolerability above the current standard of care.* Bristol-Myers Squibb and Nektar are equally sharing costs of the combined therapy trials. Nektar maintains its global commercial rights to NKTR-214.

NKTR-214 preferentially binds to the CD122 receptor on the surface of cancer-fighting immune cells in order to stimulate their proliferation. In clinical and preclinical studies, treatment with NKTR-214 resulted in expansion of these cells and mobilization into the tumor micro-environment. NKTR-214 has an antibody-like dosing regimen similar to the existing checkpoint inhibitor class of approved medicines.

24. On March 1, 2018, the Company reported its financial results for the fourth quarter and year ended December 31, 2017. Defendant Robin boasted of a "transformational" year, stating as follows:

"This past year was truly transformational for Nektar as we achieved a number of successes with Nektar medicines across our three key therapeutic areas of immuno-oncology, immunology and pain," said Howard W. Robin, President and Chief Executive Officer of Nektar. "In the area of pain, we completed a successful Phase 3 program for NKTR-181 in over 2,100 patients and healthy volunteers that will comprise our NDA submission in the second quarter of this year. In immunology, we entered into a major partnership with Eli Lilly for NKTR-358, a potential first-in-class T regulatory resolution therapeutic, which will be developed to treat a broad range of auto-immune disorders. Finally, in immuno-oncology, the clinical success we achieved with NKTR-214 led to a groundbreaking collaboration with Bristol-Myers Squibb that now enables us to broadly and rapidly advance NKTR-214 into over 20 registrational trials in up to 15,000 patients."

25.     That same day, on March 1, 2018, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K tout the Company as a leader in PEGylation, stating in relevant part:

> *As a leader in the polymer conjugation field, we have advanced our technology platform to include new advanced polymer technologies that can be tailored in specific and customized ways with the objective of optimizing and significantly improving the profile of a wide range of molecules, including many classes of drugs targeting numerous disease areas.* Polymer conjugation or PEGylation has been a highly effective technology platform for the development of therapeutics with significant commercial success, such as Amgen's Neulasta® (pegfilgrastim) and Roche's PEGASYS® (PEG-interferon alfa-2a). Nearly all of the PEGylated drugs approved over the last fifteen years were enabled with our PEGylation technology through our collaborations and licensing partnerships with a number of well-known biotechnology and pharmaceutical companies. PEGylation is a versatile technology as a result of polyethylene glycol (PEG) being a water soluble, amphiphilic, non-toxic, non-immunogenic compound that has been shown to safely clear from the body. Its primary use to date has been in currently approved biologic drugs to favorably alter their pharmacokinetic or pharmacodynamic properties. However, in spite of its widespread success in commercial drugs, there are some limitations with the first-generation PEGylation approaches that have been used with biologics. For example, these techniques cannot be used successfully to create small molecule drugs which could potentially benefit from the application of the technology. Other limitations of the early applications of PEGylation technology include sub-optimal bioavailability and bioactivity, and its limited ability to be used to fine-tune properties of the drug, as well as its inability to be used to create oral drugs.  With our expertise and proprietary technology in polymer conjugation, we have created the next generation of PEGylation technology. *Our advanced polymer conjugation technology platform is designed to overcome the limitations of the first generation of the technology platform and to allow the platform to be utilized with a broader range of molecules across many therapeutic areas. We have also developed robust manufacturing processes for generating second generation PEGylation reagents that allow us to utilize the full potential of these newer approaches.*

26.     The 2017 10-K also discussed the Company's efforts to develop in combination NKTR-214 and Opdivo® (nivolumab), stating in relevant part:

> On September 21, 2016, we entered into a Clinical Trial Collaboration Agreement (BMS Agreement) with Bristol-Myers Squibb Company (BMS), pursuant to which we and BMS are collaborating to conduct Phase 1/2 clinical trials evaluating NKTR-214 and BMS' human monoclonal antibody that binds PD-1, known as Opdivo® (nivolumab), as a potential combination treatment regimen in at least five tumor types and eight

indications, and such other clinical trials evaluating the combined therapy as may be mutually agreed upon by the parties (each, a Combined Therapy Trial). Under the BMS Agreement, BMS is responsible for 50% of all out-of-pocket costs reasonably incurred by us in connection with third party contract research organizations, laboratories, clinical sites and institutional review boards. Each party is otherwise responsible for its own internal costs, including internal personnel costs, incurred in connection with each Combination Therapy Trial. Interim data from the dose-escalation phase of the trial was presented at the 2017 Society for Immunotherapy of Cancer (SITC) meeting in November 2017. We identified the Phase 2 dose for NKTR-214 and we are currently enrolling subjects in the expansion phase of the study.

On February 13, 2018, we entered into a Strategic Collaboration Agreement (the BMS Collaboration Agreement) with BMS, pursuant to which we and BMS will jointly develop NKTR-214, including, without limitation, in combination with BMS's Opdivo® (nivolumab) and Opdivo® plus Yervoy® (ipilimumab), and other compounds of BMS, us or any third party. The parties have agreed to jointly commercialize NKTR-214 on a worldwide basis. BMS will pay us a non-refundable upfront cash payment of $1.0 billion and purchase $850.0 million of shares of our common stock at a purchase price of $102.60 per share pursuant to a Share Purchase Agreement (Purchase Agreement).

27.     The 2017 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the 2017 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

28.     On April 11, 2018, the Company announced that it had initiated dosing patients in the Phase 1/2 REVEAL clinical study evaluating the efficacy and safety of the combination of investigational medicines NKTR-262 and NKTR-214 in the treatment of solid tumors.  In particular, the April 11, 2018 press releases stated as follows:

"The REVEAL study is intended to show the synergistic impact on the entire immune activation cascade of an initial intratumoral injection of NKTR-262 followed by treatment with NKTR-214," said Mary Tagliaferri, M.D., Senior Vice President of Clinical Development and Chief Medical Officer at Nektar Therapeutics. "Engagement of the innate and adaptive immune cascades is the most effective way to restore immune surveillance mechanisms to drive both local tumor antigen production and a specific and sustained T cell response to attack a patient's tumors.  We believe the combination

approach of these two novel immuno-oncology agents could ultimately help patients with many types of advanced or metastatic solid tumor cancers, including those resistant to existing immunotherapies."

29.     On May 10, 2018, the Company reported its financial results for the first quarter ended March 31, 2018.  In the May 10, 2018 press release, Defendant Robin stated that "Nektar begins 2018 in a very strong position with a major collaboration with Bristol-Myers Squibb for NKTR-214 and key advancements in our immuno-oncology and immunology pipeline[.]"

30.     On August 8, 2018, the Company reported its financial results for the second quarter ended June 30, 2018.  In the August 8, 2018 press release, Defendant Robin represented that "[o]ver the past few months, we have reported significant progress across all areas of our pipeline, with notable milestones for our immuno-oncology, immunology and pain programs[.]"

31.     The statements referenced in ¶¶ 23-30 were materially false and misleading when made. These false and/or misleading statements failed to disclose material adverse facts about the Company's clinical-stage drug, NKTR-214. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) prior studies which attempted to pegylate IL-2 failed; (ii) NKTR-214's extended half-life was unlikely to result in efficacy and created additional high-dosing safety concerns; (iii) NKTR-214 was less effective than IL-2 alone; (iv) the combination of NKTR-214 with nivolumab has not yet demonstrated significant positive results; and (v) as a result, Nektar's public statements as set forth above were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

32.     On October 1, 2018, Plainview published a report entitled "NKTR-214: Pegging the Value at Zero".  The report addressed the efficacy of Nektar's lead clinical-stage drug NKTR-214, which the Company has touted as "a promising treatment for cancer, particularly in combination with checkpoint inhibitors."  The Plainview report stated that "Nektar hypothesized that IL-2 [a naturally

occurring cytokine] could be improved by adding polyethylene glycol molecules to it (pegylating it) to extend the half-life and block interaction with" a specific receptor, but that "[u]nfortunately, the anticipated benefits did not materialize and pegylation has proved to be a drag on efficacy." The Plainview report asserted that the core concept of Nektar's plan to develop NKTR-214 into "a new universal cancer treatment" "has never worked in practice", and further asserted that Nektar's decision to only disclose certain trial results represented "an unprecedented level of data opacity."

33.     Specifically, the Plainview report found that NKTR-214 resulted in a "stunning" 0% objective response rate ("ORR") in the Company's studies. In comparison, in nine studies of IL-2 between 1994 and 2011, IL-2 resulted in reported ORR's ranging from 15% to 29%.

34.     The Plainview report noted that "NKTR-214 is not the first attempt at pegylating IL-2", and each of the prior studies failed to establish positive results. Accordingly, Plainview concluded:

> NKTR-214's 0% ORR makes it very hard to believe that NKTR-214 will work as part of a combination therapy. For combination therapies in oncology, 2+2=3, not 2+2=5—the total effect is nearly always less than the sum of the parts. *We are unaware of any oncology drug that reported a 0% ORR as a monotherapy and then went on to achieve success as part of a combination therapy,* but there are many therapies with meaningful monotherapy ORR rates that have failed to add value as part of a combination therapy.

35.     Additionally, NKTR-214 in the PIVOT trial failed to sufficiently induce an increase in lymphocytes to trigger a successful clinical response (*i.e.* its intended mechanism to treat the disease). While prior studies of IL-2 alone have established that a 200-300% increase in lymphocytes is necessary in order to elicit a response, NKTR-214 only induced a 33-50% increase in lymphocytes.

36.     As for the increase in the half-life of the drug, Plainview explained how NKTR-214's increases over IL-2 does little to improve efficacy: "NKTR-214 is too weak to work, with a pharmacokinetic profile yielding only 7-20% of the active AUC[2] of a standard cycle of IL-2 due to 1)

---

[2] The area under the plasma drug concentration-time curve ("AUC") reflects the actual body exposure to drug after administration of a dose of the drug.

lower maximum tolerated dose and 2) pegylation interfering with NKTR-214 drug activity." The extended half-life of NKTR-214 also raised additional safety concerns, as the dosing is front-loaded and irreversible.

37.     Next, the Plainview report asserts that the Company's assertions concerning NKTR-214's efficacy in tumor-infiltrating lymphocyte (TIL) CD8+ is "brazenly misleading" as it "is distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ but saw no clinical benefit." Further, the report found that there was also a "lack of significant effect [of NKTR-214] in combination with nivolumab[.]"

38.     Based on the extensive research and findings cited in the report, Plainview concluded:

In Nektar's quest to improve IL-2, the company wound up with a product that is completely useless for treating cancer. Elongating half-life with pegylation makes sense for many indications where the goal is to reach and maintain steady state. These include many neurological or chronic conditions that cannot be cured directly, such as pain or ADHD. However, it makes no sense for treating cancer. The goal is not to reach steady-state exposure to IL-2, it is to kill the malignant tumor cells.

*In exchange for the long half-life of NKTR-214, Nektar was forced to sacrifice both total and peak therapeutic effect.* NKTR-214's PEG polymers also forced Nektar to use a significantly lower dose compared to IL-2. The end result is a drug with AUC that is much lower than IL-2, therapeutic effect (target receptor binding) that is even lower than the AUC would imply, and a maximum concentration that does not appear to meet the minimum threshold for efficacy.

*With a 0% ORR as a monotherapy, NKTR-214 has already failed where IL-2 succeeded, and by combining NKTR-214 with checkpoint inhibitors, Nektar is now trying to succeed where IL-2 failed. Neither the science nor the data support NKTR214, and we are betting against it*.

39.     Following publication of the Plainview report, Nektar's stock price fell $5.63 per share, or 9.24%, over the following two trading sessions, closing at $55.33 per share on October 2, 2018.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nektar securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nektar securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nektar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nektar;

- whether the Individual Defendants caused Nektar to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nektar securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

46.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Nektar  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Nektar securities between the time the Defendants failed to disclose or misrepresented material facts and

the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

47.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

49.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

50.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nektar securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Nektar securities and options at artificially inflated prices.  In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nektar securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nektar finances and business prospects.

53.      By virtue of their positions at Nektar , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Nektar, the Individual Defendants had knowledge of the details of Nektar internal affairs.

55.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nektar.  As officers

and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nektar businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nektar securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Nektar business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Nektar securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

56.     During the Class Period, Nektar securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nektar securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Nektar securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Nektar securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

57.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

59.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.    During the Class Period, the Individual Defendants participated in the operation and management of Nektar, and conducted and participated, directly and indirectly, in the conduct of Nektar business affairs.  Because of their senior positions, they knew the adverse non-public information about Nektar misstatement of income and expenses and false financial statements.

61.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nektar financial condition and results of operations, and to correct promptly any public statements issued by Nektar which had become materially false or misleading.

62.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nektar disseminated in the marketplace during the Class Period concerning Nektar results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nektar to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Nektar within the meaning of Section 20(a) of the

Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nektar securities.

63.     Each of the Individual Defendants, therefore, acted as a controlling person of Nektar.  By reason of their senior management positions and/or being directors of Nektar, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nektar to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Nektar and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nektar.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 30, 2018

Respectfully submitted,

**POMERANTZ LLP**

/s/ Jennifer Pafiti
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood, II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
       ahood@pomlaw.com
       jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com
       mdees@holzerlaw.com

*Attorneys for Plaintiff*