1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7   IN RE NEKTAR THERAPEUTICS          Case No. 18-cv-06607-HSG
8
                                       **ORDER GRANTING DEFENDANT'S**
9                                      **MOTION TO DISMISS**
                                       Re: Dkt. No. 65
10
11
12          This is a consolidated securities class action brought by Plaintiffs Oklahoma Firefighters

Pension and Retirement System and El Paso Firemen & Policemen's Pension Fund (together,

"Lead Plaintiffs") against Defendant Nektar Therapeutics ("Nektar" or "the Company") and

Howard W. Robin, President and Chief Executive Officer; John Nicholson, Chief Operating

Officer and Senior Vice President; Stephen K. Doberstein, Senior Vice President and Chief

Scientific Officer, and later Chief Research and Development Officer; Mary Tagliaferri, Senior

Vice President of Clinical Development, and later Chief Medical Officer; Jonathan Zalevsky,

Senior Vice President of Research Biology and Preclinical Development, and later Chief Scientific

Officer; and Ivan P. Gergel, Senior Vice President of Drug Development and Chief Medical

Officer ("Individual Defendants," and collectively with Nektar, "Defendants"). In their complaint,

Plaintiffs allege three violations of Sections 10(b) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act") and Rule 10b-5: (1) making false and misleading statements under

Section 10(b) and Rule 10b-5(b), (2) engaging in deceptive conduct under Section 10(b) and Rule

10b-5(a) and (c), and (3) control person liability under Section 20(a). Dkt. No. 54 (Consolidated

Class Action Complaint or "CCAC") ¶¶ 178–203. Pending before the Court is Defendants'

motion to dismiss the consolidated class action complaint, for which briefing is complete. Dkt.

United States District Court
Northern District of California

Nos. 65 ("Mot."), 69 ("Opp."), and 70 ("Reply").[1]  For the following reasons, the Court **GRANTS** Defendants' motion to dismiss.

## I.    BACKGROUND

Plaintiffs bring this securities action "on behalf of a class of purchasers of the common stock of Nektar who bought their shares between January 10, 2017, and September 28, 2018, inclusive (the 'Class Period')."  CCAC at ¶ 1.  The following facts are taken from the CCAC and judicially noticeable documents.

Nektar is a research-based biopharmaceutical company with a "research and development pipeline of new investigational drugs [that] includes treatments for cancer, autoimmune disease, and chronic pain."  *Id.* at ¶ 17.  At issue in this case is Nektar's development of its "flagship" drug, NKTR-214.  *Id.* at ¶ 3.  NKTR-214 was "a modified version of Interleukin-2," a human protein that "triggers the body's production of cancer-fighting cells."  *Id.* at ¶¶ 3–4.  While Interleukin-2 "has long been approved cancer therapy," a patient would need "significant quantities of native [Interleukin]-2 to get any kind of effect, and at that point it's wildly toxic."  *Id.* at ¶ 3 (quotations omitted).  The Company designed NKTR-214 to address this problem and "produce significant quantities of cancer-fighting cells without affecting the production of immunosuppressive cells."  *Id.* (quotations omitted).

### A.    EXCEL Clinical Trial

#### i.    Trial Data

"In December 2015, Nektar announced that the first human patients had been dosed with NKTR-214 in a Phase I clinical trial, EXCEL, for patients with advanced solid tumors."  *Id.* ¶ 29. EXCEL was a 28-patient monotherapy trial which dosed participants once every two to three weeks.  *Id.* at ¶¶ 62, 79.  "On January 10, 2017, Defendant Robin gave a presentation at the annual JP Morgan Healthcare Conference," displaying results from the EXCEL clinical trial.  *Id.* ¶ 30. "One slide showed that cancer-fighting cells increased by an average of 30-fold in tumors of purportedly ten patients dosed with NKTR-214 every three weeks, with very little change in their

---

[1] The Court finds this matter is appropriate for disposition without oral argument and the matter is deemed submitted.  *See* Civil L.R. 16-5.

United States District Court
Northern District of California

immunosuppressive Treg cells." *Id.* ¶ 31.  This chart, the "30-fold increase chart," forms the basis of Plaintiffs' securities claims:



*Id.* ¶¶ 77, 81, 85.  This 30-fold increase chart was then presented in a similar or identical form at numerous subsequent conferences.  *Id.* at ¶ 32.

### ii.  Plainview Report

"On October 1, 2018, Plainview [LLC] published a report titled 'NKTR-214: Pegging the Value at Zero' (the 'Plainview Report' or the 'Report')."  CCAC at ¶ 58; *see also* Dkt. No. 66-19 (Ex. 18). [2]  The Report concluded that NKTR-214 is "too weak to work," and found that "Nektar's frequently cite[d . . .] 30-fold average change in tumor-infiltrating lymphocyte (TIL) CD8+ . . . is distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ [(cancer-fighting cells)] but saw no clinical benefit."  *Id.* at ¶ 59.  This finding referred to the chart above.  The Report also contended that "the [purported] source of the '30-fold' increase claim was a single line chart from a poster that Nektar displayed at a February 2017 American Society of

---

[2] The Report included the following disclaimer: "The information included in this document is based upon selected public market data and reflects prevailing conditions and the Authors' view as of this date, all of which are accordingly subject to change.  Dkt. No. 66-19 (Ex. 18) at 2.  Additionally, "Plainview acknowledged in the Report that its authors 'have short positions in and may own option interests on the stock of [Nektar] and stand to realize gains in the event that the price of the stock decreases.'"  CCAC at ¶ 70.

Clinical Oncology [ASCO] symposium." *Id.* at ¶ 60.  The line chart identified in the Report was

Figure 6 of the February 2017 ASCO poster:



*Id.* at ¶ 61; *see also* Dkt. No. 66-4.  Pointing to Patient 14 in the graph above, the Report

explained:

> Nektar ran a 28-patient Phase 1 EXCEL trial, during which Nektar
> evaluated the change in tumor-infiltrating CD8+ T cells. None of the
> patients actually saw a 30-fold change in TIL CD8+: one single
> patient saw a ~300x increase, and this skewed the average.  The
> reported average barely exceeded the standard error and was not even
> close to statistical significance; tell-tale signs of data driven by
> variation rather than efficacy.

CCAC at ¶ 62 (emphasis omitted); *see also* Dkt. No. 66-19 at 16.  Plaintiffs allege that through the

Report's disclosure of the purported source of the data for the 30-fold increase chart, *id.* at ¶ 65,

"investors finally had the opportunity to study the relevant line chart . . . as well as the patient

information to the right of the [chart]," *id.* at ¶ 66.  From the chart, investors deduced as follows:

> The lines for Patients 2, 4, 6 are orange and the lines for Patients 14
> and 15 are purple. That means that Patients 14 and 15 were on a two-
> week dosing schedule, not a three-week dosing schedule as Nektar
> had said. The information to the right of the line chart makes clear
> that patients whose lines are purple are dosed "q2w" or every two
> weeks, and that patients whose lines are orange are dosed "q3w" or
> every three weeks. This shows that forty percent of the patients Nektar
> claimed to be on a three-week schedule were actually being dosed
> more often than Nektar claimed.

*Id.* at ¶ 67.  Thus, if the analysis was truly based on the "three patients dosed every three weeks—

Patients 2, 4, and 6—the fold change" was "~1.8 fold, a dramatically lower multiple that

undermines the central message Nektar repeatedly delivered during the Class Period."  *Id.* at ¶ 68.

Furthermore, because the 30-fold increase chart indicated that it represented "a 10-patient data set"

and the source for the 30-fold increase chart was the line chart, which contains a "five-patient data

United States District Court
Northern District of California

set," Plaintiffs allege that these facts "mean[] that the data for the bar chart showing a 1.6-fold 'Tregs' increase comes from five other patients." *Id.* at ¶ 69. Plaintiffs allege that the Report's revelations make clear that the 30-fold increase chart shared "'CD8' [cancer-fighting cell] data from five patients but does not share their immunosuppressive 'Tregs' data, and it shares immunosuppressive 'Tregs' data from five other patents but does not share their 'CD8' data." *Id.*

"On Friday, September 28, 2018, Nektar's stock closed at $60.96. The Plainview Report was published before the marked opened on Monday, October 1, 2018, and by the time the market closed, Nektar was trading at $56.65—a one day drop of 7% on heavy trading volume." *Id.* at ¶ 70.

### B.   PIVOT-2 Clinical Trial

"In February 2018, Nektar and [Bristol-Myers Squibb ("BMS")] announced a 'Global Development & Commercialization Collaboration' to evaluate NKTR-214." *Id.* ¶ 37. This second clinical trial, known as PIVOT-02, tested a combination of NKTR-214 and Opdivo, a cancer immunotherapy drug developed by BMS. *Id.* ¶¶ 34, 56. "In connection with that collaboration, BMS agreed to pay Nektar $1.85 billion upfront, comprised of $1.0 billion in cash and the purchase of ~8.28 million shares of Nektar stock at $102.60 per share." *Id.* ¶ 37.

Plaintiffs allege that "Nektar personnel, including Defendants Gergel and Tagliaferri, or others working at their direction, would reach out to PIVOT-02 investigators . . . to obtain data directly from study sites for the purpose of including new, good data in medical conference posters and presentations and investor presentations." *Id.* at ¶ 44. "[B]ad patient data would be excluded when the data was received after a predetermined cut-off time, but . . . good patient data would be included in presentations via an extension of the deadline." *Id.* "On November 11, 2017, Nektar hosted an 'Investor Meeting' to coincide with the Society of Immunotherapy of Cancer ('SITC') annual meeting at which limited data concerning the PIVOT-02 clinical trial was presented." *Id.* at ¶ 34. "Following the November 2017 SITC meeting, Nektar's stock price rose in part because 'Management . . . unveiled impressive early-stage trial data for NKTR-214, a wholly owned immuno-oncology drug that's being studied for use alongside [BMS's] multibillion-dollar drug Opdivo.'" *Id.* at ¶ 36. Plaintiffs allege the stock price rose artificially, due in part to Defendants'

United States District Court
Northern District of California

"fail[ure] to disclose their unsustainable scheme to manipulate publicly presented PIVOT-02 data, creating the false impression that the trial results were better than they really were." *Id.* at ¶ 14.

On June 2, 2018, "MD Anderson physician and Nektar consultant Dr. Adi Diab presented PIVOT-02 clinical trial data concerning NKTR-214 and Opdivo at the ASCO annual meeting in Chicago." CCAC at ¶ 53. Reports from the event allegedly concluded:

> According to the new ASCO data set, for melanoma, the [overall response rate ("ORR")] is now 50% (14 of 28 patients in stage 2)—down from 85% last November when 11 of 13 patients responded. Similarly, for renal cell carcinoma, the ORR went down from 64% (seven of 11 patients) to 46% (12 of 26) in stage 2.

*Id.* (alterations in original).[3] "Following this news, Nektar's stock fell from $90.35 at the close from the previous Friday, June 1st, to $52.57 at the close of Monday June 4, 2018, a decline of 41.82%." *Id.* at ¶ 54. Despite these reports on the PIVOT-2 data, at the Jeffries 2018 Healthcare Conference on June 6, 2018, "Zalevsky reemphasized the EXCEL data that the market still did not know was manipulated." *Id.* at ¶ 57.

## C.   False and Misleading Statements

### i.   The Chart

Plaintiffs point to three primary aspects of the 30-fold increase chart that they allege were false or misleading representations by Defendants:

> (a)  The 29.8 figure:
>   (i)  is based on the inclusion of an outlier patient who . . . saw a ~300x increase in CD8 cancer-fighting cells;
>   (ii)  is based on the inclusion of two patients dosed every two weeks;
>   (iii) is unsupported by the relied-on clinical trial data which, by Lead Plaintiff[s'] estimate, demonstrated that patients dosed every three weeks averaged a CD8 fold-increase of approximately 1.8 in the tumor microenvironment.
> (b)  "Shown are results from N=10 patients" creates the false impression that both data points are derived from the same 10-person patient population when, in fact, the figures are derived from two distinct patients populations – five for the 28.9 CD8 cancer-fighting cell figure, and five for the 1.6 immunosuppressive Tregs cell figures."

---

[3] While Defendants contest the accuracy of this statement, the Court must accept Plaintiffs' alleged facts as true. As noted below, Plaintiffs do not specifically identify Exhibits 14 and 15 of Defendants' request for judicial notice in the Consolidated Class Action Complaint, and the Court does not take judicial notice of these documents.

6

(c) The "Week 3/predose" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the five patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks.

CCAC at ¶ 78(a)–(c). Similar versions of this chart were presented at numerous investor conferences, and Plaintiffs make the same allegations as to all presentations. *See id.* at ¶¶ 77–78, 81–82, 85–86, 89–90, 93–94, 100–01, 105–06, 107–08, 111–12, 117–18.

### ii.   Statements at Investor Conferences

Plaintiffs additionally point to statements made at many of the same conferences where Individual Defendants provided commentary on a version of the 30-fold increase chart. On January 10, 2017, Defendant Robin presented at a JP Morgan Investor Event. *Id.* at ¶ 77. Plaintiffs allege that Robin stated:

> We've designed a new IL-2 molecule with a biased action to the beta, gamma receptors and not that alpha receptor. And consequently, there you can produce significant quantities of CD8 positive T cells without affecting the production or the proliferation of regulatory T cells.
> The other thing we've done is made a pro-drug, because one of the problems you have with native IL-2 is, when you administer a native IL-2, it releases immediately in plasma and you get this massive unwanted immune response. It's very short-lived, but it has very, very serious side effects in terms of cytokine storm, et cetera. And what we've done is, designed a molecule where the biological linkers release in the tumor microenvironment and you don't see – and therefore, you get the full effect of the cytokine in the tumor, not in circulation. So with that, you're also able to achieve antibody-like dosing. So we're dosing NKTR-214 once every three weeks in an outpatient setting.
> So here's some data from the Phase 1 trial, demonstrating – and these are 10 patients where we have tumor biopsies. And you can clearly see that we had a significant increase in CD8 positive T-effector cells with no increase in T-reg cells. And interestingly enough, we also see a great increase in PD-1 positive CD8 T cells. So, very, very pleased with these results. The Phase 1 study was designed to show these biomarkers and this is clearly what we set out to do; cause the proliferation of T-effector cells and not cause the proliferation of regulatory T cells.

Dkt. No. 66-1 (Ex. 1) at 2–3; *see also* CCAC at ¶ 79 (emphasis omitted). Similarly, on March 7, 2017, Defendant Doberstein represented the Company at a Cowen & Company Healthcare Conference. *Id.* at ¶ 81. Plaintiffs allege Doberstein stated:

> Now what we found in patients from NKTR-214 is that first, as a monotherapy, it does pretty much exactly what we designed it to do. You can see a 30-fold increase in CD8 cells inside the tumors of

> patients from tumor biopsies who've received NKTR-214 with almost no increase in Tregs. And that's exactly the way that we designed the medicine to act.

Dkt. No. 66-5 (Ex. 4) at 6; *see also* CCAC at ¶ 83 (emphasis omitted).[4]  "On June 3, 2017, Dr. Adi Diab of the MD Anderson Cancer Center and Co-Chair Scientific Advisory Board for PIVOT Program," *id.* at ¶ 89, displayed the same 30-fold increase chart with the following commentary:

> And so to summar[ize], this—the most important, as you can see when you look at the left column here, and you can see what we've been talking about, and I reemphasize that point because this is a very important marker, not only mobilizing of the T cells in the tumor microenvironment, but you're also mobilizing CD8 more than Tregs, achieving very high CD8-to-Treg ratio of—in the tumor microenvironment, that's very impressive.  That's very beneficial for the patients.
> . . .
> And NKTR-214, in addition of mobilizing the CD8 cells, there is also increasing in the number of NK cells, the natural killers.  This happens without an increase of the T regulatory cells, and that's a—lead to the high ratio of CD8 to Tregs.

Dkt. No. 66-9 (Ex. 8) at 6; *see also* CCAC at ¶ 91 (emphasis omitted).

Plaintiffs allege that "[o]n November 11, 2017, the Company hosted an 'Investor Meeting' to coincide with the SITC annual meeting at which limited data concerning the PIVOT-02 clinical trial was presented."  CCAC at ¶ 97.  Defendant Zalevsky allegedly stated:

> For one thing, we know that in the presence of [NKTR-]214 there's such a high amount of activated immune cells.  Different clones of

---

[4] Plaintiffs allege that Defendants made similar "30-fold" statements at several other conferences.  On May 22, 2017, Defendant Zalevsky presented at a UBS Healthcare Conference and similarly noted that "CD8 T cells increased by 30[-]fold in the tumor microenvironment.  This is shown just after a single-dose administration of NKTR-214, and completely consistent with the design, the T regs, which are not touched due to the bias of the molecule, are unchanged."  CCAC at ¶¶ 85, 87 (emphasis omitted); *see also* Dkt. No. 66-7 (Ex. 6) at 6.  On June 7, 2017, at the Jeffries Healthcare Conference, Defendant Doberstein allegedly stated, "[y]ou can see here when we do Q3-week dosing, almost a thirtyfold increase in tumor T cells within the biopsy—T cells within the tumor biopsy of the effector cell type."  CCAC at ¶ 95 (emphasis omitted).  On March 14, 2018, at the Cowen & Company conference, Defendant Zalevsky is alleged to have said "we're evaluating immunological changes in those biopsy tissues.  And shown on the left is proportion of CD8 cytotoxic T cells or regulatory T cells that you see is a full change from week 3 to baseline.  And you can see that there's a 30-fold induction of CD8 T cells, but there's essentially no change in Tregs.  This is exactly the design goal and this drives a very high CD8-to-Treg ratio."  *Id.* at ¶ 113 (emphasis omitted); *see also* Dkt. No. 66-13 (Ex. 12) at 6.  Finally, on June 6, 2018, at a Jefferies investor event, Defendant Zalevsky again presented the 30-fold increase chart, allegedly stating "you can see that for patients for whom we collected serial biopsies, you can see an elevation up to 30-fold in the proportion of tumor-infiltrating cytotoxic T cells, shown in orange, with essentially no change in regulatory T cells or T regs.  This is exactly the design goals of NKTR-214, demonstrated in principle in human patients."  CCAC at ¶ 119 (emphasis omitted).

immune cells recognizing multiple antigens increasing the tumor killing army.

Dkt. No. 66-11 (Ex. 10) at 8; *see also* CCAC at ¶ 98 (emphasis omitted).  Again, on November 15, 2017, at a Jefferies Healthcare Conference, Defendant Zalevsky allegedly stated:

> We know that with NKTR-214, it can fill the gap of actually replenishing the patient's own immune system.  In fact as a T cell growth factor, it acts like an engine to grow armies and armies of antigen-specific tumor reactive T cells.  These T cells can infiltrate into the body, they can enter the tumor microenvironment and they can go to work, attacking the tumor cells . . . .
> We profiled NKTR-214 in a monotherapy clinical trial and we reported these results over the last year and a half.  Now the key with this monotherapy study was that we wanted to prove the mechanism of action in the patient's tumor itself.
> And so we collected a number of biopsies both pretreatment and on-treatment and we use those biopsies to characterize the functions of NKTR-214, shown here in this slide is the fact that NKTR-214 has on inducing T cell infiltrates into the tumor.  And you can see there's a 30-fold increase in the amount of CD8 T cells that entered into the tumor and because of the biased signaling, you can see there's no change in T regs.  So this is very much skewed and dominated tumor killing cytotoxic T cell response.

CCAC at ¶ 102 (emphasis omitted).  At the January 9, 2018 JP Morgan Healthcare Conference, Defendant Robin allegedly explained the 30-fold increase chart as follows:

> So what we've done is, using our technology, we have a biased receptor binding in such a way that we cause the proliferation of effector T cells and we don't cause an increase in regulatory T cells.  And because of that, you can give very low doses of NKTR-214 dosed on an antibody-like schedule once every 3 weeks on an outpatient basis.  You see nominal side effects, and you get a profound stimulation of the immune system.  So in patients, just to demonstrate this.  Here you could see the chart on the left, a great—significant increase in effector T cells with no increase in regulatory T cell.  Also, very important, in the left chart, you see that NKTR-214 also increases PD-1 expression.  We take patients who are PD-L1 negative and turn them PD-L1 positive, another very, very important aspect of treating patients in the immunotherapy world.

*Id.* at ¶ 109 (emphasis omitted).  Plaintiffs allege that all these statements were false or misleading for the same three reasons the 30-fold increase chart is false or misleading.  *See, e.g., id.* at ¶ 110.

Outside of statements made at investor conferences, Plaintiffs also allege that a June 2018 video released by Nektar included false and misleading statements.  *Id.* at ¶ 115.  The video had "a voice superimposed over a graphical representation of cancer-fighting cells being created by NKTR-214 without a corresponding growth of regulatory cells inside a tumor."  *Id.*  The video

1   stated:

> Cancer immunotherapies are designed to enable a patient's own immune system to attack tumor cells, but existing therapies do not work for most patients, in part due to an insufficient number of cancer-fighting cells, and too many suppressive cells, which can blunt tumor-killing. What is needed is an immunotherapy that expands, mobilizes and accumulates these powerful cancer-fighting cells, namely CD8-positive effector T-cells and NK cells, within tumors – without expanding unwanted suppressive regulatory T-cells.
> NKTR-214 selectively grows cancer-fighting cells, with the goal of making cancer immunotherapy more effective. Administration of this biologic prodrug is by infusion once every three weeks. In the body, active conjugates emerge slowly over time, which avoids overstimulation of the immune system. Activated NKTR-214 targets CD122 receptors found on the surfaces of cancer-fighting cells, which in turn drives their proliferation and accumulation inside the tumor.
> In clinical studies, treatment with NKTR-214 resulted in increases in cancer-fighting cells of up to 30-fold.

*Id.* (emphasis omitted).

## II.   REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice of or consider incorporated by reference the following 25 documents: (1) SEC filings (Exs. 20, 22, 23, 24, 25); (2) investor presentation transcripts (Exs. 1, 1A, 4, 6, 8, 10, 12, 14); (3) investor presentation slide decks (Exs. 2, 3, 5, 7, 9, 11, 13, 15); (4) articles (Exs. 18, 19); (5) historical stock price chart during the Class Period (Ex. 21); and (6) clinical trial protocols (Ex. 16, 17). Dkt. No. 67 at 1–5; Dkt. No. 66 ("Wechkin Decl."), Exs. 1–26. Plaintiffs filed no objection to Defendants' request for judicial notice.

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine. 899 F.3d 988 (9th Cir. 2018). Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. *Id.* Separately, the incorporation by reference doctrine is a judicially-created doctrine

United States District Court
Northern District of California

10

that allows a court to consider certain documents as though they were part of the complaint itself. *Id*. at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. *Id*. However, it is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id*. at 1014.

The Court will consider the investor presentation transcripts and investor presentation slide decks that Plaintiffs allege contain false and/or misleading statements for the purpose of determining what was disclosed to the market. Because "the plaintiff refers extensively to the document[s] [and] the document[s] form[ ] the basis of the plaintiff's claim," the Court **GRANTS** the motion as to Exhibits 1, 1A, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13, finding these documents incorporated by reference. *Khoja*, 899 F.3d at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)); *see also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice of press releases); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979–80 (N.D. Cal. 2010) (taking judicial notice of slide presentations to analysts).

The Court will also consider the Plainview articles that Plaintiffs allege disclosed Defendants' alleged misstatements. Given Plaintiffs' extensive reliance on these documents to detail the bases for the alleged falsity in Defendants' statements, the Court finds them incorporated by reference, and **GRANTS** the request as to Exhibits 18 and 19 on this basis. *See* CCAC ¶¶ 12, 14, 51, 58–70, 71–76, 78(a), 124, 132, 133; *see also Khoja*, 899 F.3d at 1002 (quoting *Ritchie*, 342 F.3d at 907).

Because the CCAC relies on Exhibits 22–25 (each a Form 4) to support "a scienter inference" as to Defendants Doberstein, Gergel, Nicholson, and Robin, the Court will consider these documents as evidence that the stock sales reflected in them occurred. CCAC ¶¶ 160–163. The Supreme Court has instructed "courts [to] consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" when determining whether the allegations in a securities complaint "give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

322–23 (2007).  Because Exhibits 22–25 are publicly filed SEC documents that are expressly referenced in the CCAC, the Court **GRANTS** Defendants' request for judicial notice as to these exhibits.  *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) ("Courts in this circuit have routinely taken judicial notice of Forms 4 to determine whether insider stock sales raise an inference of scienter to support a § 10(b) action.").

"[S]tock price is public information 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' and are the proper subject of judicial notice in a motion to dismiss."  *In re Finisar Corp. Derivative Litig.*, 542 F. Supp. 2d 980, 990 (N.D. Cal. 2008) (quoting Fed. R. Evid. 201(b)).  Accordingly, the Court **GRANTS** Defendants' request for judicial notice as to Exhibit 21.

Defendants' Exhibits 14, 15, and 20 are not specifically referenced in the CCAC or relevant to the Court's analysis.  Therefore, Defendants' request as to those exhibits is **DENIED AS MOOT**.  Finally, Defendants request that the Court take judicial notice of Exhibit 16, the EXCEL clinical trial protocol, and Exhibit 17, the PIVOT-02 trial protocol.  Dkt. 67 at 4.  These documents however "did not necessarily form the basis of the complaint," *Khoja*, 899 F.3d at 1002, and Defendants instead offer them to contradict Plaintiffs' allegations.  Accordingly, the Court **DENIES** Defendants' request for judicial notice as to Exhibits 16 and 17.

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

2    556 U.S. 662, 678 (2009).

3          In reviewing the plausibility of a complaint, courts "accept factual allegations in the

4    complaint as true and construe the pleadings in the light most favorable to the nonmoving party."

5    *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless,

6    Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of

7    fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

8    2008).

9    **B.    Heightened Pleading Standard**

10         Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use

11   or employ, in connection with the purchase or sale of any security registered on a national

12   securities exchange or any security not so registered . . . any manipulative or deceptive device or

13   contrivance . . . . " 15 U.S.C. § 78j(b). Under this section, the SEC promulgated Rule 10b–5,

14   which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or

15   to omit to state a material fact necessary in order to make the statements made, in the light of the

16   circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). At the

17   pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only

18   meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened

19   pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities

20   Litigation Reform Act ("PSLRA"). *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. June

21   10, 2020); *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under

22   Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires

23   that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ.

24   P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting

25   pleading requirements" of the PSLRA. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,

26   990 (9th Cir. 2009). The PSLRA's requirements were "enacted in 1995 as part of Congress's

27   desire to 'curb perceived abuses of the § 10(b) private action—nuisance filings, targeting of deep-

28   pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'"

*Nguyen*, 962 F.3d at 414 (quoting *Tellabs*, 551 U.S. at 320).  Specifically, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

## IV.    FALSE AND MISLEADING STATEMENTS CLAIM

Plaintiffs allege that Defendants made false and misleading statements to the public regarding the EXCEL trial in violation of Section 10(b) and Rule 10b–5(b).  CCAC at ¶¶ 178–87.  To prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

### A.    Falsity

Falsity is alleged "when a plaintiff points to [a] defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008.  "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quotations and alterations omitted).  Misleading statements "must be 'capable of objective verification.'" *Id.* (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)).  "For example, 'puffing'—expressing an opinion rather than a knowingly false statement of fact—is not misleading." *Id.*  Finally, an actionable representation must be material.  "For the purposes of a 10b–5 claim, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

Defendants first argue that Plaintiffs' claim must be restricted to the makers of the

United States District Court
Northern District of California

challenged statements: Defendants Robin, Doberstein, and Zalevsky.  Mot. at 10–11.  Because Plaintiffs do not allege that Defendants Gergel, Nicholson, and Tagliaferri made any false or misleading statements, Defendants argue that they should be dismissed from Plaintiffs' Section 10(b) claim.  The Supreme Court has held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it" for purposes of assessing liability under Section 10(b) of the Exchange Act and Rule 10b–5(b).  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The Court agrees that Plaintiffs fail to allege any facts that suggest Defendants Gergel, Nicholson, and Tagliaferri were the makers of any of the alleged false or misleading statements.  In fact, all of the alleged misstatements outlined in the Consolidated Class Action Complaint specifically credit each statement to one of the other Individual Defendants (Defendants Robin, Doberstein, or Zalevsky).  *See e.g.*, CCAC at ¶ 109.  Accordingly, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Section 10(b) claim as to Gergel, Nicholson, and Tagliaferri.

Defendants next argue that Plaintiffs fail to allege falsity as to the remaining Individual Defendants because they do not provide specific allegations to support the assumption that the five patients reflected in the Figure 6 line graph from the February 2017 ASCO poster were included in the ten patients referenced in the 30-fold increase chart.  Mot. at 7–10.  Plaintiffs rely on the line graph to detail the three reasons they allege Defendants' statements regarding the 30-fold increase chart were false or misleading: (1) the 30-fold figure is based on the inclusion of an "outlier" patient, (2) the ten patient population sample creates the impression that both the CD8 cancer-fighting cell figure and the immunosuppressive Tregs cell figure are derived from the same ten patients, when these figures actually were each based on different sets of five patients, and (3) the "Week 3/predose" chart descriptor suggests that all patients in the population sample were dosed every three weeks when two of the five patients were dosed every two weeks.  CCAC at ¶ 78(a)–(c).  The Court analyzes each claimed basis separately.

First, Plaintiffs allege that Defendants' statements were false and misleading because they are "based on the inclusion of an outlier patient."  *Id.* at ¶ 78(a).  To support this allegation, Plaintiffs primarily rely on the Plainview Report, which identified the Figure 6 line chart from the

United States District Court
Northern District of California

2017 ASCO poster as the source of the 30-fold increase chart.  CCAC at ¶¶ 60–61, 63, 66; *see also* Dkt. No. 66-19 (Ex. 18) at 16.  However, nothing in the Consolidated Class Action Complaint details why Plainview's assertions support a plausible inference of falsity.  Plaintiffs fail to provide any information regarding the authors of this Report and their qualifications.  CCAC at ¶ 12 (identifying Plainview LLC only as "a short-seller of Nektar stock").  The Report itself also failed to include any information as to the authors.  *See* Dkt. No. 66-19 (Ex. 18) at 2 (noting simply that "Plainview LLC and its affiliates" as well as "others that contributed research to this report and others that we have shared our research with" constitute "Authors" of the piece).  Instead, far from describing any expertise in oncology or methodologies for conducting clinical trials, Plainview self-identified as having something to gain from a decrease in Nektar's stock price.  *Id.* (disclosing that the authors "have short positions in and may own option interests on the stock of [Nektar], and stand to realize gains in the event that the price of the stock decreases."); *see also* CCAC at ¶ 70.

Where a securities plaintiff relies on an expert opinion, "such factual allegations are subject to the same standard applied to evaluate facts alleged to have originated with any 'confidential informant' (or other witness)."  *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535 at \*30 (N.D. Cal. 2007) (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233–34 (9th Cir. 2004)).  This requires allegations sufficient to "support the probability that a person in the position occupied by the [confidential] source would possess the information alleged." *Nursing Home*, 380 F.3d at 1233.  Given Plainview's disclosures detailing that it stood to benefit from a poor performance in Nektar's stock price and the lack of any information establishing why Plainview's opinions on the highly-technical matters at issue here are reliable, Plaintiffs fail to sufficiently show that the Report supports their allegations of falsity.

Plaintiffs also rely on CW #2, a former employee at Nektar who "worked in Clinical Development Operations."  CCAC at ¶ 40.  "CW #2 participated in the preparation for and often attended Executive Committee meetings" where "[r]egular attendees were Robin, Doberstein, Nicholson, Zalevsky, Tagliaferri, and Gergel."  *Id.* at ¶ 41.  Specifically, Plaintiffs rely on CW #2 for his "confirm[ation]" that the outlier patient from the EXCEL trial whose data was included in

the Company's '30-Fold' increase bar chart was discussed at Executive Committee meetings." *Id.*
CW #2 allegedly indicated that "Robin specifically was aware of this issue and nevertheless
instructed that the data from the outlier patient be included in public presentations." *Id.*; *see also
id.* at ¶ 145.  Even taking all of these allegations as true, Plaintiffs fail to provide a further
allegation necessary to support the assumption that the Figure 6 line graph contained source data
for the 30-fold increase figure:  namely, that the "outlier data" discussed at the executive meetings
was the same data depicted in the Figure 6 line graph.[5]  The Figure 6 line graph depicts only five
patients of a 28-patient trial, and CW #2 provides no basis to conclude that the data regarding
those same five patients, as opposed to other data from the EXCEL trial, was discussed with
Robin.  Without some specificity regarding the EXCEL trial data, CW #2's statements fail to
support Plaintiffs' assumption that the Figure 6 line graph provided the source data for the 30-fold
increase figure.

More fundamentally, even if the Court were to assume that the data was the same,
Plaintiffs fail to allege why inclusion of this data and the failure to disclose that inclusion made
Defendants' statements materially misleading.  Plaintiffs take for granted that the inclusion of
"outlier" data necessarily made the reported results flawed, but never explain why the data could
not be legitimately included in a clinical trial.  Importantly, "disagreements over statistical
methodology and study design are insufficient to allege a materially false statement." *Rigel
Pharm.*, 697 F.3d at 878.  Although Plaintiffs argue that *Rigel* is distinguishable because here "it is
alleged that the statistical methodology, analysis and conclusions underpinning the data have been
misrepresented or concealed," the Court disagrees.  Opp. at 8–9.  The Consolidated Class Action
Complaint does not challenge the EXCEL trial data itself but focuses instead on Defendants'
presentation of the data, specifically the inclusion of the "outlier data."  Plaintiffs fail to explain
*why* the inclusion of the "outlier data" in the EXCEL trial, or the failure to disclose its inclusion,
necessarily made the 30-fold figure false or misleading, which is inadequate under the PSLRA's

---

[5] Plaintiffs sufficiently detail that CW #2's role was such that he or she would be in a position to
hear Defendant Robin discuss and instruct that the purported outlier patient data should be used in
public presentations, such as the 30-fold increase chart.  *See Nursing Home*, 380 F.3d at 1233.

1   heightened pleading standards.  And the confidential witnesses did not provide the necessary

2   allegations either, instead focusing on "the practice of using un-validated data" and "cherry

3   picking" data contrary to "proper protocols" as applied to the PIVOT-02 trial, not the EXCEL trial

4   upon which the false statement claim is based.  *See* CCAC at ¶¶ 44–52.[6]

5       Thus, although Plaintiffs argue in their opposition "that Defendants committed fraud by

6   publicly reporting results that they knew or should have known were either so incomplete or so

7   statistically flawed as to lack clinical significance," they have failed to explain why or how the

8   data was so "incomplete" or "statistically flawed" as to be misleading on its face.  Opp. at 8

9   (quoting *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005)).

10   Additionally, "it bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty

11   to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct.

12   1309, 1321 (2011).  "Disclosure is required . . . only when necessary 'to make statements made, in

13   the light of the circumstances under which they were made, not misleading.'"  *Id.* at 1321 (quoting

14   17 C.F.R. § 240.10b–5(b)).  Plaintiffs have not alleged how or why such a disclosure was

15   necessary, given that they have not explained why Defendants' statements were false or

16   misleading.

17       As for the second and third categories (i.e., the claims that (a) the ten patient population

18   sample creates the impression that both the CD8 cancer-fighting cell figure and the

19   immunosuppressive Tregs cell figure are derived from the same ten patients instead of different

20   sets of five patients, and (b) the "Week 3/predose" chart descriptor suggests that all patients in the

21   population sample were dosed every three weeks when two of the five patients were dosed every

22   two weeks), Plaintiffs provide no specific factual allegations to support the assumption that the

23   Figure 6 line chart provided the source data for Nektar's EXCEL clinical trial representations.

24   This assumption again forms the basis for Plaintiffs' claim as to these categories, but Plaintiffs

25   provide no additional allegations to make the conclusions of the Plainview Report reliable, and

26

27   _____

28   [6] The Court only notes that no such allegations were made and does not suggest that similar allegations by the confidential witnesses for the EXCEL trial would necessarily meet the pleading standard.

United States District Court
Northern District of California

neither confidential witness provides any detail as to these categories.  Thus, for the same reasons discussed above, Plaintiffs fail to adequately allege that Defendants' statements were false or misleading as to either category. [7]

Because the Consolidated Class Action Complaint fails to adequately allege that any of the statements in the three categories identified by Plaintiffs were false or misleading, the Court **GRANTS** Defendants' motion to dismiss for failure to plead falsity.

**B.   Scienter**

Defendants also argue that Plaintiffs fail to raise a strong inference of scienter as to their false or misleading statements claim.  Mot. at 17–21.  Under the PSLRA, whenever intent is an element of a claim, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "The inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  The required state of mind is one of at least "deliberate recklessness," which "is more than '*mere* recklessness or a motive to commit fraud.'"  *Nguyen*, 962 F.3d at 414 (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (emphasis in original)).  "It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'"  *Id.* (quoting *Schueneman*, 840 F.3d at 705) (emphasis in original)).  The Court agrees that Plaintiffs fail to adequately allege scienter as to this claim.

**i.   Direct Scienter**

Plaintiffs fail to provide specific allegations that Defendants presented the 30-fold increase chart with knowledge and intent to mislead or conceal the true EXCEL clinical trial results.  Although Plaintiffs point to CW #2's participation in Executive Committee meetings where

---

[7] Plaintiffs argue that Defendants "confirm that misleading comparisons were made between different sets of patients," through their confirmation that the error bar on a chart in Figure 3 of the February 2017 ASCO poster continued to be used in a slide presented at a June 2017 ASCO conference.  Opp. at 5–8.  However, to survive a motion to dismiss, Plaintiffs must point to factual allegations in the Consolidated Class Action Complaint, not to new arguments raised in the briefing.  They fail to do so here.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendant Robin "instructed that the data from the outlier patient be included in public

2    presentations," CCAC at ¶ 41, they fail to explain why this action was wrong or indicative of

3    scienter.  *See Rigel Pharm.*, 697 F.3d at 883 (finding insufficient plaintiff's allegations of scienter

4    where "[p]laintiff note[d] that it alleged that [defendant] knew there was a [geographical] effect

5    [on data]," because there were "no allegations that . . . defendants believed that they made false or

6    misleading statements relating to [the geographical] effect or that Defendants believed that they

7    were misrepresenting the statistical significance of their results.").  Similarly, although Plaintiffs

8    allege that CW #2 said that "Robin specifically was aware of this issue," they do not provide

9    allegations to allow the Court to infer that an awareness of so-called "outlier" patient data presents

10   an obvious danger of misleading investors about Phase I trial results.  CCAC at ¶ 41.  Similar to

11   the shortcomings regarding falsity discussed above, Plaintiffs fail to provide critical allegations

12   necessary to transform the false and misleading statements claim into more than a statistical

13   disagreement.

14        Plaintiffs additionally argue that Individual Defendants were aware that their presentation

15   of EXCEL trial data was misleading because "Defendants only once disclosed that their data for

16   the '30-fold increase' claim was outlier-driven," *id.* at ¶ 146, and Defendants had not "suggested a

17   non-culpable inference to explain away the allegations of scienter," Opp. at 14.  Neither of these

18   arguments meets the standard required under the PSLRA.  First, as detailed above, there are no

19   reliable allegations to support the assumption that the Figure 6 line graph is the source of the 30-

20   fold increase chart, undermining Plaintiffs' unsupported claims that Defendants tried to "obscure

21   this fact."  *Id.* at 15.  Second, Defendants do not bear the burden to offer nonfraudulent

22   explanations for their statements.  Instead, Plaintiffs must allege particularized facts that create a

23   strong inference of scienter that is "cogent and at least as compelling as any opposing inference of

24   nonfraudulent intent."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999),

25   *as amended* (Aug. 4, 1999).  They fail to do so here.

26        ii.    **Core Operations Theory**

27        Plaintiffs also argue that because "the development of NKTR-214 was crucial to the

28   financial viability and well-being of Nektar," there is a strong inference of scienter.  CCAC at

¶ 151.  "The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)).  "Proof under this theory is not easy.  A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports."  *Id.*  A plaintiff may also meet the standard "[i]n rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).  The Court finds that Plaintiffs fail to meet this heavy burden.

Under the first prong, Plaintiffs point to Defendants Robin, Zalevsky, and Doberstein's alleged misstatements and omissions to argue that because Defendants "repeatedly made material false statements," they "were aware of the status of its clinical trials."  CCAC at ¶ 153.  Plaintiffs further argue that "[t]his inference is furthered by the direct evidence of their involvement with the NKTR-214 program and their scientific, medical, and drug development backgrounds that would have qualified them to interpret the data and be aware of the industry norms for conducting clinical trials."  *Id.*  Pointing to Defendants' statements or their professional backgrounds does not suffice under this theory.  Instead, Plaintiffs must produce "specific admissions . . . of detailed involvement in the minutia of a company's operations," and none of Defendants' alleged misstatements provide such admissions.  *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062.

Plaintiffs' confidential witness allegations that Defendant Robin ordered the "outlier" patient to be included and the Executive Committee's role in deciding what data to present to the public are also insufficient.  Opp. at 21.  As Defendants note, Plaintiffs' argument in this regard appears based less on a core operations theory than on a repetition of its direct scienter argument.  *See* Opp. at 21; Reply at 12.  To the extent that Plaintiffs offer these allegations to show scienter directly, that effort fails for the reasons noted above.

United States District Court
Northern District of California

1    Finally, to the extent that Plaintiffs argue these allegations reflect Defendants' detailed

2    involvement with the NKTR-214 program, they do not add anything in light of Plaintiffs' global

3    failure to adequately allege falsity in the first place.  *See In re Biogen Inc. Sec. Litig.*, 857 F.3d 34,

4    44 (1st Cir. 2017) (finding that core operations allegations "inapt" where "the evidence [did] not

5    establish that, at the time the challenged statements were made, there existed reasonably accessible

6    data within the company materially contradicting those statements.").

7    Under the second prong, Plaintiffs argue that "[s]ecuring development support [from

8    BMS] was also of crucial importance to Nektar's operations," such that the core operations

9    inference is implicated.  Opp. at 21.  However, simply alleging that the partnership with BMS was

10   crucial does not give rise to a strong inference of scienter.  *See Norfolk Cty. Ret. Sys. v. Solazyme,*

11   *Inc.*, No. 15-cv-02938-HSG, 2018 WL 3126393, at *9 (N.D. Cal. June 26, 2018) (finding that

12   Plaintiffs failed to allege "specific involvement of the [d]efendants in the details of the purported

13   misrepresentations" even where the alleged misrepresentations concerned the "central

14   cornerstone" of defendants' strategy).

15   Even viewing Plaintiffs' scienter allegations holistically, the Court finds that Plaintiffs fail

16   to sufficiently allege a strong inference of scienter for the false and misleading statements claim.

17   *See Tellabs*, 551 U.S. at 326 ("the court's job is not to scrutinize each allegation in isolation but to

18   assess all the allegations holistically").  Accordingly, the Court **GRANTS** Defendants' motion to

19   dismiss the false or misleading statements claim for failure to allege scienter.

20   **V.   SCHEME LIABILITY CLAIM**

21   To allege a violation of Rule 10b–5(a) and (c), 17 C.F.R. § 240.10b–5(a) and (c), a

22   plaintiff must allege the same elements as a Rule 10b–5(b) claim, except that plaintiff's scheme

23   liability claim cannot be based solely on false or misleading statements, but must instead involve

24   deceptive conduct "beyond those misrepresentations or omissions."  *WPP Luxembourg Gamma*

25   *Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011).  Thus, to plead a scheme

26   liability claim, a plaintiff must allege: "(1) the defendant committed a deceptive or manipulative

27   act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged

28   deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the alleged

1    deceptive or manipulative act; (5) economic loss; and (6) loss causation." *Rabkin v. Lion*

2    *Biotechnologies, Inc.*, No. 17-cv-02086-SI, 2018 WL 905862, at *16 (N.D. Cal. Feb. 15, 2018);

3    *see also New York City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 996 (N.D. Cal. 2009).

4    Scheme liability allegations are subject to Rule 9(b)'s heightened pleading standards.  *In re Bank*

5    *of Am. Corp.*, No. 09-MD-02014 JSW, 2011 WL 740902, at *6 (N.D. Cal. Feb. 24, 2011) (citing

6    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 498 F.3d 87, 102 (2d Cir. 2007)).

7        **A.**    **Deceptive or Manipulative Act**

8          Defendants argue that Plaintiffs fail to allege a scheme liability claim due primarily a

9    failure to plead fraud with the specificity required under the PLSRA.  Mot. at 12–13.  Defendants

10   additionally argue that Plaintiffs fail to plead deceptive conduct or a connection between any

11   purported deceptive conduct and the investing public.  Mot. at 15–16.

12         Plaintiffs' scheme liability claim relates to allegations regarding the PIVOT-02 clinical

13   trial.  In support of this claim, Plaintiffs rely on factual allegations provided by CW #1, a former

14   Nektar Director of Clinical Development Operations who was "responsible for ensuring that

15   clinical trials were conducted in accordance with standard protocols and reported to Defendant

16   Tagliaferri," and CW #2.  CCAC at ¶ 38.  CW #1 represented that "Nektar directed that employees

17   not follow proper procedures for reading scans, which led to the presentations of inaccurate

18   overly-positive data about NKTR-214 clinical trial to the public."  *Id.* at ¶ 39.  Specifically,

19   "Nektar did not wait for research to conclude before making presentations, but instead used real-

20   time un-validated data, which is contrary to proper protocols.  This conduct . . . included

21   telephoning trial sites to obtain unverified patient data for inclusion in public presentations such as

22   the ASCO conference."  *Id.*  CW #2 additionally "reported that Nektar personnel, including Gergel

23   and Tagliaferri, or others working at their direction, would reach out to PIVOT-02 investigators—

24   medical doctors treating patients enrolled in the trial—to obtain data directly from study sites for

25   the purpose of including new, good data in medical conference posters and presentations and

26   investor presentations."  *Id.* at ¶ 44.  "[B]ad patient data would be excluded when the data was

27   received after a predetermined cut-off time, but . . . good patient data would be included in

28   presentations via an extension of the deadline."  *Id.*  CW #2 additionally "reported that the

United States District Court<br>Northern District of California

PIVOT-02 trial had an unusually high number of amendments and administrative letters to the study's protocol," and that these amendments and letters were "designed to exclude from the study patients who were too sick." *Id.* at ¶ 48. "[I]n addition to the formal protocol amendments designed to shape the patient population," Defendant "Tagliaferri . . . would call study sites to have them implement undocumented non-protocol criteria to exclude patients more likely to have a poor prognosis." *Id.*

Defendants first argue that these allegations lack the required specificity under Rule 9(b) and the PSLRA.  Mot. at 12–13.  "Federal Rule of Civil Procedure 9(b) requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme."  *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).  Here, Plaintiffs allege that the conduct observed by the former employees was contrary to "proper protocols."  CCAC at ¶ 45.  However, as Defendants note, Plaintiffs do not detail what these protocols are, and instead only allege that the requirement that "clinical trial data be validated, collected, and analyzed before being presented publicly" was not followed here. *Id.*  The Class Action Complaint takes for granted that Defendants' review of the PIVOT-02 trial data was deceptive, without actually explaining in detail what the data was, what industry standards require with regard to such data, how the data should have been prepared and presented to investors, and why Defendants' presentation did not meet those standards.  Allegations that Defendants did not follow "industry standards" because they included un-validated data gathered directly from investigators do not adequately explain why such conduct is deceptive.[8]  Without these critical allegations, the Court agrees with Defendants' argument that such references to "protocols" are "vague and conclusory" and cannot meet the PLSRA's pleading requirements. Reply at 11.

Accordingly, the Court **GRANTS** Defendants' motion to dismiss the scheme liability claim on this ground.

---

[8] While the term "cherry-picking" may suggest improper conduct, this is simply a conclusion and characterization.  Plaintiffs still fail to allege what data was at issue and why Defendants' selection of some data over other data was necessarily deceptive.

United States District Court
Northern District of California

### B.   Scienter

Defendants also argue that Plaintiffs fail to raise a strong inference of scienter as to their scheme liability claim. Mot. at 17–21. For this claim, Plaintiffs rely on allegations provided by confidential witnesses and stock sales made by Individual Defendants.

### i.   Direct Scienter

Plaintiffs rely primarily on allegations provided by CW #2 in order to tie the deceptive practice allegations directly to Individual Defendants. Similar to Plaintiffs' deceptive conduct allegations, the confidential witnesses do not provide the specific and particular facts necessary to give rise to a strong inference of scienter. Plaintiffs allege that that Individual Defendants knew that presenting un-validated clinical trial data was contrary to accepted industry and scientific protocol "[g]iven their industry backgrounds, advanced medical training, and experience in the drug development process," and further that "it is inconceivable that the Individual Defendants were unaware that these practices violated industry standards." *Id.* at ¶ 144. In addition to being devoid of particular facts, these allegations also provide no explanation as to why these actions are indicative of scienter. For instance, although Plaintiffs allege that calls were made directly to trial clinicians, they do not explain why calls to investigators to obtain trial data, on their own, would necessarily reflect knowledge or intent to deceive (given that not all studies are blind studies). Plaintiffs do allege that "[i]n an extreme example of Nektar trying to affect the PIVOT-02 patient population, CW #2 reported that Dr. Tagliaferri suspended an entire country's participation in the trial." *Id.* at ¶ 49. Specifically, "[b]ecause investigators in Poland were recruiting patients she thought were too sick, patient recruitment there was, at least temporarily, halted." *Id.* While this provides some particularized facts to support the allegations regarding the patient population, it again does not explain why such an action is inherently wrong or indicative of scienter. An "inference of scienter [must be] . . . at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Defendants' removal of certain patient populations during the development of a trial could be done for a number of practical or logistical reasons that are not deceptive. Without specific allegations explaining, for example, why the Defendants' decision to suspend trials in Poland was more likely than not made to deceive

investors, Plaintiffs fail to meet the PSLRA's pleading requirements.

### ii.   Stock Sales

Finally, Plaintiffs point to stock sales by four of the six Individual Defendants during the Class Period to support an inference of scienter.  CCAC at ¶¶ 159–63.  To determine whether stock sales are indicative of scienter, the Court must look to three factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (quoting *Silicon Graphics*, 183 F.3d at 986).  Here, Plaintiffs allege that Defendant Robin sold 808,636 shares of common stock (which represented about 64% of his personal holdings during the class period), Defendant Doberstein sold 701,261 shares (which represented about 87% of his personal holdings), Defendant Gergel sold 201,457 shares (which represented about 75% of his personal holdings), and Defendant Nicholson sold 422,611 shares (which represented 67% of his personal holdings).  CCAC at ¶¶ 160–63.

Although these figures, as well as the gross profits associated with these sales, appear significant, the Court finds these allegations are not sufficiently indicative of scienter.  The Individual Defendants' net sales and net profits are starkly lower than the gross figures cited in Plaintiffs' allegations due to Individual Defendants' concurrent common stock purchases, substantially undermining any inference of scienter.  *See e.g.*, Dkt. No. 66-23, Ex. 22 (Doberstein's Form 4s over the course of the Class Period showing significant common stock purchases).  Importantly, all of the sales by Defendants Doberstein, Robin, and Gergel, and almost half of the sales by Defendant Nicholson, were made under Rule 10b5-1 trading plans, which also weighs against an inference of scienter. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) ("Sales according to pre-determined plans may 'rebut [ ] an inference of scienter.'")  (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427–28 (9th Cir. 1994)); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) ("Stock trades are only suspicious when 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'") (quoting *Silicon Graphics*, 183 F.3d at 986).

United States District Court
Northern District of California

Plaintiffs also highlight Defendant Nicholson's discretionary sale of 220,144 shares on March 6 and 7, 2018.  CCAC at ¶ 163.  Significantly, this sale occurred as Nektar's price had been rising after announcing its partnership with BMS regarding the PIVOT-02 trial.  *See id.* at ¶ 37.  In fact, the stock price went past $100 for the first time during the class period just two days prior to Defendant Nicholson's discretionary sale, and continued to rise and stayed above $100 for over a month afterwards.  Dkt. No. 66-22, Ex. 21 at 11.  Given this historical context of the stock price, the Court does not find this sale indicative of scienter given the incentive for all holders to sell.  *See Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*, 838 F.3d 76, 85 (1st Cir. 2016) ("Such an increase—no matter what its cause—creates a substantial incentive for holders to sell unless they believe the price will continue to rise and are willing to wait. Sales in the historical context described in the complaint carry little force in implying knowledge that the stock will drop.").  Based on these factors, the Court agrees with Defendants that Individual Defendants' stock sales do not support an inference of scienter.

Because Plaintiffs' allegations fail to support a strong inference of scienter, individually and when viewed holistically, the Court also **GRANTS** Defendants' motion to dismiss Plaintiffs' scheme liability claim on this ground.

## VI.    LOSS CAUSATION

Finally, Defendants argue that Plaintiffs fail to plead loss causation.  Mot. at 21–25.  Because Plaintiffs' allegations as to loss causation apply to both claims, the Court analyzes this element separately.  "[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)).  This "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'"  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)).  However, this is not the only way to meet

United States District Court
Northern District of California

the pleading burden.  Instead, "loss causation is simply a variant of proximate cause," and "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* at 1210.  In other words, plaintiffs must show that the "the earlier misrepresentation" accounts for the loss, as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

Plaintiffs first contend that Defendants' "manipulat[ion of] the PIVOT-02 data" proximately caused the June 4, 2018 stock price drop.  CCAC at ¶ 125.  "Defendants' actionable omissions concerning their manipulative conduct and how it affected the publicly reported results of PIVOT-02 were a substantial factor in causing an artificial increase in Nektar's stock price," and "the release of less favorable data at the ASCO conference in June 2018 would not have come as such a shock" had Defendants not engaged in such conduct. *Id.* at ¶¶ 126–27.  On June 2, 2018, Dr. Diab allegedly reported much lower ORRs in mid-stage results for the PIVOT-02 trial. *Id.* at ¶¶ 53–54.

These allegations do not sufficiently plead loss causation for Plaintiffs' scheme claim. Importantly, as Defendants note, "Nektar's June 2, 2018 presentation reflected new developments in an ongoing clinical trial."  Mot. at 24.  Defendants provided "mid-stage" results of the PIVOT-02 trial in June 2018, while their previous presentation in November 2017, which Plaintiffs allege contained manipulated data, presented "early-stage" results. *See* CCAC at ¶ 126, 131.  Plaintiffs do not plausibly allege that the claimed manipulation of the PIVOT-02 data was the proximate cause of the stock price drop when the release of updated results (that missed expectations) led to a market reaction. *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018) (finding loss causation insufficiently pled where plaintiffs "at best, advance[] a narrative in which [the] stock price dropped on the disappointing news that a highly promising cancer therapy failed to clear its clinical trial"); *cf Loos v. Immersion Corp.*, 762 F.3d 880, 887–88 (9th Cir. 2014), *as amended* (Sept. 11, 2014) (explaining that Ninth Circuit "precedent requires a securities fraud plaintiff to allege that the market 'learned of and reacted to th[e] fraud, as opposed to merely

reacting to reports of the defendant's poor financial health generally.'") (quoting *Metzler Inv.*

*GMBH*, 540 F.3d at 1059).

In *Dura Pharmaceuticals*, the Supreme Court rejected the premise that "plaintiffs need

only establish, *i.e.*, prove, that the price on the date of purchase was inflated because of the

misrepresentation." 544 U.S. at 342 (internal quotation and citation omitted). Instead, the

Supreme Court found that even where "the inflated purchase price suggests that the

misrepresentation . . . 'touches upon' a later economic loss . . . it is insufficient" to plead loss

causation. *Id.* at 343. The Supreme Court explained:

> Normally, in cases such as this one (*i.e.*, fraud-on-the-market cases),
> an inflated purchase price will not itself constitute or proximately
> cause the relevant economic loss.
>
> For one thing, as a matter of pure logic, at the moment the transaction
> takes place, the plaintiff has suffered no loss; the inflated purchase
> payment is offset by ownership of a share that *at that instant* possesses
> equivalent value. Moreover, the logical link between the inflated
> share purchase price and any later economic loss is not invariably
> strong. Shares are normally purchased with an eye toward a later sale.
> But if, say, the purchaser sells the shares quickly before the relevant
> truth begins to leak out, the misrepresentation will not have led to any
> loss. If the purchaser sells later after the truth makes its way into the
> marketplace, an initially inflated purchase price *might* mean a later
> loss. But that is far from inevitably so. When the purchaser
> subsequently resells such shares, even at a lower price, that lower
> price may reflect, not the earlier misrepresentation, but changed
> economic circumstances, changed investor expectations, new
> industry-specific or firm-specific facts, conditions, or other events,
> which taken separately or together account for some or all of that
> lower price. (The same is true in respect to a claim that a share's
> higher price is lower than it would otherwise have been—a claim we
> do not consider here.) Other things being equal, the longer the time
> between purchase and sale, the more likely that this is so, *i.e.*, the
> more likely that other factors caused the loss.
>
> Given the tangle of factors affecting price, the most logic alone
> permits us to say is that the higher purchase price will *sometimes* play
> a role in bringing about a future loss. It may prove to be a necessary
> condition of any such loss, and in that sense one might say that the
> inflated purchase price suggests that the misrepresentation (using
> language the Ninth Circuit used) 'touches upon' a later economic loss.
> But, even if that is so, it is insufficient. To 'touch upon' a loss is not
> to cause a loss, and it is the latter that the law requires. 15 U.S.C.
> § 78u–4(b)(4).

*Id.* at 342–43 (emphasis in original; citations omitted). Thus, even though Plaintiffs allege that the

stock price was artificially inflated due to Defendants' deceptive conduct, the June 2, 2018 "mid-

United States District Court
Northern District of California

1    stage" results constitute a later event which "account[ed] for some or all that lower price." *Id.* at

2    343.  Accordingly, Plaintiffs fail to establish loss causation as to the Rule 10b-5(a) and (c) scheme

3    liability claim.

4            Plaintiffs allegations regarding the June 4, 2018 price drop similarly fail to establish loss

5    causation as to the Rule 10b-5(b) false statements claim.  As alleged, the data that was revealed on

6    June 2, 2018 related only to the PIVOT-02 trial.  Each of the allegedly false statements pled in the

7    Consolidated Class Action Complaint relates exclusively to the EXCEL trial, specifically the 30-

8    fold increase chart.  Plaintiffs allege nothing to connect the June 4, 2018 stock price drop from

9    mid-stage results in the PIVOT-02 trial with the challenged statements regarding the 30-fold

10   increase chart beyond the conclusory argument that "the concealed risk from both the false

11   statements about the EXCEL trial . . . and manipulation of PIVOT-02 data . . . worked together to

12   create unrealistic expectation for future NKTR-214 results."  Opp. at 23.  This does not meet the

13   standard required by the PSLRA: nothing in the Complaint plausibly establishes that Defendants'

14   misstatements about the EXCEL clinical trial, as opposed to some other fact, caused Plaintiffs'

15   June 4, 2018 loss.  *See Lloyd*, 811 F.3d at 1210.

16           Plaintiffs next contend that that the October 1, 2018 Plainview Report constituted a

17   corrective disclosure of Nektar's false and misleading presentation of its clinical trial data.  CCAC

18   at ¶¶ 132–36.  Importantly, however, Plainview indicated that the Report was prepared with

19   publicly-available data.  *See* Dkt. No. 66-19 (Ex. 18) at 2 (acknowledging that the information in

20   the Report "is based upon selected public market data.").  Thus, the Report cannot constitute new

21   information unknown to the market.  Instead, "the mere repackaging of already-public information

22   by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."  *Meyer v.*

23   *Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597

24   F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed

25   facts does not constitute a corrective disclosure of anything but the journalists' opinions.").  As the

26   Eleventh Circuit aptly observed, "If every analyst or short-seller's opinion based on already-public

27   information could form the basis for a corrective disclosure, then every investor who suffers a loss

28   in the financial markets could sue under § 10(b) using an analyst's negative analysis of public

United States District Court
Northern District of California

filings as a corrective disclosure.  That cannot be—nor is it—the law." *Meyer*, 710 F.3d at 1199.

Because Plaintiffs fail to establish loss causation under either claim, the Court **GRANTS** Defendants' motion to dismiss on loss causation grounds.

## VII.   CONCLUSION

For the reasons noted above, the Court **GRANTS** Defendants' motion to dismiss all of Plaintiffs' claims **WITH LEAVE TO AMEND**.[9]  Any amended complaint must be filed within twenty-eight (28) days of the date of this order.

When preparing an amended complaint, Lead Plaintiffs are further ordered to prepare a statement-by-statement chart of the information required by 15 U.S.C. § 78u-4(b)(1) and (2) that specifically identifies: (A) each statement or action alleged to have been false or misleading, (B) the reasons the statement or action was false, misleading, or deceptive when made, and (C) if an allegation regarding the statement or omission is made on information and belief, all facts on which the belief is formed.  The chart should clearly identify which statements or omissions are attributable to which defendants, and include a detailed statement of the facts giving rise to a strong inference that each defendant acted with the required state of mind.  Plaintiffs should also summarize their allegations regarding what each defendant knew with regard to the statement or omission, and when they knew it.  Such a chart should be included within any amended complaint or attached to any amended complaint.  For guidance on the format for such a chart, the Court directs Lead Plaintiffs to review *In re NVIDIA Corp. Sec. Litig.*, 18-cv-07669-HSG, Dkt. No. 149-2.

**IT IS SO ORDERED.**

Dated:  7/13/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[9] Plaintiffs' claim under Section 20(a) of the Securities Act is expressly premised on the Section 10(b) claims.  CCAC ¶¶ 199–203.  Since Plaintiffs fail to allege a Section 10(b) claim against Defendants for the reasons noted above, the Section 20(a) claim must be **DISMISSED**.  *See Zucco*, 552 F.3d at 990.