Thomas A. Dubbs (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Marisa N. DeMato (*pro hac vice*)
James E. McGovern (*pro hac vice*)
Thomas G. Hoffman (*pro hac vice* pending)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
mcanty@labaton.com
mdemato@labaton.com
jmcgovern@labaton.com
thoffman@labaton.com
*Attorneys for Lead Plaintiffs*

James M. Wagstaffe (#95535)
**WAGSTAFFE, VON LOEWENFELDT, BUSCH &
RADWICK, LLP**
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com
*Liaison Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| IN RE NEKTAR THERAPEUTICS SECURITIES LITIGATION | **Case No.: 4:18-cv-06607-HSG**<br><br>**SECOND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Hon. Haywood S. Gilliam, Jr.** |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ..................................................................................... 1

II.     PARTIES ................................................................................................................. 4

III.    JURISDICTION AND VENUE ............................................................................... 6

IV.     FACTUAL ALLEGATIONS .................................................................................... 6

        A.      The Immune System ................................................................................... 6

        B.      Nektar Rolls Out Its False "30-Fold" Increase Narrative ................................... 14

        C.      Nektar Reports Positive PIVOT-02 Data at SITC 2017 .................................... 17

        D.      Investors React to "Disappointing" PIVOT-02 Data at ASCO 2018 .................. 18

        E.      Despite Poor Clinical Trial Results From EXCEL, Nektar Maintains Its
                False "30-Fold" Increase Claim Regarding the PIVOT Trial .............................. 19

        F.      The October 1, 2018 Plainview Report Reveals That The 30-Fold Increase
                Claim Was Driven by a Single Outlier Patient ..................................................... 20

        G.      Nektar Responds to Plainview and Plainview Replies to Nektar;
                Plainview's Central Arguments Are Not Challenged ........................................... 25

V.      Post-Class Period Information Confirms the Plainview Report .................................... 26

VI.     Additional Evidence the EXCEL Data Was Outlier-Driven ........................................ 26

        A.      CW # 2 Confirms the Inclusion of The Outlier Patient Drove The 30-Fold
                Increase Claim ................................................................................................... 26

        B.      Expert Analysis Also Indicates The 30-Fold Increase Claim Was Driven
                by an Outlier Patient .......................................................................................... 27

                1.      The Inclusion of Outlier Data from Patient 14 Skewed The 30-Fold
                        Increase Claim ....................................................................................... 28

                2.      Inclusion of the Outlier Patient Was Contrary to Industry and
                        Scientific Standards ............................................................................... 31

VII.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS .............................. 34

        A.      The January 2017 JP Morgan Conference ........................................................... 34

        B.      The March 2017 Cowen and Company Conference ............................................. 36

        C.      The May 2017 UBS Conference .......................................................................... 38

        D.      The June 2017 ASCO Analyst & Investor Meeting ............................................. 39

E.      The June 2017 Jefferies Conference ...............................................41

F.      The November 2017 Release of PIVOT-02 Results..........................43

G.      The November 2017 Jefferies London Healthcare Conference..........44

H.      The November 2017 Piper Jaffray Annual Healthcare Conference ....47

I.      The January 2018 JP Morgan Healthcare Conference.......................48

J.      The March 2018 Cowen & Company Conference ............................50

K.      The June 2018 Mechanism of Action Video ...................................51

L.      The June 2018 Jefferies Conference ..............................................52

VIII.   LOSS CAUSATION.................................................................................54

A.      Defendants' False and Misleading Statements and Omissions Artificially Inflated the Price of Nektar's Common Stock (NKTR) .................................54

B.      The Price of Nektar's Common Stock Fell Dramatically When The PIVOT-02 Clinical Trial Failed to Meet Expectations Set by Nektar's Fraudulent Statements, Omissions and Actions...................................................55

        1.      June 4, 2017 – Corrective Disclosure  and/or Materialization of Concealed Risk ...........................................................................55

                (a)      The Market Was Surprised by the PIVOT-02 Trial Results Because Nektar Had Misled Investors About the Performance of NKTR-214 in Previous Clinical Trials ..............55

                (b)      Market Commentators Confirmed the Cause of Nektar's Share Price Decline on June 4, 2018 .........................................56

C.      October 1, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk: The Plainview Report Revealed that Nektar Had Misrepresented the Performance of NKTR-214 .................................................57

        1.      The Market Reacted  Negatively to the Plainview Report .....................57

        2.      As a Result of Defendants' Fraudulent Conduct, the Price of Nektar Common Stock Was Inflated .......................................................58

IX.     MATERIALITY ........................................................................................58

X.      ADDITIONAL ALLEGATIONS SUPPORTING  THE INDIVIDUAL DEFENDANT'S SCIENTER.......................................................................60

A.      Defendants Acted with Conscious Misbehavior or Recklessness .....................60

1.    Defendants Were Familiar with the Excel Dataset and Knew That Including Outlier Patient Data Was Misleading ....................................... 60

2.    Defendants Hid the Source of the 30-Fold Increase Claim Based on The EXCEL Data ................................................................................. 61

3.    Defendants Misleading Presentation of The EXCEL Data Was Part of a Broader Effort to Create Misleading Positive Clinical Trial Data ........................................................................................................ 64

4.    Development of NKTR-214 Was Core to Nektar's Operations and the Individual Defendants Were Directly Involved in It ......................... 70

5.    Defendants Did Not Deny Their Conduct When Confronted with the Claim That They Misrepresented Their Data .................................. 70

B.    Defendants Had the Motive and Opportunity to Commit the Alleged Fraud ...................................................................................................... 71

1.    The Development of NKTR-214 Was of Crucial Importance to Defendants .............................................................................................. 71

2.    Defendants' Insider Trades Evince Strong Evidence of Motive ............. 72

XI.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE ........................................... 73

XII.    PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET ................................ 73

XIII.    CLASS ACTION ALLEGATIONS ................................................................................ 75

FIRST CLAIM FOR RELIEF (For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants) .................... 76

SECOND CLAIM FOR RELIEF (For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants) ........................................................................... 78

XIV.    REQUEST FOR RELIEF ............................................................................................... 79

XV.    JURY DEMAND ............................................................................................................ 80

Plaintiffs Oklahoma Firefighters Pension and Retirement System and El Paso Firemen & Policemen's Pension Fund (together, "Lead Plaintiff"), by their undersigned attorneys, hereby bring this Second Consolidated Class Action Complaint ("Complaint") against Nektar Therapeutics ("Nektar" or the "Company"), Howard W. Robin, Stephen K. Doberstein, and Jonathan Zalevsky (together, the "Individual Defendants" and collectively with Nektar, "Defendants"). The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of Nektar and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (*e.g.*, CW # 1)), review and analysis of publicly available information, and consultations with experts. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

I.   **NATURE OF THE ACTION**

1.   Lead Plaintiff brings this action on behalf of a class of purchasers of the common stock of Nektar who bought their shares between January 10, 2017 and September 28, 2018, inclusive (the "Class Period"), and were damaged thereby (the "Class").

2.   Lead Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), based on Defendants' misstatements and omissions concerning clinical trials for Nektar's "flagship" drug, NKTR-214.[1]

3.   The concept behind NKTR-214 was straightforward: find a way to increase the immune system's cancer-fighting cells within tumors without increasing production of cells that

---

[1] NKTR-214 is now known as Bempegaldesleuken but was referred to during most of its development as "NKTR-214" in Company publications, investor calls and presentations. Accordingly, it will be referred to herein as NKTR-214.

suppress the body's immune system.  Historically, putting this concept into practice has proven difficult.  The scientific community has known for decades that a human protein called Interleukin-2, or IL-2, triggers the body's production of cancer-fighting cells. Indeed, Defendant Robin, Nektar's President and CEO, has described IL-2 as the "master growth factor" for cancer-fighting cells. As explained by Robin, IL-2 "stimulates the immune system, and that's very, very important." But IL-2 also triggers the production of immunosuppressive cells, which are also known as "Treg" cells. IL-2 has long been an approved cancer therapy but, as explained by Defendant Robin, "you have to give significant quantities of native IL-2 to get any kind of effect, and at that point it's wildly toxic."

4. To turn the concept—increasing cancer-fighting cells while not increasing immunosuppressive cells—into reality, Nektar created NKTR-214, a modified version of Interleukin-2.  Defendant Robin touted NKTR-214 as "unique" because it was "designed" to "produce significant quantities" of cancer-fighting cells "without affecting the production" of immunosuppressive cells.

5. To prove NKTR-214 could increase cancer-fighting cells in a tumor without expanding immunosuppressive cells, the Company conducted a clinical trial called EXCEL. Although properly analyzed initial results were negative, the Defendants repeatedly represented to the investing public that NKTR-214 produces a "30-fold increase," or 30 times, in cancer-fighting cells with almost no increase in immunosuppressive cells. Those claims were false. Specifically, Defendants' "30-fold increase claim was false for at least two reasons:

    1) <u>Intentional use of outlier data</u>: Defendants knowingly included outlier data derived from a single patient who exhibited a unique and significant increase in cancer-fighting cells, which dramatically skewed the results of the trial, as reported to the marketplace.

    2) <u>Misrepresentation of the dosing schedule</u>: Defendants falsely claimed that the patients in the trial were dosed with NKTR-214 every three weeks when, in fact, two of the patients used to support the 30-fold increase claim—including the outlier patient—were dosed every two weeks.

6.    Nonetheless, during the Class Period, Defendants repeatedly touted their false "30-fold increase" claim at least 11 times in presentations to the public.

7.    In part to develop further evidence that NKTR-214 could improve the lives of cancer patients, the Company began conducting a Phase 2 clinical trial of NKTR-214, called PIVOT-02, which is still ongoing. PIVOT-02 was designed to evaluate the combination of NKTR-214 and Opdivo, an approved anti-cancer agent from Bristol Meyers Squibb ("BMS").

8.    Because Defendants' fraudulent conduct in presenting the EXCEL data had inflated expectations for the drug, a risk was created that negative data from PIVOT-02 would remove this inflation from Nektar's share price.  On Saturday, June 2, 2018,  that undisclosed risk was realized: Nektar publicly presented further results from the PIVOT-02 trial, which contemporaneous news reports characterized as "disappointing" and "confusing" because the treatment's effectiveness was shown to have dramatically dropped as evidenced by a declining "response rate" from 85% to 50%. The market's reaction was dramatic: on Monday, June 4, Nektar's stock price closed at $52.57, a *41.82%* decline from the prior close on Friday, June 1. Defendants' fraud was a substantial factor in causing investors' economic losses on Monday, June 4, 2018.

9.    Defendants' fraud was also a substantial factor in causing investors' economic losses later on October 1, 2018. On Monday, October 1, 2018, Plainview LLC ("Plainview"), a short-seller of Nektar stock, published a detailed report fundamentally challenging the Company's claim that NKTR-214 significantly increased cancer-fighting cells in tumors (the "Plainview Report"). The Plainview Report characterized Nektar's "30-fold" increase claim as "Brazenly Misleading," and it provided a link to the source data for the initial clinical trial of NKTR-214, revealing the falsity of Defendants' prior statements concerning EXCEL.

10.    That day, Nektar's stock price dropped by $3.89, a 7% decline from its closing price on Friday, September 28, 2018.

## II.    PARTIES

### Lead Plaintiff

11.    Oklahoma Firefighters Pension and Retirement System ("OFPRS") is a defined-benefit pension plan headquartered in Oklahoma City, Oklahoma. OFPRS purchased Nektar common stock at artificially inflated prices during the Class Period and has, accordingly, been damaged by Defendants' wrongful conduct. Attached hereto at Tab A is a certification reflecting OFPRS's transactions in Nektar common stock during the Class Period.

12.    El Paso Firemen & Policemen's Pension Fund ("El Paso FPF") is a defined-benefit pension plan headquartered in El Paso, Texas. El Paso FPF purchased Nektar common stock at artificially inflated prices during the Class Period and has, accordingly, been damaged by Defendants' wrongful conduct. Attached hereto at Tab B is a certification reflecting El Paso FPF's transactions in Nektar common stock during the Class Period.

### Defendants

13.    Nektar Therapeutics holds itself out as "a research-based biopharmaceutical company that discovers and develops innovative medicines in areas of high unmet medical need."[2] Nektar's research and development pipeline of new investigational drugs includes treatments for cancer, autoimmune disease, and chronic pain. Nektar is incorporated in Delaware, with principal executive offices located at 455 Mission Bay Boulevard South, San Francisco, California 94158. Nektar's common stock is traded under the symbol "NKTR" on the NASDAQ.

14.    Howard W. Robin was, at all relevant times, Nektar's President and Chief Executive Officer, and a Director of the Company. Robin became Nektar's President and CEO in 2007. Robin was a direct and substantial participant in the fraud, who also profited from the sale of Nektar securities at artificially inflated prices during the Class Period and received substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful

---

[2] Nektar 2017 10-K at 4.

conduct set forth herein. During the Class Period, Robin sold approximately 808,000 shares of Nektar stock, recognizing more than **$38 million** in proceeds.

15.     Stephen K. Doberstein, PhD., was, at all relevant times, an employee of Nektar, serving as Senior Vice President and Chief Scientific Officer until he was promoted to his current position, Senior Vice President, Research and Development and Chief Research and Development Officer, in November 2017. Doberstein was a direct and substantial participant in the fraud, who also profited from the sale of Nektar securities at artificially inflated prices during the Class Period and received substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein. During the Class Period, Doberstein sold approximately 701,000 shares of Nektar stock, recognizing more than **$29 million** in proceeds.

16.     Jonathan Zalevsky, PhD., was, at all relevant times, an employee of Nektar, serving as Senior Vice President, Research Biology and Preclinical Development until he was promoted to his current position, Chief Scientific Officer, in December 2017. Zalevsky was a direct and substantial participant in the fraud, who received substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein.

17.     The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of Nektar, possessed the power and authority to control, and did ultimately control, the contents of Nektar's SEC filings, press releases, content on the Company's website, and other market communications during the Class Period. The Individual Defendants were provided with copies of the Company's reports and other releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and their access to material information available to them, the Individual Defendants knew that the adverse facts specified herein had not been adequately disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## III.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

20.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Nektar's principal executive offices are located within this Judicial District.

21.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## IV.    FACTUAL ALLEGATIONS

### A.    The Immune System

22.    The body's immune system is a complex network of cells, tissues, organs, and the substances they produce, all working in concert to rid the host body of unwanted organisms and substances, such as pathogenic (disease causing) microbes, toxins, allergens, and damaged or abnormal cells:

> The immune system protects the body from possibly harmful
> substances by recognizing and responding to antigens. Antigens
> are substances (usually proteins) on the surface of cells, viruses,
> fungi, or bacteria. Nonliving substances such as toxins, chemicals,
> drugs, and foreign particles (such as a splinter) can also be

antigens. The immune system recognizes and destroys, or tries to destroy, substances that contain antigens.[3]

23.     The body's "immune response" to potentially harmful antigens includes attacking them with protective proteins called antibodies, which are designed to neutralize or kill antigens. The immune response may also include subsets of leukocytes (white blood cells), in particular, subsets of white blood cells comprising certain lymphocytes that can recognize antigens themselves and destroy the cell, bacteria, parasite or virus that bears that antigen.

24.     Although more than 80 immune cell subsets have been recognized to date, this Complaint will focus primarily on a few cell types. The term leukocytes, or white blood cells, refers broadly to several specialized types of immune system cells that help the body fight infection and other diseases. Leukocytes begin as hematopoietic stem cells that are created in the bone marrow. Through a process called cellular differentiation, hematopoietic stem cells become progressively more mature, becoming specialized into different "daughter" cell types. As shown in Figure 1, below, stem cells can differentiate into common lymphoid progenitor cells or myeloid stem cells, which can then further differentiate into a number of different immune system cells:

[3] https://medlineplus.gov/ency/article/000821.htm

**FIGURE 1[4]**



25.     "The family of leukocytes is comprised of lymphocytes, monocytes, eosinophils, basophils, and neutrophils." As shown in Figure 1, the lineage of the latter four types of leukocytes is by way of myeloid stem cells. The four lines of cells that descend from common lymphoid progenitor cells are lymphocytes. They include B lymphocytes or B cells (so named because they differentiate in the bone marrow), natural killer cells, T lymphocytes or T cells (so named because they differentiate in the thymus), and NK-T cells.

26.     T cells are among the immune cell subsets on which this Complaint will focus. T cells themselves form further subsets; they go through a further process of differentiation to

---

[4] David D. Chaplin, M.D., PhD, *Overview of the Immune Response*, J. Allergy Clin Immunol., 125 (Feb. 2010)

form several kinds of more specialized T cells which, broadly speaking, can be divided into two groups—killer T cells and helper T cells.

27.    There are proteins and sugars that are characteristically found on the surface of certain cells that, due to their unique presence on certain cell types, serve as markers of that cell type.  These structures can be used to define functionally distinct subsets of leukocytes, including subsets of T cells. These structures do not generally induce an immune response within the same species; however, they serve as antigens should that cell type be introduced to a different species (e.g., in the case of a human cell injected into a mouse).  Thus, these markers serve as antigens, and antibodies made against them can be used to identify the cells bearing the given marker (e.g. an antibody raised in a mouse that will detect that human antigen on the human cell surface).  The T cell surface antigens (markers) primarily discussed in this Complaint are called "differentiation antigens."

28.    Hundreds of differentiation antigens have been identified by an international council called "Human Cell Differentiation Molecules (HCDM)" that organizes periodic Human Leukocyte Differentiation Antigen (HLDA) Workshops at which newly identified cell surface molecules are defined, registered, and assigned cluster of differentiation (CD) numbers.

29.    CD8+ T cells (cytotoxic T cells) express the Cluster of Differentiation antigen "8" (hence, "CD8") glycoprotein on their surface. One key role that CD8+ T cells play in the immune system is killing infected or malignant cells. "Resting naive CD8+ T cells have an astounding capacity to react to pathogens by massive expansion and differentiation into cytotoxic effector cells that migrate to all corners of the body to clear the infection."[5]

30.    The T cells bearing Cluster of Differentiation molecule "4" (the "CD4" marker) are "helper" T cells. CD4+ T cells (*i.e.*, T cells that express the CD4 glycoprotein on their surface) further differentiate into subsets, including "regulatory" T cells, also known as Treg cells, or Tregs. Tregs play a role in regulating or suppressing other cells in the immune system.

[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3303224/

Among other things, Tregs suppress activation and proliferation of CD8+ T cells. Indeed, Tregs suppress almost every kind of effector cells; in addition to CD8+ T cells, Tregs also suppress CD4$^+$ T cells, B cells, and NK cells. Nektar describes CD4+ regulatory T cells as "a type of cell that can suppress tumor-killing T cells."[6]

31.     Under certain conditions, promoting the proliferation of Tregs and suppressing the body's immune response is considered desirable, for instance to try to reduce organ transplant rejection rates. With chronic infection or malignancy, however, suppressing the body's immune response is undesirable.

### 1.     Cancer and the Role of Interleukin-2 in Immunotherapy

32.     A critical aspect of an "immune response" is the ability of the immune system to distinguish between the "self" host body and "non-self" cells and substances. The goal of a properly regulated immune response is to protect the host without causing undue damage to the host's "self" tissues.

33.     "Cancer" is a catchall term "for diseases in which abnormal cells divide without control and can invade nearby tissues."[7] Cancer cells originate from the human host, but they can be recognized by the immune system as "non-self" due to changes in their cell surface structures. To survive, cancer cells must evade recognition by the body's immune system. One of the "universally recognized" characteristics of cancer is "evading immune destruction."[8]

34.     The area that surrounds and feeds a tumor, including normal cells, molecules, and blood vessels, is called the "tumor microenvironment." A cancerous tumor only becomes clinically apparent once it has evaded immune destruction by creating a tumor microenvironment that is immunosuppressive.

---

[6] https://www.nektar.com/pipeline/rd-pipeline/nktr-214

[7] https://www.cancer.gov/publications/dictionaries/cancer-terms/def/cancer; *see also* https://www.health.harvard.edu/topics/cancer.

[8] Maonan Wang, *et al.,Role of tumor microenvironment in turmorigenesis,* 8 J. of Cancer (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5381164/pdf/jcav08p0761.pdf.

35.    Immunotherapy refers to cancer treatments that seek to leverage a patient's own immune system to attack cancer cells in the patient's body. The immunosuppressive tumor microenvironment is a type of camouflage that allows cancerous cells to survive, replicate, and spread. Immunotherapy broadly describes treatments developed in an attempt to remove the camouflage so that the patient's immune system can attack and kill the cancer cells.

36.    Tumors utilize multiple mechanisms for evading the immune system. Cancer researchers have accordingly pursued multiple types of cancer immunotherapy strategies, including, among others, the use of monoclonal antibodies, vaccines, and cytokines.

37.    Cytokines are proteins that cells release that have specific effects on the interactions and communications between nearby cells. One such cytokine that all T cells rely on for their survival is called "Interleukin-2" (abbreviated as "IL-2"). T cells produce IL-2, and it is a potent T-cell growth factor. In other words, IL-2 promotes T cell proliferation. Nektar has called IL-2 "The Central Immuno-Stimulatory Cytokine."[9]

38.    IL-2 is also essential for the development and maintenance of Treg cells, which regulate or suppress cytokine production of CD4+ T cells and CD8+ T cells. IL-2 thus has pleiotropic effects in that it plays a role both in activating and in suppressing the body's immune response.

39.    Recombinant DNA technology allows for industrial scale production of recombinant human ("rh") substances, including cytokine proteins. Recombinant human Interleukin-2, or rhIL-2, known as aldesleukin, was the first cancer immunotherapy, and one of the first recombinant proteins, approved by the United States Food and Drug Administration ("FDA"). Aldesleukin was first approved to treat malignant melanoma in 1992, and was later approved for use in patients with renal cell carcinoma.

40.    IL-2 therapy "has been used with success in curing metastatic renal cell carcinoma and melanoma in a small minority of patients. However, the benefits can be

[9] Howard Robin, *Nektar, Jefferies 2016 Healthcare Conference*, 11 (Jun. 6, 2016).

accompanied by severe toxicity."[10] Severe side effects with IL-2 therapy, such as such as hypotension and vascular leak syndrome, limit maximal dosing, and therefore limit the number of patients able to receive treatment and potential cure. Hypotension is the medical term for abnormally low blood pressure. Vascular or capillary leak syndrome "is a life-threatening toxicity resembling septic shock that may occur with intravenous high-dose IL-2. The increased IL-2 in the circulation and immune stimulation [may cause] massive cytokine release and inflammatory reaction. Capillaries become more permeable, leading to the loss of intravascular fluid into extravascular space."[11]

### 2. IL-2 Receptors and the Effects of IL-2 on T Cells

41.    As noted above, cytokines can affect nearby cells. *How* cytokines affect nearby cells, and in particular how IL-2 interacts with T cells, is important in understanding how NKTR-214 purports to differ from rhIL-2.

42.    Cytokines are a type of extracellular signaling molecule—a cue designed to transmit specific information to target cells, and they are recognized by specific proteins, called receptors, on the surface of target cells. Once recognized, they initiate intracellular signaling cascades that elicit specific cellular responses.

43.    IL-2 is recognized by specific cell surface proteins called IL-2 receptors. More specifically, IL-2 "binds" to three classes of cell surface receptors formed by various combinations of three IL-2 receptor (IL-2R) subunits, each of which is identified by its cluster of differentiation (CD) antigens. They are: the IL-2 receptor alpha (α) subunit (CD25), beta (β) subunit (CD122), and gamma (γ) subunit (CD132).

44.    IL-2 binds to its receptors at different affinities. When all three IL-2 receptor subunits (IL-2Rαβγ) are present, they have "high" binding affinity to IL-2. The combination of

[10] Laura A. Pachella, RN, MSN, AGPCNP-BC, AOCNP et al., The Toxicity and Benefit of Various Dosing Strategies for Interleukin-2 in Metastatic Melanoma and Renal Cell Carcinoma, 6 J. Adv. Pract. Oncol (May/Jun. 2015). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4625627/pdf/jadp-06-212.pdf.

[11] *Id.*

beta and gamma subunits (IL-2Rβγ) have "intermediate" binding affinity, and a single IL-2 receptor subunit has "low" binding affinity to IL-2.

45. "At high doses, IL2 binds to … IL2Rβγ [the beta-gamma] receptor leading to desired expansion of tumor killing CD8+ memory effector T (CD8 T) cells."[12] But (a) as just noted, IL-2 binds to receptor IL2Rαβγ with greater affinity and (b) Tregs express high levels of the α-chain, meaning that high doses of IL-2 also expand immunosuppressive Treg cells. Expansion of Tregs represents an undesirable effect of rhIL-2 for cancer immunotherapy.

### 3. The Concept Behind NKTR-214

46. NKTR-214 was developed as an "engineered" cytokine. Nektar holds out NKTR-214 as "a novel CD122-biased cytokine designed to preferentially activate the beta and gamma sub-units of the IL-2 receptor in order to proliferate tumor-killing T cells within the body (CD8-positive effector T cells and natural killer T cells) without stimulating regulatory T cells (CD4-positive T cells)."[13]

47. The purported "bias" towards CD122—the beta (β) IL-2 receptor subunit—is by virtue of a process called PEGylation. The P-E-G in PEGylation stands for polyethylene glycol. PEGylation is the process by which biological molecules such as IL-2 are modified by chemically linking them to chains of PEG molecules. PEGylation has become a leading drug delivery approach for proteins, in part because PEGylated molecules tend to display prolonged circulatory times—it takes longer for the body to clear a PEGylated molecule, thereby extending the biologic "half life" of the PEGylated molecule.

48. A February 2016 article published in Clinical Cancer Research and co-authored by more than 20 Nektar employees sets forth the hypothesis for NKTR-214:

---

[12] Deborah H. Charych, *et al.. NKTR-214, an Engineered Cytokine With Biased IL2 Receptor Binding, Increased Tumore Exposure, and Marked Efficacy in Mouse Tumor Models*, 22 Clinical Cancer Research 680 (Feb. 1, 2016) https://clincancerres.aacrjournals.org/content/clincanres/22/3/680.full.pdf.

[13] https://www.prnewswire.com/news-releases/nektar-announces-first-patient-dosed-in-phase-12-clinical-study-of-nktr-214-a-cd122-biased-immuno-stimulatory-cytokine-300189411.html.

> We hypothesized IL2 conjugation with polyethylene glycol (PEG) could be used to mask the region of IL2 that interacts with the IL2Rα subunit responsible for activating immunosuppressive Tregs, biasing activity towards tumor killing CD8+ T cells. PEGylation could alter the immunostimulatory profile of aldesleukin without mutation of its amino acid sequence while creating an inactive prodrug, mitigating rapid systemic immune activation, and improving tolerability.[14]

49.     Another article co-authored by Nektar employees states that "[t]he design uses the same amino acid sequence of FDA-approved aldesleukin with the addition of multiple releasable polyethylene glycol (PEG) chains located at the region of IL2 that binds to the IL2Rα subunit of the heterotrimeric IL2Rαβγ complex." Whereas "[f]ree-IL2 protein is undetectable *in vivo* as it is eliminated faster than formed," with administration of NKTR-214 "the PEG chains slowly release, creating a cascade of increasingly active IL2 protein conjugates bound by fewer PEG chains. The 1-PEG-IL2 and 2-PEG-IL2 species derived from NKTR-214 are the most active conjugated-IL2 species."[15]

**B.     Nektar Rolls Out Its False "30-Fold" Increase Narrative**

50.     In December 2015, Nektar announced that the first human patients had been dosed with NKTR-214 in a Phase 1 clinical trial, EXCEL, for patients with advanced solid tumors.  On January 10, 2017, Defendant Robin gave a presentation at the annual JP Morgan Healthcare Conference. Robin spoke at length, demonstrating his expertise in the topic of immuno-oncology, and with the mechanism of action of NKTR-214, in particular:

---

[14] Deborah H. Charych, *NKTR-214, an Engineered Cytokine With Biased IL2 Receptor Binding, Increased Tumore Exposure, and Marked Efficacy in Mouse Tumor Models*.

[15] Deborah H. Charych, et al., *Modeling the receptor pharmacology, pharmacokinetics, and pharmacodynamics of NKTR-214, a kinetically-controlled interleukin-2 (IL2) receptor agonist for cancer immunotherapy* Plos One (July 5, 2017) https://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0179431&type=printable.

Let's start with NKTR-214. Now IL-2, as many of you know, is the master growth factor for T cells and natural killer cells. . . . And that stimulates the immune system, and that's very, very important. But . . . that causes the proliferation of CD4 regulatory T [immunosuppressive] cells. And consequently, you're starting to — you're trying to stimulate the immune system at the same time you're down-regulating the immune system. And that therapeutic window is very, very tight . . . it's wildly toxic.

So what we've done with NKTR-214 is something unique. We've designed a new IL-2 molecule with a biased action to the beta gamma receptors [where] *you can produce significant quantities of CD8-positive T [cancer-fighting] cells without affecting the production or the proliferation of regulatory T [immunosuppressive] cells*.

51.    As he spoke, Defendant Robin displayed slides prepared for the presentation. One slide showed that cancer-fighting cells increased by an average of 30-fold in the tumors of purportedly ten patients dosed with NKTR-214 every three weeks,[16] with very little change in their immunosuppressive Treg cells.  (The chart is reproduced at ¶77).   While the "30-fold increase" slide was being displayed, Defendant Robin stated as follows:

So here's some data from the Phase I trial. Demonstrating — and these are 10 patients where we have tumor biopsies. *And you can clearly see that we had a significant increase in [cancer-fighting] CD8-positive T-effector cells with no increase in T-reg cells. . . . So very, very pleased with these results.* The Phase I study was designed to show these biomarkers. And this is clearly what we set out to do, cause the proliferation of T-effector [cancer-fighting] cells and not cause the proliferation of regulatory T [immunosuppressive] cells. (emphasis added)

---

[16] Specifically, the cancer-killing cells at issue are tumor cell-directed NK and cytotoxic T-cells.

52.    As discussed below, this claim was deliberately misleading, ignoring that the result was driven by a single outlier patient.

53.    Subsequently, Defendants repeatedly presented slides containing in every case this same "30-fold increase" claim, in addition to other falsehoods related to patient numbers, the dosing schedule, and the conduct of clinical trials:

- On March 7, 2017, at the Cowen and Company 37th Annual Health Care Conference, on a slide that showed that cancer-fighting cells increased by an average of *30-fold* in the tumors of ten patients dosed with NKTR-214 every three weeks, but did not provide any context for the data—such as the fact that it was driven by the inclusion of the outlier patient from the EXCEL trial.

- On May 22, 2017, at the UBS Global Healthcare Conference, on a slide that showed that cancer-fighting cells increased by an average of *30-fold* in the tumors of ten patients dosed with NKTR-214 every three weeks but did not identify the source of the data displayed.

- On June 3, 2017, at an Investor Meeting coinciding with the annual meeting of the American Society of Clinical Oncology ("ASCO").  The slide misleadingly stated that the "results" it contained were derived from "10 patients," and it compared their "predose" tumor biopsy analyses with their "Week 3" biopsy analyses.

- On June 7, 2017, at the Jefferies Global Healthcare Conference, on a slide that showed that cancer-fighting cells increased by an average of *30-fold* in the tumors of ten patients dosed with NKTR-214 every three weeks but did not identify the source of the data.

- On November 15, 2017, at the Jefferies London Healthcare Conference on a slide that showed that cancer-fighting cells increased by an average of *30-fold* in the tumors of ten patients dosed with NKTR-214 every three, weeks but did not identify the source of the data.

- On November 28, 2017, at the Piper Jaffray London Healthcare Conference, on a slide that showed that cancer-fighting cells increased by an average of *30-fold* in the tumors of ten patients dosed with NKTR-214 every three weeks but did not identify the source of the data.

- On January 9, 2018, at the JP Morgan Healthcare Conference, on a slide that showed that cancer-fighting cells increased by an average of *30-fold* in the tumors of ten patients dosed with NKTR-214 every three weeks but did not identify the source of the data.

- On March 14, 2018, at the Cowen & Company Annual Health Care Conference, on a slide that showed that cancer-fighting cells increased by an average of *30-fold* in the tumors of ten patients dosed with NKTR-214 every three weeks but did not identify the source of the data.

54. In addition, on June 1, 2018, Nektar released a 2-minute and 41-second video entitled "NKTR-214 Mechanism of Action Video."[17] At 1:36, the video's narrator states: "In clinical studies, treatment with NKTR-214 resulted in *increases in cancer-fighting cells of up to thirty-fold*."

### C. Nektar Reports Positive PIVOT-02 Data at SITC 2017

55. On November 11, 2017, Nektar hosted an "Investor Meeting" to coincide with the Society for Immunotherapy of Cancer ("SITC") annual meeting at which limited data concerning the PIVOT-02 clinical trial was presented. At the follow-on investor event, the Company outlined the NKTR-214 development program, described purported benefits of combining NKTR-214 with Opdivo and discussed the reported PIVOT-02 data.

56. During the Company's presentation, Defendant Zalevsky stated, in part, that "we know that in the presence of [NKTR-] 214 there's such a high amount of activated immune cells. Different clones of immune cells recognizing multiple antigens *increasing the tumor killing army*."[18] This data was positive in part because Defendants had manipulated the collection of PIVOT-02 data to make it appear more positive. *See infra* ¶¶ 179-97.

57. The PIVOT-02 report was well-received by the market. Following the November 2017 SITC meeting, Nektar's stock price rose in part because "Management . . . unveiled impressive early-stage trial data for NKTR-214, a wholly owned immuno-oncology drug that's being studied for use alongside **Bristol-Myers Squibb's** (NYSE: BMY) multibillion-dollar drug Opdivo."[19] On November 13, 2017, Investor's Business Daily reported: "Nektar Therapeutics (NKTR) launched to a nearly 17-year high Monday on strong combination data for its immuno-

---

[17] *See* Nektar Mechanism of Action Video, *NKTR-214 Selectively grows cancer-fighting CD8+ T cells and NK cells* (2018), https://vimeo.com/user52905391.

[18] Transcript of Conference Call of Nektar Therapeutics Analyst and Investor Event at Society for Immunotherapy of Cancer (SITC) 32nd Annual Meeting (November 11, 2017, 11:15 PM).

[19] Todd Campbell, *Here's Why Nektar Therapeutics Is Skyrocketing 70% in November*, The Motley Fool (Nov. 16, 2017), https://www.fool.com/investing/2017/11/16/heres-why-nektar-therapeutics-is-skyrocketing-70-i.aspx.

oncology drug combined with Bristol-Myers Squibb's (BMY) Opdivo in skin, kidney and lung cancers."[20]

58.    In February 2018, Nektar and BMS announced a "Global Development & Commercialization Collaboration" to evaluate NKTR-214 with Opdivo. In connection with that collaboration, BMS agreed to pay Nektar *$1.85 billion* upfront, comprised of $1.0 billion in cash and the purchase of ~8.28 million shares of Nektar stock at $102.60 per share.[21]

**D.    Investors React to "Disappointing" PIVOT-02 Data at ASCO 2018**

59.    On Saturday, June 2, 2018, MD Anderson physician and Nektar consultant Dr. Adi Diab presented PIVOT-02 clinical trial data concerning NKTR-214 and Opdivo at the ASCO annual meeting in Chicago. Shortly after Dr. Diab's ASCO presentation concluded, Nektar held an "Analyst and Investor Event" at which Nektar presented many of the same slides Dr. Diab had used in his presentation earlier that afternoon. As reported the following day by FierceBiotech:

> According to the new ASCO data set, for melanoma, the [overall response rate ("ORR")] is now 50% (14 of 28 patients in stage 2)—down from 85% last November when 11 of 13 patients responded. Similarly, for renal cell carcinoma, the ORR went from 64% (seven of 11 patients) to 46% (12 of 26) in stage 2.[22]

60.    Following this news, Nektar's stock fell from $90.35 at the close from the previous Friday, June 1st, to $52.57 at the close on Monday, June 4, 2018, a decline of *41.82%*. On the morning of June 5, 2018, MarketWatch reported that "[t]he latest results from a

[20] Allison Gatlin, *This Biotech Just Neared A 17-Year High On Strong Cancer Regimen*, Investor's Bus. Daily (Nov. 13, 2017), https://www.investors.com/news/technology/biotech-nektar-therapeutics-stock-nears-17-year-high-on-cancer-regimen/.

[21] BMS Press Release (Feb. 14, 2018), https://news.bms.com/press-release/partnering-news/bristol-myers-squibb-and-nektar-therapeutics-announce-global-developme.

[22] Phil Taylor, *ASCO: Mixed reaction to BMS, Nektar's high-stakes 'confusing' I-O trial*, FierceBiotech (June 3, 2018), https://www.fiercebiotech.com/biotech/asco18-mixed-reaction-to-nektar-s-confusing-nktr-214-trial.

collaboration testing Bristol-Myers Squibb's cancer drug Opdivo with Nektar Therapeutics' NKTR-214 didn't exactly impress investors."[23]

61.    After the market close on Monday, June 4, 2018, TheStreet.com reported that Nektar's "[s]hares plummeted after investors and Wall Street analysts found Nektar's mid-stage trial results for its collaborative effort with Bristol-Myers Squibb Co. . . . to combine Nektar's NKTR-214 top immune-oncology program with Bristol-Myers' Opdivo drug to be below expectations."[24]

62.    Reuters reported that "[m]ixed results over the weekend from closely watched studies combining Bristol-Myers Squibb Co.'s cancer immunotherapy with Nektar Therapeutics experimental drug NKTR-214, led at least one Wall Street analyst [who lowered Nektar's price target by $12] to reassess expectations."[25]

### E.    Despite Poor Clinical Trial Results From EXCEL, Nektar Maintains Its False "30-Fold" Increase Claim Regarding the PIVOT Trial

63.    On June 6, 2018, Defendant Zalevsky made a presentation on behalf of the Company at the Jefferies 2018 Healthcare Conference. As the more recent trial results caused the market concern, Zalevsky reemphasized the EXCEL data that the market still did not know was misleading. The slide deck accompanying the presentation included the "30-fold increase" bar chart. While the slide was being displayed, Zalevsky stated that it "shows clinical data from the monotherapy program for NKTR-214. What you can see in the bar chart on the right-hand side [sic], *you can see that for patients for whom we collected serial biopsies, you can see an elevation up to 30-fold in the proportion of tumor-infiltrating cytotoxic T cells, shown in*

[24] Alexander Nicoli, *Nektar Therapeutics Just Lost More Than $6 Billion in Value Because of One Drug*, TheStreet.com, (June 4, 2018), https://www.thestreet.com/investing/stocks/nektar-therapeutics-shares-just-got-hammered-14610395.

[25] Reuters, *Mixed Results for Bristol/Nektar Combination in Cancer Trial* (June 3, 2018), https://news.yahoo.com/mixed-results-bristol-nektar-combination-cancer-trial-020607290--finance.html.

*orange, with essentially no change in regulatory T cells or Tregs.* This is exactly the design goals of NKTR-214, demonstrated in principle in human patients."

      **F.**      **The October 1, 2018 Plainview Report Reveals That The 30-Fold Increase Claim Was Driven by a Single Outlier Patient**

64. On October 1, 2018, Plainview published a report entitled "NKTR-214: Pegging the Value at Zero" (the "Plainview Report" or the "Report"). The Report's core finding, that NKTR-214 is "too weak to work," is driven largely by analyses demonstrating that the Company oversold NKTR-214's ability to increase cancer-fighting CD8 cells.

65. In a section entitled "Nektar's CD8+ Claims are Brazenly Misleading," the Plainview Report focuses on Nektar's "frequently cite[d . . .] 30-fold average change in tumor-infiltrating lymphocyte (TIL) CD8+," which the Report revealed "is distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ but saw no clinical benefit."

66. As revealed by the Report, the source for the "30-fold" increase claim was a single line chart from a poster that Nektar displayed at a February 2017 American Society of Clinical Oncology symposium ("ASCO GU"). The poster, which was titled "A Novel Immune Agonist, NKTR-214, Increases the Number and Activity of CD8+ Tumor Infiltrating Lymphocytes in Patients with Advanced Renal Cell Carcinoma," is reproduced on the following page (in landscape mode):[26]

---

[26] The poster can also be found at, https://www.nektar.com/application/files/9714/8829/0353/2017_ASCOGU_NKTR-214-clinical_poster.pdf.



67.     The specific line chart identified by Plainview as the source for the "30-fold increase" claim (the middle chart in Figure 6) is reproduced below, as is additional patient information relevant to the charted patient data:



68.     As explained by Plainview,

Nektar ran a 28-patient Phase 1 EXCEL trial, during which Nektar evaluated the change in tumor-infiltrating CD8+ T cells. ***None of the patients actually saw a 30-fold change in TIL CD8+: one single patient saw a ~300x increase, and this skewed the average.*** The reported average barely exceeded the standard error and was not even close to statistical significance; tell-tale signs of data driven by variation rather than efficacy.

69.     Stating "Here's how Nektar transformed mediocre data into an impressive-looking average," Plainview then examines the line chart from Nektar's February 2017 ASCO GU poster alongside the bar chart in Nektar's September 2017 ESMO poster:



Sources: ASCO GU 2017 Poster (Hurwitz et al), SITC 2016 Poster (Diab et al), & ESMO 2017 Poster (Diab et al)

70.    As noted by Plainview, "Patient 14" jumped from a near-zero readout [of increased cancer-fighting cells] at the start of the three-week period to having a reading near 2,500, while the four other patients had modest or negligible increases in cancer-fighting CD8 cells.

71.    The Plainview Report not only identified the sources for its data, it provided investors with links. The blue-font "Sources" below the charts themselves—including the "ASCO GU 2017 Poster (Hurwitz et al)" reference—now allowed investors to easily find and view the results of the data for themselves. As noted above, Nektar studiously avoided identifying the ASCO GU poster as the source for its "30-fold" claim, in its investor presentations. Instead, Nektar:

    a.    failed entirely to identify the source of its "fold change" claim (*see* January 10, March 7, and May 22, 2017 presentations, discussed in Section V, *supra*); or

    b.    cited SITC 2016 and the JP Morgan presentation (identified as occurring in 2016 and in 2017) as the source (*see* June 3 and 7, 2017 presentations, discussed in Section V, *supra*); or

    c.    cited SITC 2016 and SITC 2017 as the source (*see* March 14 and June 6, 2018 presentations, discussed in Section V, *supra*).

72.    On October 1, 2018, having been specifically alerted to and provided with easy access to this data, investors finally had the opportunity to study the relevant line chart from Figure 6 of Nektar's ASCO GU 2017 poster, as well as the patient information to the right of the Figure 6 charts. The relevant data is reproduced below (in original form rather than the version in ¶ 69 which is how it appeared in the Plainview Report):



73. The five patients whose data is plotted in the line chart are Patients 2, 4, 6, 14, and 15. The lines for Patients 2, 4, 6 are orange and the lines for Patients 14 and 15 are purple. That means that Patients 14 and 15 were on a **two**-week dosing schedule, **not** a three-week dosing schedule as Nektar had said. The information to the right of the line chart makes clear that patients whose lines are purple are dosed "q2w" or every two weeks, and that patients whose lines are orange are dosed "q3w" or every three weeks.  This shows that forty percent of the patients Nektar claimed to be on a three-week schedule were actually being dosed more often than Nektar claimed.

74. Plainview calculated that if one removed Patients 14 and 15 and base the analysis on the remaining three patients dosed every *three* weeks—Patients 2, 4, and 6—the fold change would look very different. Based on the same data Nektar itself used to calculate the "CD8" fold-change [of cancer-fighting cells], by limiting the population sample to patients ***who actually received NKTR-214 every three weeks***, "30-fold" becomes ***~1.8 fold, a dramatically lower multiple that undermines the central message Nektar repeatedly delivered during the Class Period.***

75. Plainview acknowledged in the Report that its authors "have short positions in and may own option interests on the stock of [Nektar] and stand to realize gains in the event that the price of the stock decreases."

76. Nektar's stock price did, in fact, decrease: On Friday, September 28, 2018, Nektar's stock closed at $60.96. The Plainview Report was published before the market opened on Monday, October 1, 2018, and by the time the market closed, Nektar was trading at $56.65—a one day drop of 7% on heavy trading volume:



### G.    Nektar Responds to Plainview and Plainview Replies to Nektar; Plainview's Central Arguments Are Not Challenged

77.    On October 3, 2018, the investor website Seeking Alpha published a response to the Plainview Report provided by Jennifer Ruddock, Nektar's Senior Vice President for Investor Relations and Corporate Affairs. The stated purpose of Nektar's response was to "focus on the major inaccuracies to point out the author's flaws in the central premise." The response later elaborates: "The writer uses as his premise in multiple areas that lymphocyte levels following treatment with NKTR-214 did not increase sufficiently."

78.    However, Nektar's response fails to identify any clinical trial evidence that Defendants could have relied on *at the time they made their statements* to support the Company's core "30-fold increase" claim that cancer-fighting CD8 cells outnumbered immunosuppressive Treg cells by that order of magnitude in the tumor microenvironment three weeks after administration of NKTR-214.

79.    Just over 24 hours later—at 12:20 pm on October 4, 2018— Plainview posted on Seeking Alpha a reply to Nektar's response: "Refuting Nektar's Apparent Response To Our Initial Report."

80.    Plainview's reply to Nektar is a point-counterpoint analysis; Plainview restates Nektar's purported criticisms and seeks to debunk them. Here too, the main focus is on post-administration lymphocyte levels. Plainview examines the ASCO 2018 data cited by Nektar and notes that its "main complaint" is that Nektar's more recent data "appears to be manipulated to

portray NKTR214 as having a strong effect when it actually doesn't." As characterized by Plainview, Nektar was "pulling the exact same stunt" with ASCO 2018, *i.e.*, presenting data in a manner that creates a "Biased Appearance of Efficacy."

**V.      Post-Class Period Information Confirms the Plainview Report**

81.      As more detailed information from the EXCEL Trial has emerged, the Plainview Report's criticism of Defendants' misleading 30-fold increase claims has been borne out by more detailed releases of data.

82.      As demonstrated by more complete data, the primary efficacy endpoint of the EXCEL trial was not met.[27]  In total, the patients evaluated in the study had no observable efficacy response using the RECIST criteria that defined the primary endpoint.  In the case of 26 patients measured for best overall tumor response by RECIST version 1.1, *no* patient saw a complete or partial response indicating efficacy, with 14 patients showing stable disease and 12 patients showing progressive disease.

83.      As such, these results indicate what Defendants knew: that the 30-fold increase claim was driven by outlier data that did not provide adequate support for their claim.

**VI.     Additional Evidence the EXCEL Data Was Outlier-Driven**

  **A.      CW # 2 Confirms the Inclusion of The Outlier Patient Drove The 30-Fold Increase Claim**

84.      CW # 2 confirmed that Patient 14 referenced in Figure 6 of the poster displayed at the 2017 ASCO GU conference was the single outlier patient who experienced a unique increase in cancer-fighting cells.  CW # 2 was aware of this due to having worked on the development of NKTR-214 where CW # 2 closely monitored the incoming data (as described further in ¶ 184).  CW # 2 was also in attendance at the conference when the presentation took place.  CW # 2 stated that subsequent presentations about NKTR-214—which touted the 30-fold increase in

---

[27] See Preliminary comments on manuscript: Bentebibel *et al, A First-in-Human Study and Biomarker Analysis of NKTR-214, a Novel IL2Rβγ-Biased Cytokine, in Patients with Advanced or Metastatic Solid Tumors*, Cancer Discovery (2019) https://pubmed.ncbi.nlm.nih.gov/30988166/.

cancer-fighting cells—also included the outlier patient.  Crucially, CW # 2 stated that no other patient in the study had a similar reaction to the drug—elaborating that had the outlier patient been removed from the data set, the result would have been "nowhere near" the 30-fold increase that was demonstrated.

85.     CW # 2 stated that many individuals at Nektar were concerned that it was misleading to present trial data that was so skewed by the inclusion of an outlier patient, recalling that employees involved in the data collection expressed concerns to management.  CW # 2 characterized this disagreement as one between the scientists and business-focused individuals, including Defendant Robin.  CW # 2 characterized the decision to present the data as "misleading," "deceitful" and "lacking scientific integrity."  CW # 2 further confirmed that attendees at the ASCO conference appeared to be misled by Nektar's presentation—which did not acknowledge that the 30-fold increase touted was driven by a single outlier patient.  Attendees instead left with optimism that was not supported by the actual trial results.  CW # 2 noted that Defendant Robin used such conferences as an opportunity to meet with investors and secure new funding.

86.     CW # 2 stated that as more data became available—which tended to discredit the early outlier-driven results—Nektar was slow to update its public story, continuing to tout the early data at conferences and to investors.  CW # 2 expressed surprise that the 30-fold increase claim was repeated through June of 2018, stating that the additional data collected over that period continued to dilute the effect of the outlier patient—as subsequent patients enrolled in clinical trials did not see a similar reaction to the early outlier patient.

**B.     Expert Analysis Also Indicates The 30-Fold Increase Claim Was Driven by an Outlier Patient**

87.     The outlier-driven nature of Defendants' 30-fold increase claim has also been confirmed by expert analysis.  Expert 1 holds a PhD in statistics and is Director of Cancer Biostatistics at a major research university.  Expert 1 has over 15 years of experience as a cancer biostatistician at two academic comprehensive cancer centers, has designed dozens of clinical trials, evaluated clinical protocols, and has published in leading cancer journals.  Expert 1

reviewed the allegations of this complaint and the study protocols for the EXCEL and PIVOT-02 trials.

### 1.    The Inclusion of Outlier Data from Patient 14 Skewed The 30-Fold Increase Claim

88.    Expert # 1 analyzed the 30-fold increase claim first presented at the January 2017 JP Morgan Conference.  Expert # 1 assumed that the outlier patient—patient 14 in the line graph presented in Figure 6 of the poster at the February 2017 ASCO GU Conference—was included in the data set used to create the bar chart on which Defendants' 30-fold increase claim was based. Expert # 1 further assumed, consistent with Defendants' representations that fold-change inputs from ten patients were used to calculate the 30-fold increase.

89.    A 30-fold average among 10 patients of necessity means that the collective fold change for those ten patients must add up to 300; 300 divided by 10 equals 30. (For purposes of this analysis, the expert rounded to the "30-fold" increase claim made by Nektar rather than the more precise 29.8 increase to keep the math simple)

90.    Analyzing the line graph in Figure 6 of the February 2017 ASCO GU poster, Expert # 1 estimated that Patient 14's CD8+ fold change was approximately 250 (based on an estimated starting value of 10 and an estimated ending value of 2500). With (a) an aggregate fold-change of 300, and (b) a single patient accounting for 250 of the total, the remaining collective contribution of 50 must be spread out among the remaining nine patients. Expert # 1 analyzed several different scenarios in which Patient 14 had a fold-change of 250 and the other nine patients shared the remaining contribution of 50. To be conservative and for Defendants' benefit, Expert # 1 assumed that none of the nine patients had a negative fold change (*i.e.*, a cells/mm$^2$ value lower at week 3 than it was at week 0).

91.    In Scenario #1, Expert # 1 assigned 250 of the aggregate 300 fold-change to Patient 14 and divided the remaining contribution of 50 evenly among the nine other patients, meaning that the fold changes for the 10 patients were: 250, 5.55, 5.55, 5.55, 5.55, 5.55, 5.55, 5.55, and 5.55. A bar chart depicting Scenario # 1 appears below:



92.    In Scenario # 2, Expert # 1 assigned 250 of the aggregate 300 fold-change to Patient 14 and assumed that one of the nine remaining patients achieved the average fold-change of 30, and divided the remaining contribution of 20 evenly among the eight other patients, meaning that the fold changes for the 10 patients were: 250, 30, 2.5, 2.5, 2.5, 2.5, 2.5, 2.5, 2.5, 2.5. (If one of ten patients has a fold-change of 250, it is not mathematically possible for more than one other patient to achieve a fold-change of 30 and keep to the no-negative-fold-changes assumption.) A bar chart depicting Scenario # 2 appears below:



93.     Finally, in Scenario # 3, Expert # 1 assigned 250 of the aggregate 300-fold change to Patient 14 and further assigned to four of the remaining nine patients Expert # 1's estimated fold changes for the other four patients whose data was depicted in Figure 6 of the February 2017 ASCO GU poster, namely: for Patient 2, a fold change of 2.6 (based on an estimated starting value of 600 and an estimated ending value of 1600); for Patient 4, a fold change of 1.2 (based on an estimated starting value of 600 and an estimated ending value of 700), for Patient 6, a fold change of 1.8 (based on an estimated starting value of 200 and an estimated ending value of 350), and for Patient 15, a fold change of 1.4 (based on an estimated starting value of 450 and an estimated ending value of 650). For those five patients (Patients 2, 4, 6, 14, and 15), the aggregate fold change is approximately 257. Expert # 1 then divided the remaining contribution of 43 evenly among the five other patients, meaning that the fold changes for the 10 patients were: 250, 2.6, 1.2, 1.8, 1.4, 8.6, 8.6, 8.6, 8.6, and 8.6. A bar chart depicting Scenario # 3 appears below:



94.     For each of the foregoing scenarios, Expert 1 also calculated the Standard Error. Standard Error (SE) is a measure of how accurate the estimated mean of a sample size is. When the sample data is more spread out, the SE is larger; a large SE is an indicator that using the mean to represent sample results may be inaccurate. Stated differently, a high SE implies higher

heterogeneity in the sample. Standard Error is calculated using a formula in which the sample's standard deviation (a measure of the dispersion of a dataset relative to its mean) is an input.

95.    For each of the three Scenarios, the Standard Error was slightly above or below 24.5. Significantly, those results comport with the error bar included in a poster displayed at the ESMO 2017 medical conference, which displayed a SE of approximately 25.[28]

96.    Based on the analyses performed, Expert # 1 opined   that Patient 14 was "clearly an outlier" which had a "profound effect on the analyses and interpretation of the EXCEL data" first presented by Nektar at the 2017 JP Morgan Conference.  Expert # 1's calculations thus serve to corroborate CW # 2's assertion that Patient 14's data was, in fact, included in Nektar's 30-fold increase calculations.

### 2.    Inclusion of the Outlier Patient Was Contrary to Industry and Scientific Standards

97.    According to Expert # 1, utilizing data from Patient 14 in a 10-patient dataset to support Defendants' 30-fold increase claim was highly misleading for two reasons.

98.    First, including Patient 14's fold change was improper because Defendants represented that the population sample on which the results were based consisted of patients dosed every three weeks. Patient 14 was dosed every two weeks.  Indeed, in the June 2019 issue of *Cancer Discovery*, a peer-reviewed medical journal, the authors (which included Defendants Tagliaferri and Zalevsky) presented fold-change results from EXCEL that differed significantly from the prior 30-fold increase claim. Expert # 1 reviewed the published article as well as the accompanying "Supplementary" tables and figures.  The authors reported a fold change of 15.1 for CD8+ cells—half of the "30-fold increase" first claimed at the JP Morgan conference in January 2017. Supplementary Figure S10, which is reproduced below, reported only on patients "at week 3 after NKTR-214 treatment compared to before treatment."

[28] As discussed *infra* in ¶¶ 173-78, these error bars were hidden from the investing public when Nektar made its 30-fold increase claims to investors.

99.    Six of the ten patient tumor samples yielded CD8+ fold changes of less than 3, and five of the six had fold changes of less than 2. The logarithmic scale of the bar graph makes the values for the error bar difficult to determine with precision, but Expert # 1 estimated that on the high end, even the Standard Error is less than 30.



Bar-plot of the data with and without
the outlier (Patient 14)

100.    Second, even if Patient 14 were dosed every three weeks, any individual with knowledge of the 10-patient dataset and a basic understanding of statistics would have understood that presenting the average increase in cancer-fighting cells for a sample of 10 patients was "highly misleading" when it included an outlier such as Patient 14.  Specifically, as it relates to Standard Error, based on the discussion above, Expert # 1 opined that in light of the large SE of 24, it was inappropriate to use the mean of 30 in communicating the fold-change results of EXCEL.

101.    More broadly, industry and scientific standards caution against presenting data when it is (1) highly incomplete or (2) outlier driven.  In the judgment of Expert # 1, each of those industry and scientific standards were violated by Nektar's alleged conduct with respect to the presentation of the 30-fold increase claim.

102.    Expert # 1 noted that participants familiar with the use of data in the pharmaceutical industry, such as Defendants, would possess the requisite understanding to realize that presenting the data to "prove" a 30-fold increase in cancer-fighting cells would

violate the above industry and scientific standards customarily followed in such trials that individuals familiar with pharmaceutical research typically assume are followed.

103.    Additional industry norms violated by Defendants' alleged conduct, according to Expert # 1, include that disseminated data and results from non-randomized trials should include the following information:

(a)    Flow of participants through each stage of the study: enrollment, assignment, allocation, and intervention exposure, follow-up, analysis

(b)    Allocation and intervention exposure: the number of participants assigned to each study condition and the number of participants who received each intervention

(c)    The number of participants included in or excluded from the main analysis, by study condition

(d)    Description of protocol deviations from study as planned, along with reasons

(e)    Number of participants (denominator) included in each analysis for each study condition, particularly when the denominators change for different outcomes; statement of the results in absolute numbers when feasible

(f)    For each primary and secondary outcome, a summary of results for each estimation study condition, and the estimated effect size and a confidence interval to indicate the precision

(g)    Inclusion of null and negative findings

(h)    Interpretation of the results, taking into account study hypotheses, sources of potential bias, imprecision of measures, multiplicative analyses, and other limitations or weaknesses of the study

(i)    Generalizability (external validity) of the trial findings, taking into account the study population, the characteristics of the intervention, length of follow-up, incentives, compliance rates, specific sites/settings involved in the study, and other contextual issues.

104.     According to Expert # 1, these guidelines are followed by the general scientific community to avoid potential biases in treatment evaluation studies that use non-randomized designs.  Expert # 1 notes that, in the context of the EXCEL trial, the standard practice would have been to adhere to these standards in both conduct and reporting of the clinical trial results and data, particularly when conducting statistical analyses of the data, defining the endpoints and making context-specific interpretations of the data. The data from all the patients enrolled in the clinical study including the primary, secondary and exploratory endpoints should be taken in totality to make informed decisions *i.e.* data should be patient-stratified, provide a breakdown, with respect to the tumor types (since different tumor types were considered), biomarkers, treatment schedule, etc.  Expert # 1 noted that the lack of clarity in the number and attributes of the patients (e.g. dosing schedule) introduces a confounding factor, which introduces potential bias, when interpreting the EXCEL trial results.[29]

## VII.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     The January 2017 JP Morgan Conference

105.     On January 10, 2017, Defendant Robin, acting on behalf of the Company, publicly displayed at a JP Morgan investor event a slide based in part on then-unpublished data that would later appear in the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:

---

[29] Des Jarlais, D. C., *et al.*, *The TREND statement*. Am. J. of Pub. Health, 94, 361-366 (2004), https://www.cdc.gov/trendstatement/pdf/trendstatement_TREND_Checklist.pdf.



106.    The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

(a)    The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)    The "**Week 3 / predose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

107.    Defendant Robin, speaking on behalf of the Company, made the following public statements at the January 10, 2017 JP Morgan investor event:

We've designed a new IL-2 molecule with a biased action to the beta gamma receptors and not the alpha receptor. **And consequently, there, you can produce significant quantities of CD8-positive T cells without affecting the production or the**

*proliferation of regulatory T cells.* The other thing we've done is made a prodrug because one of the problems you have with native IL-2 is when you administer a native IL-2, it releases immediately in plasma, and you get this massive unwanted immune response. It's very short-lived but it has very, very serious side effects in terms of cytokine storm, et cetera. ***And what we've done is designed a molecule where the biological linker's released in the tumor microenvironment, and you don't see — and therefore, you get the full effect of the cytokine in the tumor, not in circulation.*** So with that, you're also able to achieve antibody-like dosing. So we're dosing — we're dosing NKTR-214 once every 2 to — once every 3 weeks in an outpatient setting.

So here's some data from the Phase I trial. ***Demonstrating — and these are 10 patients where we have tumor biopsies. And you can clearly see that we had a significant increase in CD8-positive T-effector cells with no increase in T-reg cells.. . . And this is clearly what we set out to do, cause the proliferation of T-effector cells and not cause the proliferation of regulatory T cells.***

108.    The **bold italicized** statements are false and misleading for the following reasons:

(a)    They are based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)    They are based on the inclusion of two patients dosed every two weeks;

**B.    The March 2017 Cowen and Company Conference**

109.    On March 7, 2017, Defendant Doberstein, acting on behalf of the Company, publicly displayed at a Cowen & Company Healthcare Conference a slide based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:



110.    The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

(a)    The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)    The "**Week 3 / predose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

111.    Defendant Doberstein, speaking on behalf of the Company, made the following public statement at the March 7, 2017 Cowen and Company event:

*Now, what we found in patients from NKTR-214 is that first, as a monotherapy, it does pretty much exactly what we designed it to do. You can see a 30-fold increase in CD8 cells inside the tumors*

*of patients from tumor biopsies who received NKTR-214 with almost no increase in T-regs, and that's exactly the way that we designed the medicine to act.*

112.    The **bold italicized** statement is false and misleading for the following reasons:

(a)    It is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cells;

(b)    It is based on the inclusion of two patients dosed every two weeks;

**C.    The May 2017 UBS Conference**

113.    On May 22, 2017, Defendant Zalevsky, acting on behalf of the Company, publicly displayed at a UBS Healthcare Conference a slide based in large part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:



114. The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

(a) The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b) The "**Week 3 / predose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

115. Defendant Zalevsky, speaking on behalf of the Company, made the following public statement at the May 22, 2017 UBS investor event:

> **CD8 T cells increased by 30-fold in the tumor microenvironment. This is shown just after a single-dose administration of NKTR-214, and completely consistent with the design, the T regs, which are not touched due to the bias of the molecule, are unchanged.**

116. The **bold italicized** statement is false and misleading for the following reasons:

(a) It is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b) It is based on the inclusion of two patients dosed every two weeks;

**D.      The June 2017 ASCO Analyst & Investor Meeting**

117. On June 3, 2017, Dr. Adi Diab of the MD Anderson Cancer Center and Co-Chair Scientific Advisory Board for PIVOT Program, publicly displayed at an ASCO investor event a slide based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:



118. The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

(a) The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b) The "**Week 3 / predose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

119. Dr. Adi Diab made the following public statement at the June 3, 2017 Nektar investor meeting:

*And so to summary, this — the most important, as you can see*

*when you look at the left column here, and you can see what*

*we've been talking about, and I reemphasize that point because*

*this is a very important marker, not only mobilizing of the T cells in the tumor microenvironment, but you're also mobilizing CD8 more than Tregs, achieving very high CD8-to-Treg ratio of — in the tumor microenvironment, that's very impressive. That's very beneficial for the patients . . .*

*And NKTR-214, in addition of mobilizing the CD8 cells, there is also increasing in the number of NK cells, the natural killers. This happens without an increase of the T regulatory cells, and that's a — lead to the high ratio of CD8 to Tregs.*

120.   The **bold italicized** statement is false and misleading for the following reasons:

(a)   It is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)   It is based on the inclusion of two patients dosed every two weeks;

**E.   The June 2017 Jefferies Conference**

121.   On June 7, 2017, Defendant Doberstein, acting on behalf of the Company, publicly displayed at a Jefferies conference a slide based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:



122.    The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

      (a)    The sources for the **29.8** figure on the bar chart are misleading; the figure is derived from data displayed at the February 2017 ASCO GU symposium.

      (b)    The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

      (c)    The "**Week 3 / predose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

123.    Defendant Doberstein, speaking on behalf of the Company, made the following public statement at the June 7, 2017 Jefferies Healthcare Conference:

It's very important that there be resident T cells there in the tumor so that we can activate them and even when we think about using checkpoint inhibitors, if there are no T cells there to release the brakes on, then that — those therapies aren't going to work. So very important that we increase the T cell populations. *You can see here when we do Q3-week dosing, almost a thirtyfold increase in tumor T cells within the biopsy — T cells within the tumor biopsy of the effector cell type*. So very important observations from the biomarker standpoint.

124. The **bold italicized** statement is false and misleading for the following reasons:

(a) It is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b) It is based on the inclusion of two patients dosed every two weeks;

F. **The November 2017 Release of PIVOT-02 Results**

125. On November 11, 2017, the Company hosted an "Investor Meeting" to coincide with the SITC annual meeting at which limited data concerning the PIVOT-02 clinical trial was presented. At the follow-on investor event, the Company outlined the NKTR-214 development program, described purported benefits of combining NKTR-214 with checkpoint inhibitor therapy, and discussed the reported PIVOT-02 data.

126. Defendant Zalevsky, speaking on behalf of the Company, made the following public statement at the investor meeting:

For one thing, *we know that in the presence of 214 there's such a high amount of activated immune cells. Different clones of*

*immune cells recognizing multiple antigens increasing the tumor*

*killing army*.[30]

127.    The **bold italicized** statement is false and misleading for the following reasons:

(a)    What Defendants purportedly "knew" about the "high amount of activated immune cells . . . increasing the tumor killing army" was based on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster and therefore:

(b)    It is based on the inclusion of an outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(c)    It is based on the inclusion of two patients dosed every two weeks;

**G.    The November 2017 Jefferies London Healthcare Conference**

128.    On November 15, 2017, Defendant Zalevsky, on behalf of the Company, publicly displayed at a Jefferies Healthcare Conference a slide based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:

---

[30] Transcript of Conference Call of Nektar Therapeutics Analyst and Investor Event at Society for Immunotherapy of Cancer (SITC) 32nd Annual Meeting (November 11, 2017, 11:15 PM).



129.    The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

(a)    The sources for the **29.8** figure on the bar chart are misleading; the figure is derived from data displayed at the February 2017 ASCO GU symposium.

(b)    The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(c)    The "**Week 3 / predose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

130.    At the November 15, 2017 conference, Defendant Zalevsky stated as follows:

*We know that with NKTR-214, it can fill the gap of actually replenishing the patient's own immune system. In fact as a T cell growth factor, it acts like an engine to grow armies and armies of*

*antigen-specific tumor reactive T cells. These T cells can infiltrate into the body, they can enter the tumor microenvironment and they can go to work, attacking the tumor cells….*

We profiled NKTR-214 in a monotherapy clinical trial and we reported these results over the last year and a half. *Now the key with this monotherapy study was that we wanted to prove the mechanism of action in the patient's tumor itself. And so we collected a number of biopsies both pretreatment and on-treatment and we use those biopsies to characterize the functions of NKTR-214, shown here in this slide is the fact that NKTR-214 has on inducing T cell infiltrates into the tumor. And you can see there's a 30-fold increase in the amount of CD8 T cells that entered into the tumor and because of the biased signaling, you can see there's no change in T regs. So this is very much skewed and dominated tumor killing cytotoxic T cell response.*

131. The first and third **bold italicized** statements are false and misleading for the following reasons:

(a) They are based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b) They are based on the inclusion of two patients dosed every two weeks;

132. The second **bold italicized** statement is false and misleading because it creates the false impression that the Company in fact succeeded in "prov[ing] the mechanism of action in the patient's tumor itself," which is unsupported by the relied-on clinical trial data.

### H.    The November 2017 Piper Jaffray Annual Healthcare Conference

133.    On November 28, 2017, Defendant Zalevsky, acting on behalf of the Company, publicly displayed at a Piper Jaffray Healthcare Conference a slide based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster. The slide (which is reproduced below) was captioned:

NKTR-214 Selectively Grows T Cells, NK Cells in

Tumor Microenvironment in Cancer Patients



134.    The below ***bold italicized*** statements contained in the chart above are false and misleading for the following reasons:

(a)    The sources for the ***29.8*** figure on the bar chart are misleading; the figure is derived from data in a poster displayed at the February 2017 ASCO GU symposium;

(b)    The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(c)    The "**Week 3 / predose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

**I.    The January 2018 JP Morgan Healthcare Conference**

135.    On January 9, 2018, Howard Robin, acting on behalf of the Company, publicly displayed at a JP Morgan Healthcare Conference a slide based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster.




136.    The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

(a)    The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)      The "***Week 3 / Pre-Dose***" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

137.    Defendant Robin made the following public statements at the January 9, 2018 JP Morgan investor event:

So what we've done is, using our technology, we have a biased receptor binding in such a way that we cause the ***proliferation of effector T cells and we don't cause an increase in regulatory T cells. And because of that, you can give very low doses of NKTR-214 dosed on an antibody-like schedule once every 3 weeks on an outpatient basis. You see nominal side effects, and you get a profound stimulation of the immune system. So in patients, just to demonstrate this. Here you could see on the chart on the left, a great — significant increase in effector T cells with no increase in regulatory T cell***. Also, very important, in the left chart, you see that NKTR-214 also increases PD-1 expression. We take patients who are PD-L1 negative and turn them PD-L1 positive, another very, very important aspect of treating patients in the immunotherapy world.

138.    The ***bold italicized*** statement is false and misleading for the following reasons:

(a)      It is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)      It is based on the inclusion of two patients who were dosed every two weeks rather than every three weeks;

**J.    The March 2018 Cowen & Company Conference**

139.    On March 14, 2018, Defendant Zalevsky, acting on behalf of the Company, displayed at a Cowen & Company conference a slide based, in large part, on data on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:




140.    The below ***bold italicized*** statements contained in the chart above are false and misleading for the following reasons:

(a)    The ***29.8*** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)    The "***Week 3 / Pre-Dose***" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

141. Defendant Zalevsky, speaking on behalf of the Company, made the following public statement at the March 14, 2018 Cowen & Company event:

And we're evaluating immunological changes in those biopsy tissues. ***And shown on the left is the proportion of CD8 cytotoxic T cells or regulatory T cells that you see is a full change from week 3 to baseline. And you can see that there's a 30-fold induction of CD8 T cells, but there's essentially no change in Tregs. This is exactly the design goal and this drives a very high CD8-to-Treg ratio.***

142. The ***bold italicized*** statement is false and misleading for the following reasons:

    (a) It is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

    (b) It is based on the inclusion of two patients who were dosed every two weeks rather than every three weeks;

**K.      The June 2018 Mechanism of Action Video**

143. In June 2018, Nektar released a video with a voice superimposed over a graphical representation of cancer-fighting cells being created by NKTR-214 without a corresponding growth of regulatory cells inside a tumor. Information in the video is based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster. The video states, in part, as follows:

Cancer immunotherapies are designed to enable a patient's own immune system to attack tumor cells, but existing therapies do not work for most patients, in part due to an insufficient number of cancer-fighting cells, and too many suppressive cells, which can blunt tumor-killing. ***What is needed is an immunotherapy that expands, mobilizes and accumulates these powerful cancer-fighting cells, namely CD8-positive effector T-cells and NK cells, within tumors – without expanding unwanted suppressive regulatory T-cells. NKTR-214 selectively grows cancer-fighting cells, with the goal of making***

*cancer immunotherapy more effective. Administration of this biologic pro-drug is by infusion once every three weeks.* In the body, active conjugates emerge slowly over time, which avoids overstimulation of the immune system. *Activated NKTR-214 targets CD122 receptors found on the surfaces of cancer-fighting cells, which in turn drives their proliferation and accumulation inside the tumor.*

*In clinical studies, treatment with NKTR-214 resulted in increases in cancer-fighting cells of up to 30-fold.*[31]

144. The **bold italicized** statements are false and misleading for the following reasons:

(a) They are based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b) They are based on the inclusion of two patients who were dosed every two weeks rather than every three weeks;

**L.     The June 2018 Jefferies Conference**

145. On June 6, 2018, Defendant Zalevsky, acting on behalf of the Company, publicly displayed at a Jefferies investor event a slide based in part on data that appeared on the second of three line charts in Figure 6 from Nektar's February 2017 ASCO GU poster:

---

[31] Nektar Mechanism of Action Video, NKTR-214 Selectively grows cancer-fighting CD8+ T cells and NK cells (2018), https://vimeo.com/user52905391.



146. The below **bold italicized** statements contained in the chart above are false and misleading for the following reasons:

(a) The sources for the 29.8 figure on the bar chart are misleading; the figure is derived from data in a poster displayed at the February 2017 ASCO GU symposium;

(b) The **29.8** figure is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(c) The "**Week 3 / Pre-Dose**" fold-change represents that all patients in the population sample were dosed every three weeks when, in fact, two of the patients whose data was included in the CD8 population sample—the outlier-patient and one other patient—were dosed every two weeks;

147. Defendant Zalevsky, speaking on behalf of the Company, made the following public statements at the June 6, 2018 Jefferies conference:

Now this slide shows clinical data from the monotherapy program for NKTR-214. What you can see in the bar chart on the right-hand side, you can see that *for patients for whom we collected serial biopsies, you can see an elevation up to 30-fold in the proportion of tumor-infiltrating cytotoxic T cells, shown in orange, with essentially no change in regulatory T cells or T regs.* This is exactly the design goals of NKTR-214, demonstrated in principle in human patients.

148.    The **bold italicized** statement is false and misleading for the following reasons:

(a)    It is based on the misleading inclusion of the outlier patient who saw a unique increase in CD8 cancer-fighting cells;

(b)    It is based on the inclusion of two patients who were dosed every two weeks rather than every three weeks;

## VIII.   LOSS CAUSATION

### A.    Defendants' False and Misleading Statements and Omissions Artificially Inflated the Price of Nektar's Common Stock (NKTR)

149.    During the Class Period, as detailed herein, Defendants made material misrepresentations and omissions that deceived the market and artificially inflated the price of Nektar common stock and operated as a fraud or deceit on Class Period purchasers of Nektar common stock by misrepresenting the Company's true state of affairs and prospects, and failing to disclose that the Company lacked clinical trial data from the tumor microenvironment that supported its "30-fold increase" claims.

150.    As a result of their purchases of Nektar common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

151.    Defendants' material misrepresentations and actionable omissions had the intended effect and caused Nektar securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $109.09 per share on March 21, 2018.

152.     Some of that inflation was removed in June 2018 when—despite the Company's ongoing efforts to skew the data—PIVOT-02 results failed to meet the artificially high investor expectations previously set by Defendants. *See* Section VIII, *infra*. In October 2018, the Plainview Report further removed inflation in the stock price by revealing the truth about Nektar's unsupported claims that NKTR-214 caused cancer-fighting CD8 cells to outnumber immunosuppressive Treg cells by orders of magnitude in the tumor microenvironment. *See* Section VIII, *infra*.

**B.     The Price of Nektar's Common Stock Fell Dramatically When The PIVOT-02 Clinical Trial Failed to Meet Expectations Set by Nektar's Fraudulent Statements, Omissions and Actions**

153.     Defendants' actionable misrepresentations concerning the EXCEL trial were a substantial factor in causing an artificial increase in Nektar's stock price.  Without this artificial inflation of Nektar's share price, the release of less favorable PIVOT-02 data at the ASCO conference in June 2018 would not have come as such a shock. The pre-ASCO stock price on June 1 would already have been closer to the post-ASCO stock price on June 4 because the earlier inflation caused by Defendants' material misrepresentations and actionable omissions would not have occurred. Defendants' material misrepresentations and actionable omissions were thus a substantial factor in causing investors' economic losses on Monday, June 4, 2018.

**1.     June 4, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)     The Market Was Surprised by the PIVOT-02 Trial Results Because Nektar Had Misled Investors About the Performance of NKTR-214 in Previous Clinical Trials**

154.     On Saturday, June 2, 2018, Dr. Diab presented NKTR-214 Phase 1/2 data from the PIVOT-02 clinical trial at the ASCO annual meeting in Chicago. Shortly after Dr. Diab's ASCO presentation concluded, Nektar held an "Analyst and Investor Event" where many of the same slides presented by Dr. Diab were again utilized. According to the data presented, the overall response rate for NKTR-214 in treating melanoma had declined from the 85% rate presented the previous November to 50%. The results were also troubling for renal cell

carcinoma, with the original response rate falling from 64% to 46% in the patients treated.[32] The data were materially worse than investors were given reasons to expect at that time.

155.    While all clinical trials involve risk, the PIVOT-02 trial results reflected additional undisclosed risk investors had no reason to expect because it was concealed by Defendants' fraud, which created a false impression that the results of the clinical trials for NKTR-214 were better than they actually were. Specifically, Defendants' false "30-fold increase" claim with respect to the EXCEL trial created an undisclosed risk that future trial results that were accurately reported and not manipulated would not be so rosy and would therefore disappoint the market.

156.    On the news of the disappointing PIVOT-02 trial results, Nektar's stock dropped $38.08 per share, from a closing price of $90.35 on June 1, 2018 to a closing price of $52.57 on June 4, 2018, or -42.15%, with unusually heavy trading volume of almost 30.88 million shares (compared to a Class Period daily average trading volume of 2 million).

### (b)    Market Commentators Confirmed the Cause of Nektar's Share Price Decline on June 4, 2018

157.    After the market closed on Monday, June 4, TheStreet.com reported that Nektar's "[s]hares plummeted after investors and Wall Street analysts found Nektar's mid-stage trial results for its collaborative effort with Bristol-Myers Squibb Co. . . . to combine Nektar's NKTR-214 top immune-oncology program with Bristol-Myers' Opdivo drug *to be below expectations*," referring to the PIVOT-02 trial.[33] The cause of the June 4, 2018, decline in Nektar's stock was summarized by MarketWatch the following morning, which stated about the

---

[32] Phil Taylor, *ASCO: Mixed reaction to BMS, Nektar's high-stakes 'confusing' I-O trial*, FierceBiotech (June 3, 2018), https://www.fiercebiotech.com/biotech/asco18-mixed-reaction-to-nektar-s-confusing-nktr-214-trial.

[33] Alexander Nicoli, *Nektar Therapeutics Just Lost More Than $6 Billion in Value Because of One Drug*, TheStreet.com, (June 4, 2018), https://www.thestreet.com/investing/stocks/nektar-therapeutics-shares-just-got-hammered-14610395.

PIVOT-02 news: "[t]he latest results from a collaboration testing Bristol-Myers Squibb's cancer drug Opdivo with Nektar Therapeutics' NKTR-214 didn't exactly impress investors."[34]

### C.    October 1, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk: The Plainview Report Revealed that Nektar Had Misrepresented the Performance of NKTR-214

158.    As previously alleged, prior to the start of trading on October 1, 2018, Plainview published a report entitled "NKTR-214: Pegging the Value at Zero" (the "Plainview Report" or the "Report"). The Report's core finding, that NKTR-214 is "too weak to work," was driven largely by analyses demonstrating that the Company falsely touted NKTR-214's ability to increase cancer-fighting cells. The Report emphasized that NKTR-214 drove levels of critical [cancer-fighting] lymphocytes (CD8+ cells and NK cells) that were too low—directly contradicting Nektar's false narrative that cancer-fighting CD8 cells outnumber immunosuppressive Treg cells by orders of magnitude in the tumor microenvironment weeks after administration of NKTR-214. *See* Section IV, *supra*. Consequently, the false narrative peddled by Nektar concerning the results of the EXCEL trial—most notably, its "30-fold increase" claim—was discredited.  Investor losses were further compounded by the inflated market expectations created by the manipulation of clinical trial protocols and misleading presentation of data for both the EXCEL trial and the PIVOT-02 trial, such as the cherry-picking of patient populations, use of non-validated data, and practices for reading scans.  *See* Section X, *supra*.

### 1.    The Market Reacted Negatively to the Plainview Report

159.    On the revelation of Nektar's false and misleading presentation of its clinical trial data, Nektar's stock dropped $4.31 per share, from a closing price of $60.96 on September 28, 2018 to a closing price of $56.65 on October 1, 2018, or -7.07%, with unusually heavy trading

---

[34] Emma Court, *Do Nektar's disappointing clinical trial results invalidate $2 billion Bristol-Myers deal?* MarketWatch (June 5, 2018), https://www.marketwatch.com/story/do-nektars-disappointing-clinical-trial-results-invalidate-2-billion-bristol-myers-deal-2018-06-04.

volume of almost 5 million shares (compared to a Class Period daily average trading volume of 2 million[35]).

### 2.    As a Result of Defendants' Fraudulent Conduct, the Price of Nektar Common Stock Was Inflated

160.    As a result of Defendants' fraudulent conduct alleged herein, the price at which Nektar common stock traded was artificially inflated throughout the Class Period. When Lead Plaintiff and other members of the Class purchased their Nektar common stock, the true value of such common stock was greatly lower than the prices actually paid. As a result of purchasing Nektar common stock during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

161.    When the Company's misrepresentations, omissions and other fraudulent conduct were revealed through corrective disclosures or caused undisclosed risks to investors to later materialize, the price of Nektar common stock fell significantly, as a portion of the artificial inflation was removed from the Company's stock price. As a result of its purchases of Nektar common stock during the Class Period, Lead Plaintiff and the other members of the Class therefore suffered economic loss.

162.    As a result of Defendants' wrongful acts, materially false and misleading statements, and omissions of adverse, undisclosed information known to the Defendants, Lead Plaintiff and other members of the Class relied, to their detriment, on such statements and omissions and documents, and/or the integrity of the market, in purchasing their Nektar common stock at artificially inflated prices during the Class Period. Had Lead Plaintiff and other members of the Class known the truth, they would not have made such purchases.

## IX.    MATERIALITY

163.    Defendants' misleading statements and omissions concerning NKTR-214's performance in clinical trials were extremely important to investors given that, as Nektar itself

---

[35] This average excludes alleged corrective disclosure and/or materialization of risk dates.

repeatedly and publicly admitted, the drug's success was crucial to the Company's business during the Class Period.

164.  For example, at the May 22, 2017 UBS Global Healthcare Conference, Defendant Zalevsky stated, "[O]ur flagship program is NKTR-214." At the London Jefferies 11/15/17 Conference, Defendant Zalevsky stated that NKTR-214 would "be a *backbone* of many, many kinds of immunotherapy regimens" and was "[n]ow the *flagship* [in Nektar's] portfolio."

165.  In Nektar's Form 10-K for 2017, which was filed with the SEC on March 1, 2018 (the "2017 10-K"), the Company warned that its business was "highly dependent" on NKTR-214's success:

> We are *highly dependent* on the success of NKTR-214, our lead I-O candidate. We are executing a broad development program for NKTR-214 and *clinical and regulatory outcomes for NKTR-214, if not successful, will significantly harm our business*.

166.  Indeed, Nektar's 2017 10-K explicitly recognized that clinical trial data, such as that which Defendants had misrepresented to the public, was highly important to the Company's valuation:

> To date, clinical outcomes from NKTR-214 have had a *significant impact* on our market valuation, financial position, and business prospects and we expect this to continue in future periods. If one or more clinical studies of NKTR-214 are not successful, it would *materially harm* our market valuation, prospects, financial condition and results of operations.

167.  Similarly, Nektar's Form 10-Q for the second quarter of 2018, which was filed with the SEC on August 9, 2018, stated: "Our current business plan is subject to *significant uncertainties and risks* as a result of, among other factors, *clinical and regulatory outcomes for NKTR-214* . . . ."

168.  Finally, Nektar's share price declined $42.39 per share on the two corrective disclosures and/or materializations of concealed risk herein alleged. *See* Section VIII, *infra*.

## X.   ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANT'S SCIENTER

169.   Throughout the Class Period, Defendants acted with scienter by either knowingly misleading investors about the performance of NKTR-214 and the conduct of its clinical trials or doing so in a deliberately reckless manner.

### A.   Defendants Acted with Conscious Misbehavior or Recklessness

#### 1.   Defendants Were Familiar with the Excel Dataset and Knew That Including Outlier Patient Data Was Misleading

170.   It is inconceivable that Nektar's management and scientific personnel was not aware that using the outlier patient's data to justify their 30-fold increase claim would mislead the public.  Each of the three Defendants was present at executive meetings where the inclusion of the outlier patient in the data presented to the public was discussed.  *See infra* ¶ 184.

171.    As discussed *supra* in ¶¶ 87-104, Expert # 1 noted that participants familiar with the use of data in the pharmaceutical industry, such as Defendants, would possess the requisite understanding to realize that presenting the data to "prove" a 30-fold increase in cancer-fighting cells would violate the industry and scientific standards against using data that is (1) highly incomplete or (2) outlier driven.  This, according to Expert # 1, is because individuals familiar with pharmaceutical research typically assume those standards are followed.

172.    Defendant Robin, as President and Chief Executive Officer, was familiar with the industry and scientific standards of the pharmaceutical industry.  As Defendant Robin parsed the data in detail and ordered that the outlier patient be included, despite the reservations of scientific personnel, it is clear that he was aware the outlier data was not typical and would likely skew the dataset.  Robin's knowledge of the EXCEL dataset can also be inferred by his repeated presentations on the topic.  In the case of Defendants Doberstein and Zalevsky, each has a PhD and worked as scientist in the development process of NKTR-214, which supports an inference that each was familiar enough with the small dataset of the EXCEL trial to realize the fold increase in CD8 cancer-fighting cells was driven by the inclusion of an outlier patient.  Like Robin, Doberstein and Zalevsky possess sufficient experience in the pharmaceutical industry to understand the basic industry and scientific standards that are utilized.

**2.    Defendants Hid the Source of the 30-Fold Increase Claim Based on The EXCEL Data**

173.    Beginning in January 2017 and continuing through June 2018 the Individual Defendants repeatedly presented their false "30-fold increase" claim. It is clear from both direct and circumstantial evidence that the Individual Defendants were aware that their presentation of the source data for this claim was misleading. Defendants only once disclosed that their data for the "30-fold increase" claim was outlier-driven, and (a) they made that disclosure only in the "Background" section of a European medical conference poster providing a general overview of PIVOT-02's objectives and design (*i.e.*, not an announcement of any results of the study), and (b) took no steps to draw investors' attention to this critical information undercutting its "30-fold increase" narrative.

174.    The poster that the Company presented at the European Society for Medical Oncology meeting in Madrid, Spain, in September 2017, entitled "PIVOT-02: A Phase 1/2, Open-Label, Multicenter, Dose Escalation and Dose Expansion Study of NKTR-214 and Nivolumab in Patients With Select, Locally Advanced or Metastatic Solid Tumor Malignancies", provided information about the design of the then-ongoing PIVOT-02 trial, such as its objectives, design and status. In a "Background" section, the Company provided information concerning the earlier Phase 1 EXCEL trial including, in Figure 3, a few bar charts.  The middle bar chart in Figure 3 displayed the same data as the "29.8" bar the Company had repeatedly used in investor presentations, with one significant difference: it contained an error bar. The error bar for the middle bar chart, titled "Selective Increase of CD8+ T Cells in the Tumor," indicates that the margin of error was almost as long as the bar itself evidencing the defendants knowledge of the outlier data being included in the charts and failing to inform the marketplace. While the error bar certainly demonstrates the Defendants knowledge of the misstatements surrounding the "30-fold " increase it still fails to clearly convey to the marketplace about the outlier patient. Significantly, at no investor conference during the Class Period did a Nektar speaker or slide presentation refer to Nektar's September 2017 ESMO poster Figure 3 bar chart titled "Selective Increase of CD8+ T Cells in the Tumor" the only material that contained the data regarding the

outlier. The fact that information was buried within hundreds of data points on a single medical poster further evinces defendants' knowledge and motive to conceal the information.

175.    While a chart with error bars was presented at the ESMO conference, it was unrecognizable as a version of the chart repeatedly presented to investors to justify the 30-fold increase claim.  An investor could not have divined from viewing the chart or the presentation that one qualified the conclusions of the other.  When Defendant Zalevsky later presented the slide at the 2017 ASCO conference, he had to "draw your attention to" the combination therapy results (in purple) ("I mean, this is an enormous increase in the amount of [cancer-fighting] T cells in the tumor. In fact, the purple bar is about a 190-fold increase over baseline."). Additionally, it appears the scale is condensed in order to draw emphasis away from the error bars that might call these verbal claims into question. The combination of these efforts to obscure the data with Defendants' verbal statements successfully hid the truth from the public.

176.    Defendants consistently and willfully hid the ball when they made numerous public presentations about NKTR-214. As previously alleged, Defendants did not reveal any data source when initially presenting the bar chart to support their "30-fold increase" claim. Defendants then presented the same information at least 11 times at subsequent events with either no source listed, or the wrong source listed.  Tellingly, Defendants added error bars to only one version of the presentation, which was presented at a medical conference outside the United States with no accompanying statement or explanation:



177.    No effort was made to correct or update these earlier statements and omissions, and while error bars appeared on the ESMO version of the bar chart, they did not appear in subsequent presentations to investors—further evincing Defendants' intent to conceal this information. *See* Section X, *supra*. It is completely implausible that a company of Nektar's

sophistication would consistently present critical misleading data on its slides solely as a product of chance.

178.    The conclusion that these misrepresentations were deliberate is furthered by the fact that each functioned to obscure the Company's problematic data related to the Company's most important product.

### 3.    Defendants Misleading Presentation of The EXCEL Data Was Part of a Broader Effort to Create Misleading Positive Clinical Trial Data

179.    Evidence from confidential witnesses establishes that Defendants consistently manipulated the collection and presentation of data to make NKTR-214 appear more positive to investors.  The misstatements about the EXCEL trial data must be understood in this context. The following information has been gathered from three confidential witnesses that worked at Nektar during the relevant period.

180.    CW # 1 is a former Nektar Director of Clinical Development Operations. CW # 1 was responsible for ensuring that clinical trials were conducted in accordance with standard protocols and reported to Mary Tagliaferri, M.D., who served as Senior Vice President, Clinical Development until she was promoted to her current position, Chief Medical Officer, in December 2017. CW # 1 worked on the development of NKTR-214.

181.    According to CW # 1, Nektar directed that employees not follow proper procedures for reading scans, which led to the presentation of inaccurate overly positive data about NKTR-214 clinical trials to the public. CW # 1 indicated that the PIVOT trial was unusually ineffective and small and that the study was amended several times to include additional cancers. CW # 1 explained that Nektar did not wait for research to conclude before making presentations, but instead used real-time un-validated data. This conduct, according to CW # 1, included telephoning trial sites to obtain unverified patient data for inclusion in public presentations such as the ASCO conference. CW # 1, an experienced clinical professional, commented, "It is never done like this.  I was disgusted." At no time did the Defendants disclose these practices regarding the manipulation of data to the marketplace.

182.    CW # 2 worked in Clinical Development Operations at Nektar throughout the Class Period. CW # 2 reported to Chief Medical Officer Ivan Gergel until Tagliaferri was elevated to the CMO position in November 2017.  A seasoned clinical investigator, CW # 2 is a former head of infectious disease research at a large public university and has worked at leading companies in the pharmaceutical industry.

183.    According to CW # 2, the working atmosphere at Nektar was "chaotic" in large part because the Company was so focused on reporting positive clinical trial data for the PIVOT-02 trial.

184.    CW # 2 often attended Executive Committee meetings related to the development of NKTR-214. Regular attendees were Robin, Doberstein, Zalevsky, Tagliaferri, and Gergel. CW # 2 emphasized that Robin was very detail-driven and was hands-on when it came to the data from PIVOT. CW# 2 confirmed that the outlier patient from the EXCEL trial whose data was included in the Company's "30-Fold" increase bar chart was discussed at Executive Committee meetings. Robin specifically was aware of this issue and nevertheless instructed that the data from the outlier patient be included in public presentations—and it was included in the data set used to support Defendants 30-fold increase misstatements.  *See supra* ¶¶ 84-86.

185.    According to CW # 2, the Company was only interested in patients showing tumor reduction and would seek out additional information on these patients to cherry-pick what was "shiny and good." It was gallows-humor for CW # 2 and colleagues to joke about what the "shiny ball of the day" was. According to CW # 2: "At Nektar it was all about raising money." NKTR-214 clinical trial data needed to be "shiny and good" for the Company to attract the interest of biopharmaceutical companies who could offer funding for the NKTR-214 clinical development program.  This, according to CW # 2, was because Nektar had a limited pipeline of products, making it important to advance even its marginal drug candidates.

186.    Nektar's focus on "good" patient data manifested itself in a number of ways that CW # 2 found troubling. That focus was driven by Nektar's top executives including Robin, Doberstein, Tagliaferri, and Gergel. Nektar Executive Committee meetings were held every two

weeks, on Wednesdays.  CW # 2 attended the meetings related to the development of NKTR-214.

187.    CW # 2 reported that Nektar personnel, including Tagliaferri and Gergel, or others working at their direction, would reach out to PIVOT-02 investigators—medical doctors treating patients enrolled in the trial—to obtain data directly from study sites for the purpose of including new, good data in medical conference posters and presentations and investor presentations. CW # 2 described a process wherein bad patient data would be excluded when the data was received after a predetermined cut-off time, but that good patient data would be included in presentations via an extension of the deadline.  CW # 2 stated that Nektar had established pre-determined cutoff deadlines for accepting data from investigators for use in presentations for medical conferences and investors.  CW # 2 described a method whereby the Nektar employees would ask the investigators, who had usually read patient scans, how certain patients were doing. If the investigator responded that the patient was doing well, Nektar would extend the previously communicated cutoff deadline and ask that the data for that patient be prepared in time to be used at the public events. If the investigator would state that the patient was not doing well, the matter would be dropped.[36]

188.    According to CW # 2, "all hell broke loose" as Nektar and trial site personnel were expected to scramble to include the positive data in the presentation.  CW # 2 confirmed

[36] This conduct is at odds with the FDA's *Guidance for Industry: E9 Statistical Principles for Clinical Trials*, Center for Drug Evaluation and Research and Center for Biologics Evaluation and Research (Sept. 1998), https://www.fda.gov/media/71336/download, which states that "every effort should be made to minimize the various known sources of bias and primary variables should be as objective as possible."  The broad term "bias" is used to "describe[] the systematic tendency of any factors associated with the design, conduct, analysis, and interpretation of the results of clinical trials to make the estimate of a treatment effect . . . deviate from its true value. It is important to identify potential sources of bias as completely as possible so that attempts to limit such bias may be made." The FDA further warns that "[t]he presence of bias may seriously compromise the ability to draw valid conclusions from clinical trials." Moreover, the FDA calls out the exact conduct the Defendants are alleged to have committed: "For example, protocol violations and exclusion of subjects from analysis based upon knowledge of subject outcomes are possible sources of bias that may affect the accurate assessment of the treatment effect."

that such "fire drills" occurred "at least once a quarter" and that the trial sites "would complain a lot" because such requests were labor-intensive and not a typical request within the industry. CW # 2 recalled the specific example that Dr. Diab at MD Anderson called Defendant Robin to complain that the requests were "killing" his staff and that multiple individuals had threatened to quit. CW # 2 confirmed that at least one investigator working quit as a result of this pressure. CW # 2 emphasized that the purpose of these requests was "to collect favorable data."

189.    CW # 2 stated that calls to trial sites were made by Nektar employees Dr. Michael Imperiale and Dr. Margaret Ziola, the Senior Director of Clinical Development at Nektar. While CW # 2 did not place these calls, CW # 2 was present with the data management team when many of them were made. CW # 2 was also aware that additional calls had taken place. CW # 2 recalled that Imperiale and Ziola protested to Tagliaferri on at least three occasions that it was inappropriate to include data after a cutoff date, but that Tagliaferri told them to "do it anyway" because Defendant "Howard [Robin] wants it."

190.    CW # 2 was also concerned because the calls to investigators were not always about obtaining information but about challenging information already reported for the purpose of trying to obtain more favorable results. Tagliaferri and Gergel would review and measure patient scans, call investigators, question their reported analyses, and suggest alternate placement options for obtaining tumor scan measurements. Per CW # 2, Nektar did not have qualified oncology radiologists on staff, and neither Tagliaferri nor Gergel were qualified to render judgments about what tumor scans did or did not show. CW # 2 confirmed that Tagliaferri traveled to the East Coast to meet with central-read facility Bioclinica and persuade them to use different cuts of tumor images—in order to make the results appear more favorable. CW # 2 provided the specific example that Tagliaferri instructed Bioclinica on how to pick which scans to measure in order to produce more favorable results. CW # 2 recalled that at a stage when only 10-12 patients were enrolled, Tagliaferri boasted to management that she had been able to persuade them to reclassify two tumor scans. The trip, noted CW # 2, had been approved by Defendant Robin.

191.   This information was confirmed by CW # 3, who worked as a senior member of the clinical team from 2018 through the end of the class period. CW # 3 was involved with the collection of response data from trial sites for the PIVOT-02 trial.  CW # 3 stated that Nektar employees, including Tagliaferri, would frequently contact independent trial sites and noted that the practice occurred frequently with the MD Anderson Cancer Center.  CW # 3 noted that the purpose of this contact was to prioritize the collection of patient data that was likely to be positive.  CW # 3 confirmed that these calls were sometimes placed by Imperiale and Ziola.  CW # 3 noted that this level of contact with independent trial sites is not typical practice within the industry and felt that it was improper.

192.   According to both CW # 1 and CW # 2, proper industry practice requires that clinical trial data be validated, collected, and analyzed before it is presented publicly. Nektar personnel would instead call investigators directly to obtain results over the phone.   CW # 1 confirmed that this practice occurred with respect to the results reported at ASCO 2018. CW # 2 confirmed that the practice of using un-validated data was more widespread and also occurred for other medical conferences including the ASCO conferences in June 2017 and 2018, and critically, the SITC conference in November 2017 (which, as discussed above, revealed positive PIVOT-02 data that was welcomed by the market and that helped drive up Nektar's stock price).

193.   CW # 2 reported that the PIVOT-02 trial had an unusually high number of amendments and administrative letters to the study's protocol—the roadmap for how a clinical trial is to be conducted. CW # 2 elaborated that many of the amendments and administrative letters were, consistent with the Company's goal of getting "good" results, designed to exclude from the study patients who were too sick. Even more disturbing, CW # 2 reported that, in addition to the formal protocol amendments designed to shape the patient population, Tagliaferri and a handful of other Nektar employees acting at her direction would call study sites to have them implement undocumented *non-protocol* criteria to exclude patients more likely to have a poor prognosis. As described by CW # 2, Nektar was not only cherry-picking which PIVOT-02 data made its way into public presentations, it was cherry-picking which patients were enrolled

in the study in the first place. CW # 2 emphasized that "you can't just make this stuff up behind the scenes" in a trial program conforming with industry standards.

194.    In an extreme example of Nektar trying to affect the PIVOT-02 patient population, CW # 2 reported that Tagliaferri suspended an entire country's participation in the trial. Because investigators in Poland were recruiting patients she thought were too sick, patient recruitment there was, at least temporarily, halted.

195.    CW # 2 confirmed that these practices were discussed at the Company's bi-weekly Executive Committee meetings attended by, among others, Robin, Doberstein, Zalevsky, Tagliaferri, and Gergel, and that they were all aware of the practices. The sum of these practices ordered by Defendants accomplished the intended effect of undermining the integrity of the PIVOT-02 data Nektar gathered and reported during the Class Period, particularly the positive data reported in November 2017 at the SITC annual meeting.

196.    Both CWs also reported information that validates a concern later expressed in the October 2018 Plainview Report. Plainview observed that, in clinical trials generally, investigator assessments of tumor size are unreliable both because of inter- and intra-observer variability in evaluating tumors, and because investigators—who interact directly with the patients and want to tell sick patients they are getting better—are naturally biased towards overstating response rates. A blinded independent central review, on the other hand, has no such bias, so Plainview's expectation was that overall response rates as reported by a blinded independent central review process would be less favorable than investigator-reported overall response rates for NKTR-214 clinical trial patients. CW # 1 reported that in the fall of 2017, Nektar sent to central read facility Bioclinica, 112 scans of PIVOT-02 patients. The scans had originally been reviewed by PIVOT-02 investigators from institutions running the clinical trials. The independent blinded review revealed that only 28 of the 112 scans reviewed by Bioclinica matched the measurements reported by the PIVOT-02 investigators. That so many patient scans were worse than had been originally reported was a "huge deal" according to CW # 1; in a conversation with a biostatistician from Nektar, CW # 1 was told that the biostatistician was surprised with such a disparity between investigator-reported results and the results of an independent blinded review.

197.    CW # 2 summed up Nektar's approach as follows: "They came out with data and jumped to a bunch of conclusions with a very small amount of data focusing on the positives and sweeping some of the lesser positive stuff under the carpet." CW #2 witnessed the very selective data published by the Company, especially when making the collaboration deal with BMS, with the knowledge, encouragement, and/or participation of senior management including Robin, Zalevsky, Tagliaferri, and Gergel.

### 4.    Development of NKTR-214 Was Core to Nektar's Operations and the Individual Defendants Were Directly Involved in It

198.    As previously alleged, the development of NKTR-214 was crucial to the financial viability and well-being of Nektar. *See* Section IV, *supra*. In addition, Individual Defendants were directly involved in the development process for NKTR-214. *See* Section X, *supra*.

199.    A core operation concerns a company's primary products or services, and it extends to matters of importance that might significantly impact the company's bottom line. There is no question that Nektar's development of the NKTR-214 drug was critically important to the Company's operations and bottom line. Indeed, Defendants have stated this on numerous occasions. *See* Section X, *supra*.

200.    Because development of NKTR-214 was a core operation of Nektar, it is reasonable to assume that senior executives, including Defendants Robin, Zalevsky and Doberstein, who repeatedly made materially false statements, were aware of the status of its clinical trials. This inference is furthered by the direct evidence of their involvement with the NKTR-214 program and their scientific, medical, and drug development backgrounds that would have qualified them to interpret the data and be aware of industry norms for conducting clinical trials.

### 5.    Defendants Did Not Deny Their Conduct When Confronted with the Claim That They Misrepresented Their Data

201.    As previously alleged, Nektar in its public exchange with Plainview in October 2018 confirmed that the 2017 ASCO GU data analyzed by Plainview was the source for its "30-fold increase" claim. Nektar did not claim that Plainview used the *wrong* data but rather argued that Plainview should have looked to more *recent* data. *See* Section IV, *supra*. Nektar has failed

to identify any clinical trial evidence that Defendants could have relied on *at the time they made their statements* to support the Company's core "30-fold increase" claim that cancer-killing cells outnumbered immunosuppressive cells by orders of magnitude in the tumor microenvironment weeks after administration of NKTR-214. Nektar's lack of response on this point therefore represents a powerful admission that their "30-fold increase" claim was false.

**B.   Defendants Had the Motive and Opportunity to Commit the Alleged Fraud**

202.   Throughout the Class Period, Defendants had both motive and opportunity to misrepresent the performance of NKTR-214 in Clinical Trials—through control of the data presented at conferences, ability to manipulate the conduct of clinical trials, and other public conduct.

**1.   The Development of NKTR-214 Was of Crucial Importance to Defendants**

203.   Nektar had ample motive to mislead investors about the accomplishments of its immuno-oncology program. Much of the Company's share price valuation was tied to the NKTR-214 drug's potential. Indeed, one article concluded: "Nektar Therapeutics is a multibillion-dollar biotech with most of its value tied to a single drug."[37]

204.   While the downside of the truth emerging was enormous, the upside of the deception was equally large. When Nektar reached its deal with BMS in February 2018 to develop NKTR-214, the "upfront cash and equity payment of $1.85 billion [was] believed to be a drug industry record" that could elevate Nektar into the "pantheon of drug developers."[38] The Company could not survive without the resources of larger drug developers such as those it

---

[37] Phil Taylor, *Nektar's long-acting IL-2 NKTR-214 has 'zero value,' claims analyst*, FierceBiotech (Oct. 1, 2018), https://www.fiercebiotech.com/biotech/nektar-s-long-acting-il-2-nktr-214-has-zero-value-claims-analyst.

[38] Ron Leuty, *Record-smashing $3.6 billion deal propels S.F. drug company in cancer immunotherapy pack*, San Francisco Business Times, (Feb. 14, 2018), https://www.bizjournals.com/sanfrancisco/news/2018/02/14/nektar-nktr-bristol-myers-squibb-bmy-cancer-opdivo.html.

received through the deal with BMS. An October 10, 2018 Zacks analyst report described it as an "Overdependence," noting that "Nektar relies heavily on partners for revenues in the form of collaboration, license and milestone payments." And, in discussing the BMS deal as a potential reason to "buy" Nektar shares, the Zacks analyst stated that "Nektar gained a strong partner in the form of Bristol-Myers, a company with immense expertise in the field of immuno-oncology" in addition to the infusion of revenue needed to further research efforts. Individual Defendant Doberstein confirmed that the BMS deal was "a very stabilizing event" which brought the company "to the next stage of [its] development" as "a force in biologics."[39]

205.    Consequently, Nektar had motive to misrepresent the clinical trial performance of the NKTR-214 drug because the viability of the Company was at stake.

**2.    Defendants' Insider Trades Evince Strong Evidence of Motive**

206.    During the 20-month Class Period, Defendants sold more than *$67 million* in Nektar common stock from their personal holdings at artificially inflated prices while in possession of adverse non-public information about NKTR-214's true clinical trial performance and the Company's business practices. *See* section VIII, *infra*.

207.    During the Class Period, Defendant Robin sold 808,636 shares of Nektar common stock, which represented about 64% of his personal holdings during the Class Period, for gross proceeds of approximately *$38 million*. That dwarfs the gross proceeds of $15 million that Robin made from sales of Nektar stock in the 20-month period preceding the Class Period.

208.    During the Class Period, Defendant Doberstein sold 701,261 shares of Nektar common stock, which represented about 87% of his personal holdings, for gross proceeds of approximately *$29 million*. These sales were unusual because, during the 20-month period preceding the Class Period, Doberstein sold only about 2,700 shares, which represented only 9% of his personal holdings, for gross proceeds of only about $42,000.

---

[39] *Id.*

## XI.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE

209.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nektar who knew that those statements were false when made.

## XII.    PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET

210.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Lead Plaintiff and other members of the Class purchased Nektar common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

211.    At all relevant times, the market for Nektar shares was efficient for the following reasons, among others:

(a)    Nektar stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Nektar filed periodic public reports with the SEC and the NASDAQ;

(c)    Nektar regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)    Nektar was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

212.    As a result of the foregoing, market professionals generally considered most publicly announced material statements about Nektar and reflected such considered information in Nektar's stock price. Under these circumstances, all purchasers of Nektar common stock during the Class Period suffered similar injury because of their purchases of common stock at artificially inflated prices and a presumption of reliance applies.

213.    Lead Plaintiff is also entitled to a presumption of reliance under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny, as Defendants' misstatements throughout the Class Period included omissions, in that they failed to inform investors of Nektar's clinical and regulatory failures.

214.    Under these circumstances, all purchasers of Nektar's common stock during the Class Period suffered similar injury through their purchase of Nektar's securities at artificially inflated prices, which fell as the truth concerning NKTR-214 became known, and a presumption of reliance applies.

## XIII.   CLASS ACTION ALLEGATIONS

215.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of Nektar during the period from January 10, 2017 through September 28, 2018 inclusive, and were damaged thereby. Excluded from the Class are Defendants; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); the officers and directors of the Company and its subsidiaries and affiliates during the Class Period; members of the immediate family of any excluded person; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity in which any excluded person has or had a controlling interest.

216.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nektar had between 152 and 174 million shares of common stock outstanding, which were actively traded on the NASDAQ. The average daily trading volume during the Class Period was more than 2 million shares. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nektar or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

217.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

218.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

219. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and drug development efforts of Nektar;

- whether the prices of Nektar's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

220. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expenses and burden of individual litigation make it practically impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

221. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed in Section X, *supra*.

222. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

### FIRST CLAIM FOR RELIEF

### (For Violation of Section 10(b) of the Exchange Act

### and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

223. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

224. This Count is asserted against Nektar and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b) promulgated thereunder by the SEC.

225. During the Class Period, Nektar and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or were deliberately reckless in disregarding were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

226. Nektar and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

227. Nektar and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Nektar were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Nektar, their control over, and/or receipt and/or modification of Nektar's allegedly materially misleading statements, and/or their associations with the Company which made them privy to material concerning Nektar, participated in the fraudulent conduct alleged herein.

228. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Nektar personnel to members of the investing public, including Lead Plaintiff and the Class.

229. As a result of the foregoing, the market price of Nektar securities was artificially inflated during the Class Period. In ignorance of the falsity of Nektar's and the Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Nektar securities during the Class Period in purchasing Nektar securities at prices that were artificially inflated as a result of Nektar's and the Individual Defendants' false and misleading statements.

230. Had Lead Plaintiff and the other members of the Class been aware that the market price of Nektar securities had been artificially and falsely inflated by Nektar's and the Individual Defendants' misleading statements and by the material adverse information which Nektar's and the Individual Defendants did not adequately disclose to market professionals, they would not have purchased Nektar's securities at the artificially inflated prices that they did, or at all.

231. As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

232. By reason of the foregoing, Nektar and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rules 10b-5(b) promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Nektar securities during the Class Period.

**SECOND CLAIM FOR RELIEF**

**(For Violation of Section 20(a) of the Exchange Act**

**Against the Individual Defendants)**

233. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

234. During the Class Period, the Individual Defendants participated in the operation and management of Nektar. The Individual Defendants conducted and participated, directly and indirectly, in the conduct of Nektar's business affairs. Because of their senior positions, they knew the material information regarding the Company's operations including in its clinical trial program.

235.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nektar's financial condition and results of operations, and to correct promptly any public statements issued by Nektar which had become materially false or misleading.

236.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nektar disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nektar to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Nektar within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nektar securities.

237.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nektar.

## XIV.    REQUEST FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment on behalf of itself and the Class, as follows:

(a)    Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XV.    <u>JURY DEMAND</u>

Lead Plaintiff demands a jury trial as to all issues so triable.

Dated: August 10, 2020

Respectfully submitted,

By: /s/Thomas A. Dubbs
Thomas A. Dubbs (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Marisa N. DeMato (*pro hac vice*)
James E. McGovern (*pro hac vice*)
Thomas G. Hoffman (*pro hac vice* pending)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
mcanty@labaton.com
mdemato@labaton.com
jmcgovern@labaton.com
thoffman@labaton.com

*Attorneys for Lead Plaintiffs*

James M. Wagstaffe (#95535)
WAGSTAFFE, VON LOEWENFELDT, BUSCH &
RADWICK, LLP
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com

*Liaison Counsel for the Class*