Thomas A. Dubbs (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Marisa N. DeMato (*pro hac vice*)
James E. McGovern (*pro hac vice*)
Thomas G. Hoffman (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
mcanty@labaton.com
mdemato@labaton.com
jmcgovern@labaton.com
thoffman@labaton.com
*Attorneys for Lead Plaintiffs*

James M. Wagstaffe (#95535)
**WAGSTAFFE, VON LOEWENFELDT, BUSCH &
RADWICK, LLP**
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone:  (415) 357-8900
Facsimile:  (415) 371-0500
Email: wagstaffe@wvbrlaw.com
*Liaison Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| IN RE NEKTAR THERAPEUTICS SECURITIES LITIGATION | **Case No.: 4:18-cv-06607-HSG** <br><br> <u>CLASS ACTION</u> <br><br> **LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS NEKTAR THERAPEUTICS, HOWARD ROBIN, STEPHEN DOBERSTEIN AND JONATHAN ZALEVSKY'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Hon. Judge Haywood S. Gilliam, Jr. <br> Date:  December 3, 2020 <br> Time:  2:00 <br> Oakland Courthouse, Courtroom 2 – 4th Floor |

1

**TABLE OF CONTENTS**

2   INTRODUCTION ............................................................................................................... 1

3   BACKGROUND ................................................................................................................. 3

4   ARGUMENT ...................................................................................................................... 4

5   I.   DEFENDANTS' FALSE STATEMENTS ARE ACTIONABLE ...................................... 4

6        A.   Defendants' Use Of The 30-Fold Bar Chart Was False And Misleading............... 5

7        B.   Plaintiff Adequately Alleged That The Outlier Patient Was Included in
             The EXCEL Data Presented To The Public ............................................................ 5
8
9        C.   Defendants Confirm The Excel Data Presented Misrepresented The
             Dosing Schedule of the EXCEL Trial Patients...................................................... 7

10       D.   Defendants' Misrepresentations Involving Data Are Actionable .......................... 8

11   II.  THE TOTALITY OF FACTORS SUPPORTS A STRONG INFERENCE OF
          SCIENTER ............................................................................................................... 10
12
         A.   Direct Scienter .................................................................................................... 11
13
         B.   Concealing The Source Of The EXCEL Data ...................................................... 13
14
         C.   Confidential Witness Statements Reveal That Defendants Were Willing to
15            Selectively Release Positive Data........................................................................ 15

16       D.   Additional Allegations of Motive ........................................................................ 16

17   III. PLAINTIFF SUFFICIENTLY PLED LOSS CAUSATION............................................ 17

18       A.   Plaintiff Adequately Pled Loss Causation With Respect To The June 4,
             2018 Stock Drop .................................................................................................. 17
19
         B.   Plaintiff Adequately Pled Loss Causation With Respect To The October 1,
20            2018 Stock Drop .................................................................................................. 19

21   IV.  CONCLUSION......................................................................................................... 23

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

3
**Page(s)**

**Cases**

4

5
*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................................4

6

7
*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008) ..........................................................................4, 10

8
*In re BofI Holding, Inc. Sec. Litig.,*
   No. 18-55415, 2020 WL 5951150 (9th Cir. Oct. 8, 2020) .........................19, 20, 21

9

10
*Brody v. Transitional Hosps. Corp.,*
   280 F.3d 997 (9th Cir. 2002) ..................................................................................4

11

12
*In re Countrywide Fin. Corp. Sec. Litig.,*
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................22

13
*Flynn v. Sientra, Inc.,*
   No. 15-07548, 2016 WL 3360676 (C.D. Cal. June 9, 2016) .................................17

14

15
*In re Gilead Scis. Secs. Litig..,*
   536 F.3d 1049 (9th Cir. 2008) .........................................................................17, 22

16

17
*In re Immune Response Sec. Litig.,*
   375 F. Supp. 2d 983 (S.D. Cal. 2005)....................................................................8

18
*Lloyd v. CVB Fin. Corp.,*
   811 F.3d 1200 (9th Cir. 2016) ..............................................................................17

19

20
*Meyer v. Greene,*
   710 F.3d 1189 (11th Cir. 2013) ......................................................................21, 22

21

22
*Mineworkers' Pension Scheme v. First Solar Inc.,*
   881 F.3d 750 (9th Cir. 2018),
   *cert. denied,* 139 S. Ct. 2741 (2019) ..................................................................19

23

24
*Provenz v. Miller,*
   102 F.3d 1478 (9th Cir. 1996)...............................................................................22

25
*In re Rigel Pharmaceuticals, Inc. Sec. Litig.,*
   697 F.3d 869 (9th Cir. 2012) ............................................................................9, 10

26

27
*Robb v. Fitbit Inc.,*
   216 F. Supp. 3d 1017 (N.D. Cal. 2016) ...............................................................10

28

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................4, 7, 10, 17

*U.S. v. Harkonen*,
   No. C 08-00164, 2010 WL 2985257 (N.D. Cal. July 27, 2010)................................................9

*Zucco Partners LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................12, 13, 17

**Statutes**

15 U.S.C. §78u-4(b)..................................................................................4, 10

**Other Authorities**

17 C.F.R. §240.10b-5....................................................................................5

**INTRODUCTION**

Nektar Therapeutics ("Nektar" or the "Company") and certain key insiders (the "Individual Defendants") presented highly misleading data about their flagship drug candidate NKTR-214 to create the false impression that the drug had produced encouraging results during the EXCEL clinical trial. This inflated Nektar's stock price throughout the Class Period of January 10, 2017 to September 28, 2018. As the unrealistic expectations created by Defendants' misconduct were inevitably disappointed by subsequent clinical trial data, investors suffered heavy losses as Nektar's stock price plummeted an astounding 42% on June 4, 2018. Investors suffered additional losses of 7% on October 1, 2018, when it was revealed by a short seller's investigation (the "Plainview Report") that Defendants used misleading outlier-driven data, which had also misrepresented the dosing schedule of the patients involved, as the basis for many of their early public statements about the effectiveness of NKTR-214 in the EXCEL clinical trial.

This Court dismissed the prior complaint with leave to amend, providing a roadmap for repleading the claims at issue. The operative Second Consolidated Class Action Complaint (the "Complaint")[1] has addressed this Court's concerns, pleading that Defendants' false and misleading statements were predicated on misleading outlier-driven data involving a single patient who had a highly unusual reaction and was dosed more frequently than Defendants' public statements claimed. Nevertheless, Defendants continue to maintain that this outlier patient might not have been included in the dataset that formed the basis for their false and misleading statements. This is simply untrue. The Complaint includes additional confidential witness statements and an analysis by a highly qualified industry expert that put this issue to rest—and that alone is sufficient to address the great majority of Defendants' arguments.

Tellingly, Defendants maintain that *even if* data from the outlier patient was included in the alleged false statements and *even if* that inclusion dramatically altered the data presented, the decision to include the data—while hiding the fact that it was outlier-driven and misrepresenting

---

[1] All capitalized terms herein have the same meaning as in the Second Consolidated Class Action Complaint For Violation of Federal Securities Laws (ECF No. 80). All citations to "¶__" and "¶¶__" refer to paragraphs in the Complaint.

1   the dosing schedule—was an innocent question of scientific methodology that is not actionable
2   under the securities laws.  There is some irony to this given the allegations that Defendants' ***own***
3   ***scientists***, at least those who were not also Nektar executives that were involved in and profited
4   financially from the alleged fraud, protested to the Defendants that presenting the outlier data
5   would be misleading.  This conclusion is further supported by information and analysis from an
6   expert about the relevant industry and scientific standards for the use of such data.  The securities
7   laws do not immunize a business decision to mislead investors simply because the deception
8   involves scientific content.

9        While this court found that scienter had not been pled in the previous complaint, that
10   holding was premised on its discussion of falsity.  Now that the operative Complaint has
11   addressed this Court's concerns about the allegations regarding the outlier data and the dosing
12   schedule, the Complaint more than supports a strong inference of scienter.  This conclusion is
13   bolstered by expert analysis that anyone of Defendants' knowledge and experience would have
14   known that their public statements would mislead investors about the performance of NKTR-214
15   in the EXCEL clinical trial.

16        Finally, Defendants argue that loss causation has not been pled, despite the fact that
17   Defendants' fraudulently inflated investor expectations that were then frustrated by subsequent
18   developments.  Again, relying on a conclusion reached by this Court after it found that the falsity
19   of Defendants' statements had not been pled, Defendants argue that the public already knew the
20   facts exposed by the Plainview Report before the two alleged corrective events took place.  But,
21   as the operative Complaint clarifies, Defendants intentionally dispersed the supposedly public
22   information in a piecemeal and misleading fashion that was *intended* to make it difficult to
23   follow the breadcrumbs.  When a market participant finally solved the puzzle, and published its
24   findings after taking a short position, the share price plummeted when investors learned the truth.
25   Defendants now seek to be rewarded because they made it difficult for the market to discover
26   their fraud.  They should not.  And their motion to dismiss must be denied.

27
28

**BACKGROUND**

Throughout the class period, Defendants repeatedly stated that their drug candidate NKTR-214 produced a "30-fold increase" in cancer-fighting cells during the EXCEL clinical trial, without causing a corresponding increase in immunosuppressive cells.  This was significant because past attempts at producing cancer-fighting cells with similar treatments had been unable to avoid also producing a toxic quantity of immunosuppressive cells.  ¶¶3-5.  With this scientific backdrop, Defendants' statements indicated that the EXCEL trial had offered an early indication of a potential breakthrough in cancer research.  Defendants touted their supposed breakthrough at a series of conferences and investor events—each time repeating that a 30-fold increase in cancer-fighting cells was achieved without a corresponding increase in immunosuppressive cells.

In reality, the 30-fold increase in cancer-fighting cells was driven by the inclusion of data from a ***single*** outlier patient (in a dataset of 10) who experienced a ~300-fold increase in cancer-fighting cells.  ¶¶64-76; 84-96.  To make matters worse, this outlier patient was dosed more frequently than Defendants' claimed in their public statements.  ¶¶73-74; 104.  No other patient had a similar reaction.  ¶84.  And had the outlier patient been excluded from the dataset, the results would not have supported Defendants' claims that the EXCEL trial demonstrated an increase in cancer-fighting cells.  ¶¶84-85.  The fact that Defendants packaged their data to justify their 30-fold increase narrative, without revealing it was driven by a single outlier patient dosed more frequently than was acknowledged, broke with basic industry and scientific standards that market participants assume are followed.  ¶¶97-104.

Because any reasonable opportunity to parse the EXCEL data would have revealed that the 30-fold increase claim was highly misleading, Defendants ensured that investors could not examine the data in sufficient detail.  *See infra* Sec. II.  This was accomplished in part by listing the outlier patient's results in a small portion of a poster at a European medical conference, and subsequently presenting aggregated data at subsequent events in the United States with no acknowledgement it was driven by outlier data.  *Id*.  This inflated Nektar's share price as the EXCEL trial results were misleadingly sold as a positive when, in fact, any familiarity with the dataset would have debunked that claim.

1    Investors began to suffer losses when the data from a subsequent clinical trial, PIVOT-

2    02, was far less positive.  ¶¶154-57.  This is because the more complete dataset from PIVOT-02

3    frustrated the expectations that had been created by the repeated public statements about the

4    EXCEL trial.  Nevertheless, because investors did not yet have reason to believe that the EXCEL

5    trial data presented at conferences was an outlier-driven illusion, this initial red flag did not

6    remove all inflation from Nektar's share price.  Defendants helped see to this by continuing to

7    taut the EXCEL data after the PIVOT-02 data came out.  ¶¶145-47.  In a subsequent corrective

8    event, a published investigation by investors performed the feat of gathering all of Nektar's

9    public statements, made at various conferences across the globe, and examining the data.  ¶¶158-

10   62.  The publication of this investigation revealed to the market that Defendants' 30-fold

11   increase claim was based on data from a single outlier patient who was dosed more frequently

12   than acknowledged.  *Id*.  Once the market learned the true basis for Defendants' 30-fold increase

13   claim, the remaining inflation was removed from Nektar's share price as the deceptive nature of

14   Defendants' misstatements became clear to the market.  *Id*.

15                                            **ARGUMENT**

16       A motion to dismiss should be denied if the complaint "contain[s] sufficient factual

17   matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

18   556 U.S. 662, 678 (2009) (quotation marks omitted).  All factual allegations must be taken as

19   true, construed in the light most favorable to the plaintiff, and considered collectively.  *Tellabs,*

20   *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

21   **I.      DEFENDANTS' FALSE STATEMENTS ARE ACTIONABLE**

22       Under the PSLRA, falsity is pled by "specify[ing] each statement alleged to have been

23   misleading" and "the reason or reasons why the statement is misleading" 15 U.S.C. §78u-

24   4(b)(1)(B).  "[A] statement is misleading if it would give a reasonable investor the impression of

25   a state of affairs that differs in a material way from the one that actually exists." *Berson v.*

26   *Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quotations omitted).  Similarly, an

27   omission "must affirmatively create an impression of a state of affairs that differs in a material

28   way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006

(9th Cir. 2002). This includes a duty "to make the statements . . . in light of the circumstances under which they were made not misleading." 17 C.F.R. §240.10b-5(b).

### A. Defendants' Use Of The 30-Fold Bar Chart Was False And Misleading

Throughout the class period, Defendants repeated the misleading claim that the EXCEL trial had demonstrated a "30-fold" increase in cancer-fighting cells, without also increasing immunosuppressive cells. ¶¶53-54. The source for this claim was never adequately revealed to investors. In reality, a single outlier patient saw an extreme ~300-fold increase, which significantly skewed the average increase in cancer-fighting cells across the 10-patient dataset used to support Defendants' public statements. ¶¶84-96. No other patient had a similar reaction, a fact confirmed by CW #2. ¶84. The dataset also included patients (including the outlier) who were dosed every two weeks (potentially increasing the chance of a favorable result as the patient receives the drug more often), which is contrary to the Company's statements that the dataset was comprised of data from patients dosed every three weeks. *Id.* at ¶73. In short, the EXCEL data provided no justification for Defendants' numerous positive statements about it. Investors who reasonably assumed that basic industry and scientific standards were followed were misled by Defendants' misconduct.

### B. Plaintiff Adequately Alleged That The Outlier Patient Was Included in The EXCEL Data Presented To The Public

The operative Complaint establishes that Defendants' 30-fold increase claim, which formed the basis for the false and misleading statements at issue, was driven by data from a single outlier patient who had a unique and highly unusual reaction. In its prior order, this Court held that the Plainview Report did not indicate sufficient expertise for this Court to accept its conclusion that the outlier patient on the Figure 6 line graph at the 2017 ASCO GU conference, who showed a ~300-fold increase in cancer-fighting cells, was included in the dataset. Dkt. #76 at 16. The Court also found that CW #2's statement that Defendant Robin ordered the outlier patient to be included in public presentations did not necessarily refer to the outlier from the Figure 6 line graph, as opposed to a different outlier in the EXCEL data. *Id.* at 17.

The operative Complaint addresses these concerns.  It is pled that CW #2, who worked in Clinical Development Operations at Nektar and attended the relevant meetings, remembers that the patient from the Figure 6 line graph was used in the false statements.  *See* Complaint at ¶84 (noting that CW #2 "confirmed that Patient 14 referenced in Figure 6 of the poster displayed at the 2017 ASCO GU conference was the single outlier patient who experienced a unique increase in cancer-fighting cells.").  CW #2 also confirmed that "no other patient in the study had a similar reaction to the drug" and that "had the outlier patient been removed from the dataset, the result would have been 'nowhere near' the 30-fold increase claim" that was presented by Defendants.  ¶¶84-85.  These statements directly support that Patient 14 from Figure 6 of the line graph was included in the 30-fold increase claims.

In an attempt to cling to their previous argument, Defendants selectively quote the Complaint and offer a strawman.  They argue that the Complaint contains "significant equivocation" about whether Patient 14 was included in the false and misleading statements by quoting only the statement from CW #2 that there was a single outlier (which, read in context, was made after the direct statement that this outlier was Patient 14).  Dkt. #86 at 12 (referring to ¶84 of the Complaint).  Notably, even if Defendants' linguistic games were accepted and the direct statement is ignored, Defendants still miss the mark.  Given that CW #2 remembered that only one patient had an outlier reaction and that outlier data significantly skewed the 30-fold increase figure, it can be inferred from CW #2's statements that Patient 14 was included in the dataset supporting Defendants' public statements (as a reading of Figure 6 clearly shows Patient 14 had an outlier reaction, there was only one outlier reaction, and an outlier reaction was included).  In other words, the Complaint directly alleges that the outlier data of Patient 14 was included in Defendants' public statements and, regardless, also pleads facts from which that inference may be logically drawn.

Importantly, this Court noted that "Plaintiffs sufficiently detail that CW #2's role was such that he or she would be in a position to hear Defendant Robin discuss and instruct that the purported outlier data should be used in public presentations, such as the 30-fold increase chart."  Dkt. #76 at 17 n.5.  *See* ¶¶182-84 (describing why CW #2 had a basis for his or her knowledge).

1    As such, it is clearly established that a single outlier patient provided the basis for Defendants'

2    30-fold increase claims.  The Complaint adequately pled this fact and it must be accepted at this

3    early stage.  *Tellabs*, 551 U.S. at 323.

4          **C.**    **Defendants Confirm The Excel Data Presented Misrepresented The Dosing Schedule of the EXCEL Trial Patients**

5

6         The Complaint pleads that Defendants' false and misleading statements misrepresented

     the dosing schedule of the patient population by claiming patients were dosed every three weeks
7
     when, in fact, two patients—including the outlier patient—were dosed every two weeks.  ¶¶5;
8
     73.  Given that a 10-patient dataset was used to support the public statements, this meant that 40
9
     percent of the patients included were on a more aggressive dosing schedule than Defendants
10
     repeatedly claimed in their presentations.  ¶73.  After the Plainview Report revealed the falsity of
11
     this misrepresentation, the Company's stock price dropped.  *See* ¶¶158-62.
12
          In the prior order, the claims related to the dosing schedule were dismissed because this
13
     Court found that the complaint did not plead that Patient 14 from the Figure 6 line graph (the
14
     outlier) was included in the dataset supporting the 30-fold increase claims (which the Plainview
15
     Report's analysis of the dosing schedule assumed).  Dkt. #76 at 18.  Defendants' brief
16
     acknowledges the interrelationship of these issues.  *See* Dkt. #86 at 10-11 ("Apart from their
17
     allegations about Patient 14 . . . Plaintiffs plead no facts showing that patients dosed every two
18
     weeks *were* in fact included in the bar chart.").  Because the Complaint now establishes that
19
     Patient 14 was included in the 30-fold increase data, it must be assumed at this stage that the
20
     dosing schedule was misrepresented—a factor that could introduce substantial bias into the
21
     market and was important to investors.  ¶104.[2]
22

23

24

25

26       [2] This statement from Expert #1 is more than sufficient to address Defendants' assertion that the Complaint does not explain why investors would view dosing on a three-week schedule less favorably than dosing on a two-week schedule.  *See* Dkt. #86 at 11.  Certainly, whether
27    Defendants' statement that positive results occurred when individuals were dosed less often than they actually were (as in the case of the outlier patient) is a question of fact at this stage. Moreover, as discussed above, the investors who authored the Plainview Report certainly found
28    it to be relevant, as did the subsequent market reaction.

### D.    Defendants' Misrepresentations Involving Data Are Actionable

Defendants continue to maintain that statements involving statistical or scientific content are discretionary matters that are not actionable under the securities laws.  This is not the law. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) (denying motion to dismiss where it was alleged that "Defendants committed fraud by publicly reporting [optimistic clinical trial] results that they knew or should have known were either so incomplete or so statistically flawed as to lack clinical significance.").[3]  Notably, this Court accepted the above as valid authority but held that the prior complaint "failed to explain why or how the data was so 'incomplete' or 'statistically flawed' as to be misleading on its face."  Dkt. #76 at 18.

Since the operative Complaint establishes that the misleading 30-fold increase claim was based on data from a single outlier patient dosed more frequently than was acknowledged, the Complaint shows that the data informing Defendants' false and misleading statements was so "incomplete" and "statistically flawed" as to be misleading on its face.  This conclusion is supported by the analysis of Expert #1, a highly qualified PhD who serves as the Director of Cancer Biostatistics at a major research university.  *See*  ¶87 (listing other qualifications).  Expert #1 conducted a statistical analysis of the 30-fold increase statements that assumed Patient 14 from the Figure 6 line graph (the outlier) was included in a dataset of 10 patients (as the slides Defendants presented indicated).  *Id*. at ¶88.[4]  Notably, Expert #1 stated that utilizing Patient 14 in the 10-patient dataset to support Defendants' 30-fold increase claim—which is exactly what

---

[3] The court further clarified that "Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light.  Whether Defendants' statements were accurate is not an issue at this stage." *Id*. Here, the 30-fold increase claims similarly presented the EXCEL clinical trial in an unduly optimistic light, while the misrepresentation of the dosing schedule was inaccurate.  Defendants' reply brief on the previous motion to dismiss attempted to distinguish this case by pointing to the fact that the *Immune Response* defendants had been informed in real time that their public statements were misleading.  Dkt. #70 at 5.  Here, the same is true.  *See* ¶85 (detailing allegations that Defendants were told by their scientists that their statements were false and misleading).  It is also a false distinction as Defendants had knowledge of what they were doing throughout the class period.  *See infra* Sec. II.

[4] The analysis was conservative and assumed that no patient had a negative fold change.  *Id*. at  ¶¶89-90.  The results were consistent with the error bar displayed at the ESMO 2017 conference, independently confirming CW #2's statement that Patient 14's data was included in Nektar's 30-fold increase calculations.  *Id*. at ¶¶95-96.

1    Defendants did—was "highly misleading" both because it misrepresented the dosing schedule

2    and because the data was incomplete and outlier-driven.  ¶¶98-100.[5]  As stated by Expert #1,

3    there are ***clear industry and scientific norms against both the presentation of "highly***

4    ***incomplete" and "outlier-driven" data.***  *Id*. at ¶100-101 (emphasis added).[6]  In the judgment of

5    Expert #1 both of these standards were violated by Defendants' use of outlier-driven data, which

6    misrepresented the dosing schedule, to support their 30-fold increase claim.  *Id*.  Expert #1

7    emphasized that individuals familiar with pharmaceutical research assume that such basic

8    standards are followed.  *Id*. at 102.

9        As such, Defendants' statements were false and misleading statements because they did

10    not acknowledge that the data was so incomplete and statistically flawed as to be misleading to

11    anyone with basic knowledge of industry and scientific standards.  As discussed, this is

12    actionable under the *Immune Response Securities Litigation* line of cases.  *See also U.S. v.*

13    *Harkonen*, No. C 08-00164, 2010 WL 2985257, at *9 (N.D. Cal. July 27, 2010) (affirming

14    finding of falsity in wire fraud conviction based on press release that expressed unreasonable

15    optimism about a failed clinical trial in light of accepted statistical methods for interpreting

16    clinical trial data).

17        Defendants continue to rely on *In re Rigel Pharmaceuticals, Inc. Securities Litigation*,

18    697 F.3d 869 (9th Cir. 2012), which affirmed the dismissal of a complaint where the plaintiff

19    "[did] not allege that [d]efendants misrepresented their own statistical methodology, analysis,

20    and conclusions, but instead criticize[d] only the statistical methodology employed by

21    [d]efendants." *Id*. at 879.  But *Rigel* did not involve an allegation that Defendants' statements

22    were so incomplete and statistically flawed as to be misleading on their face.  Nor did any of the

23

24

25        [5] Defendants' assertion that Expert # 1 only demonstrated basic facts about the computation of an average is belied by the fact that his or her computation of various scenarios shows no

26    other patient besides the outlier could have had a similar reaction—a fact also confirmed by CW #2, as was discussed previously.  *See* Dkt. #86 at 14-15.  While Defendants ridiculously assert

27    that any fold change in the patients may be significant even if the 30-fold increase claim is outlier-driven, that again is a question of fact not appropriate for resolution at this stage.

28        [6] The clear identification of these two standards belies Defendants' assertion that the Complaint does not articulate what standards were violated by Defendants' conduct.  *See* Dkt. #86 at 13-14.  It is too late for Defendants to address this point on reply.

cases in Defendants' list of cases applying *Rigel*.  Instead, the dispute was merely whether one of several reasonable, which is to say not misleading, methodologies should have been used.

Here, where Defendants presented inaccurate and outlier-driven data that would mislead anyone versed in industry and scientific standards, this case involves far more than an academic disagreement over whether one of several reasonable research methodologies is the best methodology for a clinical trial.

## II.     THE TOTALITY OF FACTORS SUPPORTS A STRONG INFERENCE OF SCIENTER

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). Alleging scienter requires "facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987.

Evaluating scienter requires a "holistic approach" that considers "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23; *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[A] court should look to the complaint as a whole, not to each individual scienter allegation.").  Significantly, scienter allegations must only be "as cogent or compelling as a plausible alternative inference." *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016).  This standard is met where, as here, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Plaintiffs need not produce a "smoking gun" to satisfy this burden.  *Id*. at 330.

Here, the picture is compelling.  Defendants repeatedly touted the claim that NKTR-214 produced a 30-fold increase in cancer-fighting cells, when they knew that the statement was based on data from a single outlier patient dosed more frequently than was claimed.  Any person of Defendants' medical training and industry experience would have known this violated industry and scientific standards related to the presentation of data and, as such, would have been

misleading to market participants who assume that such standards are followed.  The inference that Defendants' conduct was intentional is supported by the lengths Defendants went to in order to hide the source of the data—burying an error bar in a poster displayed once in Spain and including an unrecognizable version of the same error bar at one subsequent event.  Knowledge may be assumed by the fact that confidential witness statements, in addition to the analysis of Expert #1, establishes that Defendant Robin was aware of the effect of the outlier patient on the dataset and nevertheless ordered that the patient be included.  This decision was consistent with Defendant Robin's subsequent conduct of only releasing positive cherry-picked data from the PIVOT-02 trial that followed the EXCEL trial.  Taken together, these facts, many of which are individually sufficient, support a strong inference of scienter.

### A.    Direct Scienter

Having pled that the Defendants' 30-fold increase claim, based on data from a single outlier patient who was dosed more frequently than acknowledged, was false and misleading, the concerns this Court identified with the scienter pleadings are readily addressed.  In its prior order, this Court noted that while it was pled that CW #2 participated in meetings where Defendant Robin instructed the data from the outlier patient to be included in public presentations, the complaint "fail[ed] to explain why this action was wrong or indicative of scienter."  Dkt. #76 at 19-20 (citing *Rigel Pharm.*, 697 F.3d at 833).  As established *supra*, that concern has been addressed by the allegation that any individual knowledgeable about industry and scientific standards would have found the use of the outlier-patient to generate the 30-fold increase claims, when no other patient had a similar reaction, to be highly misleading.  Expert #1 noted that "participants familiar with the use of data in the pharmaceutical industry, ***such as Defendants***, would possess the requisite understanding to realize that presenting the data to "prove" a 30-fold increase in cancer-fighting cells would violate the above industry and scientific standards [of not using "highly incomplete" or "outlier" data to sell a claim] customarily followed in such trials that individuals familiar with pharmaceutical research typically assume are followed."  ¶102 (emphasis added).

Each Defendants had an industry background, scientific, and medical training that makes them familiar with basic industry and scientific standards.  ¶¶13-17.  That these individuals were immersed in decisions about what data would be included in public statements supports that their conduct was intentional.  CW #2 confirmed that the decision to include the outlier patient was made at Executive Committee meetings, in which each Individual Defendant participated, and that the ultimate decision to include the data was ***ordered*** by Defendant Robin personally.  ¶184. As discussed, this Court has already credited that CW #2 is adequately alleged to have knowledge of these events.  *See supra* Sec. I.  The falsity of the 30-fold increase claim, combined with these allegations about knowledge, is probative of scienter.  *See Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) ("[F]alsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact [was prominent].") (quotation marks omitted).

Defendants' direct knowledge of the dataset used to mislead the public is further supported by the additional information provided by CW #2 that the Company's own scientists protested to Defendants that it would be misleading to include the outlier data.  *See* ¶85.[7] Defendants argue this is contradictory because Defendants Zalevsky and Doberstein also had scientific backgrounds (*id.*) but those Defendants also had business roles ***and were involved in making the false and misleading statements*** and profited from the fraud by making stock sales during the Class Period.  As such, had Defendants unwittingly erred during the meetings in which it was determined what data should be included (an assumption that strains credulity), the misleading nature of their eventual public statements were brought to their attention before they were made.  Defendants prioritized their self-interest over their duties as scientists, despite being cautioned by the Company's own scientists who had no such conflicts.

---

[7] While Defendants protest that the names of the employees and scientists have not been provided (Dkt. #86 at 19), that level of granularity is not required.

**B.      Concealing The Source Of The EXCEL Data**

The Complaint also establishes that Defendants engaged in a pattern of deceptive behavior to hide the misuse of statistical data that supported the 30-fold increase claims.  While this was pled in the prior complaint, this Court did not credit the allegations because it found that it was not pled that Patient 14 from the Figure 6 line graph (the outlier) was necessarily included in the dataset that supported the 30-fold increase claims.  Dkt. #76 at 20.  Because that fact has now been established, the chronology of events indicates that public information was disseminated in a deceptive pattern more likely to result from intentional conduct than any innocent explanation.[8]

In a poster displayed at the European Society for Medical Oncology meeting in Madrid, Spain in September 2017, Defendants first presented the 30-fold increase claim.  ¶174.  Unlike the slides displayed as Defendants presented their false and misleading statements, this poster contained an error bar that indicated the 30-fold increase claim was achieved with outlier data. *Id*.  Tellingly, this feature disappeared from every presentation made during the Class Period. *Id*. Instead, the information remained buried within hundreds of data points on a single medical poster displayed during a presentation in Spain.  *Id*.  The Complaint provides context for how the error bars, which contained no accompanying explanation, were buried in the poster by reproducing the poster:

---

[8] Defendants' motion merely states that this allegation was previously found insufficient, taking for granted it should be again, when the reason for this Court's previous holding was that the underlying falsity allegation had not been pled.  Now that the 30-fold increase claims have been shown to be false and misleading, the pattern of how Defendants kept the public from seeing how the data was assembled is even more stark.

¶176.  After Defendant Robin set the narrative of a 30-fold increase being demonstrated, each Defendant towed the line in their presentations.  At one conference in the United States, ASCO 2017, Defendant Zalevsky presented a slide with an error bar (while verbally stating the 30-fold

increase claim) where the error bar appeared condensed to draw emphasis away from it.  ¶175.[9]
This succeeded in preventing the market from absorbing the information that the 30-fold increase claim was driven by data from an outlier patient (who was also dosed more frequently than was acknowledged).  The market did not learn of that information until the publication of the Plainview Report.

In short, Defendants repeatedly obscured any statistical information that could have allowed investors to put Defendants' misleading 30-fold increase statements into their proper context.  As alleged, this consistent pattern of obscuring the source of the data is evidence of Defendants' scienter.  ¶176-77.   It is not plausible that a company of Nektar's sophistication would have done this by mistake.  *Id*. at ¶177.  Each presentation helped fit the pattern, negating any innocent explanation that Defendants might offer for their behavior.  It is telling that once the Plainview Report connected the dots, investors were shocked and the Company's share price immediately declined.  The market could not learn that outlier data supported the 30-fold increase claim from the single poster displayed in Spain and the unrecognizable graphics displayed at one subsequent conference.

### C.   Confidential Witness Statements Reveal That Defendants Were Willing to Selectively Release Positive Data

The Complaint further establishes evidence of scienter by showing that NKTR-214 was of sufficient importance to the Company that the PIVOT-02 trial, which followed the EXCEL trial, was manipulated to produce more positive data.  The Complaint alleges that to obtain more favorable PIVOT data, Defendants, and others acting at their direction, improperly interfered with the conduct of the trials in various ways. *See*, *e.g.*, ¶187 (selectively granting extensions of cutoff deadlines only to present positive data to investors); ¶¶188-91 (calling investigators to suggest they alter their conclusions about patient scans to produce more favorable data); ¶¶193-94 (improper use of non-protocol criteria to exclude patients to improve results, including suspension of all participants from Poland, who may have been more ill).  This information was

---

[9] Defendants misrepresent the Complaint on this point, stating that the Complaint says Defendant Zalevsky drew attention to the error bar.  In fact, a reading of ¶175 of the Complaint indicates that Zalevsky drew attention to the portion of the slide indicating an "enormous increase in the amount of [cancer fighting] T cells in the tumor."  *See* Dkt. #86 at 18.

1   supported by the statements of three confidential witnesses with direct knowledge of this

2   conduct.  ¶¶180; 182; 191.

3       Importantly, the confidential witnesses establish that Defendants manipulated PIVOT-02

4   given a desire to release only positive data to obtain funding.  This is important as the motive

5   also explains why Defendants would release an outlier-driven dataset to support their 30-fold

6   increase claim during the EXCEL trial.  CW #2, who worked in Clinical Development

7   Operations at Nektar throughout the Class Period and attended executive meetings where

8   Defendants discussed NKTR-214, explained Defendants' motives with the statement that "[a]t

9   Nektar it was all about raising money."  ¶¶182-85.  NKTR-214 was particularly important to

10   Defendants given Nektar's limited pipeline of viable drug candidates.  *Id*. at ¶185.

11       The Complaint alleges that during the PIVOT trial, calls were made to trial sites to

12   persuade them to selectively submit positive data before public presentations, while negative

13   data was excluded by the selective enforcement of pre-determined cutoff deadlines.  ¶¶187-89.

14   As the new Complaint details, CW #2 was present for many of these calls and recalled that

15   Nektar employees Dr. Michael Imperiale and Dr. Margaret Ziola, who were tasked with making

16   these calls, protested to Tagliaferri that it was inappropriate to include data after a cutoff date,

17   but current Chief Medical Officer Tagliaferri told them to "do it anyway" because Defendant

18   "Howard [Robin] wants it."  ¶189.[10]  By doing so, the Defendants ensured that positive trial data

19   would disproportionately affect the data reported to the public.  Consequently, these statements

20   establish a further pattern of intentional conduct by Defendant Robin of selectively releasing

21   positive data, as he did previously with the EXCEL data in the alleged false and misleading

22   statements.

23       **D.**  **Additional Allegations of Motive**

24       While Plaintiffs must only show a strong inference of intentional conduct, the pleadings

25   also shed additional light on Defendants' motives.  As the Complaint alleges, securing funding

26

27       [10] CW #3, whose statements were not available at the time of the previous complaint, corroborated that these calls took place, were sometimes placed by Imperiale and Ziola and, like CW #1 and CW #2, felt the conduct was improper and not consistent with industry standards. ¶191.

28

by producing positive clinical trial results was also of crucial importance to Nektar's operations because it helped Nektar secure the developmental support of BMS.  ¶204.  Based on analyst reports referenced in the Complaint, Plaintiff alleged this allowed Nektar to receive a record cash payment.  *Id*.  Defendant Doberstein described the deal as "a very stabilizing event" and the Company was seen by analysts as heavily reliant on partners for revenue.  *Id*.  In addition, each of the Defendants profited through sales of stock.  *See* ¶¶206-8.  Such allegations of motive are supportive of scienter.  *See Tellabs*, 551 U.S. at 325 ("[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference").  While the Court found neither allegation of motive was sufficient to indicate scienter in its prior order, they must be considered holistically with the allegations of the operative Complaint.  *See id.* at 322-23.

## III.     PLAINTIFF SUFFICIENTLY PLED LOSS CAUSATION

"To establish loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quotation marks omitted).  "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."  *Id*. at 1057.  This is "a context-dependent inquiry . . . as there are an infinite variety of ways for a tort to cause a loss."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (citation and quotation marks omitted).  A plaintiff need allege only that a given disclosure was a "substantial factor," rather than the only factor, in causing the decline in the price of a security.  *See, e.g.*, *Flynn v. Sientra, Inc.*, No. 15-07548, 2016 WL 3360676, at *16 (C.D. Cal. June 9, 2016).

### A.     Plaintiff Adequately Pled Loss Causation With Respect To The June 4, 2018 Stock Drop

On Saturday, June 2, 2018, Nektar introduced NKTR-214 Phase 1/2 data from the PIVOT-02 clinical trial at the ASCO conference in Chicago and a subsequent analyst and investor event.  ¶59-62.  The new data revealed a clinical trial performance significantly worse than investors had been led to expect, which caused an ***astounding 42% drop*** in Nektar's share

price on Monday, June 4, 2018, when the market incorporated the new information.  ¶156.

Contemporaneous analyst commentary confirmed that the drop was caused by the disappointing

data.  ¶157.  As alleged, the fundamental reason that the additional PIVOT-02 data did not meet

expectations is because those expectations had been inflated by Defendants' numerous false and

misleading statements about the EXCEL trials.  ¶155.

In its prior order, this Court noted that the June 4, 2018 drop was not adequately alleged

to be a consequence of the scheme liability allegations that have been withdrawn.  Dkt. #76 at

28.  As the operative Complaint alleges, this drop was due to the frustration of positive

expectations for the effectiveness of NKTR-214 created by the false and misleading 30-fold

increase claims, as the availability of more data about the drug increasingly cast doubt on the

optimism generated by the misleading dataset that was presented.  *See* ¶155.

While the Court held that "nothing in the Complaint plausibly establishes that

Defendants' misstatements about the EXCEL clinical trial, as opposed to some other fact, caused

Plaintiffs' June 4, 2018 loss."  Dkt. #76 at 30, this point is addressed by the new allegations

establishing that false and misleading statements inflated the Company's share price by

introducing the false 30-fold increase narrative to the market.  The Complaint pleads that the

subsequent drop was a clear materialization of risk: "Defendants' false '30-fold increase' claim

with respect to the EXCEL trial created an undisclosed risk that future trial results that were

accurately reported and not manipulated would not be so rosy and would therefore disappoint the

market."  ¶155.

Because the less favorable PIVOT results, from a different study, did not reveal that the

statement about the EXCEL trial was false, not all inflation was removed by this drop.  Investors

still had some reason to be optimistic about the EXCEL data (not knowing it was driven by a

single outlier dosed more often than was claimed), even though the PIVOT data cast doubt on

the effectiveness of NKTR-214.[11]  In addition, Defendants helped to ensure this by continuing

to taut the EXCEL data during this period.  ¶¶145-47.  Importantly, Ninth Circuit law does not

_____

[11] The fact that the measurement criteria for these studies had differences is irrelevant, what
matters is that the false and misleading EXCEL data indicated NKTR-214 may be effective,
while the PIVOT data called that into question.

require that such a materialization of the risk actually reveal the fraudulent nature of Defendants' false and misleading statements. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018), *cert. denied,* 139 S. Ct. 2741 (2019) (The court explained that "it is the underlying facts concealed by fraud that affect the stock price. Fraud simply causes a delay in the revelation of those facts. The ultimate issue [for loss causation] is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.") (citations and quotation marks omitted).

**B.      Plaintiff Adequately Pled Loss Causation With Respect To The October 1, 2018 Stock Drop**

On October 1, 2018, the Plainview Report discredited Nektar's false narrative that the EXCEL trial demonstrated a "30-fold increase" in cancer-fighting cells and also revealed that the dosing schedule had been misrepresented. ¶73. This removed the remaining inflation caused by those statements. *Id.* On the news, Nektar's stock price declined 7% from its previous closing price. ¶159.

In its prior order, this Court held that because the Plainview Report was based on publicly available data, it did not constitute a corrective disclosure. *See* Dkt. #76 at 30 (citing *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013)). Importantly, this holding was reached when the allegation in the prior complaint that Defendants hid the source of the 30-fold increase claim in their public statements was not credited, as the falsity allegations now firmly established were not credited.[12] *See supra* Sec. II (discussing how the misleading features of the dataset used to support the 30-fold increase claim were buried in a foreign poster and one subsequent presentation).

Defendants cannot escape liability merely because the market did not immediately react to their well-hidden manipulation of data that could be discovered only by a painstaking reconstruction of their deceptive conduct. Recent authority from the Ninth Circuit has addressed this precise question. The case, *In re BofI Holding, Inc. Sec. Litig.*, No. 18-55415, 2020 WL 5951150 (9th Cir. Oct. 8, 2020), concerned whether a bank committed securities fraud by

---

[12] Defendants therefore miss the mark by claiming the previous loss causation allegations are merely repackaged. Dkt. #86 at 23. The Complaint must be read as a whole.

portraying itself as a safer investment than it actually was.  *Id*. at *2.  The question on appeal was

whether a whistleblower lawsuit and a series of blog posts could be corrective events for

purposes of loss causation.  *Id*.  The blog posts, like the Plainview Report, were published

anonymously on the website *Seeking Alpha* by an investor who acknowledged having taken a

short position against the bank.  *Id*. at *4.  Also, as in this case, it was undisputed that the blog

posts were based solely on information derived from public sources.  *Id*.  In a further similarity,

the district court ruled that the blog posts could not be a corrective disclosure because they were

derived from public sources of information.  *Id*.  While the Ninth Circuit ultimately affirmed the

judgment of the district court, it rejected that rationale and provided guidance for future cases

where a Complaint pleads that the market did not learn of a fraud until a report was published

that connects previously available sources of public information for the first time.

      The Ninth Circuit reasoned that a corrective disclosure is adequately pled where it is

alleged that: "(1) a corrective disclosure revealed, in whole or in part, the truth concealed by the

defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to

decline and the inflation attributable to the misstatements to dissipate."  *BofI Holding, Inc. Sec.

Litig.*, 2020 WL 5951150, at *6.  At the pleading stage, this requires facts "plausibly suggesting"

that both showings can be made.  *Id*.  In the context of the blog posts, this meant that plaintiffs

needed to "plead with particularity facts plausibly explaining why the information was not yet

reflected in the company's stock price."  *Id*. at *9.  The Ninth Circuit observed that this could be

accomplished by pleading that "[i]f other market participants had not done the same analysis,

then it is plausible that the blog posts disclosed new information that the market had not yet

incorporated into BofI's stock price."  *Id*.  After a review of its precedent, the Ninth Circuit

explicitly rejected the existence of a bright-line rule that categorically disqualifies corrective

disclosures merely because they are based on already public information:

> Contrary to the bright-line rule BofI urges us to adopt, these cases endorse a
> flexible approach to evaluating corrective disclosures. ***A disclosure based on
> publicly available information can, in certain circumstances, constitute a
> corrective disclosure.*** The ultimate question is again one of plausibility: Based on
> plaintiffs' particularized allegations, can we plausibly infer that the alleged
> corrective disclosure provided new information to the market that was not yet
> reflected in the company's stock price? ***The fact that the underlying data was***

> *publicly available is certainly one factor to consider. But other factors include the complexity of the data and its relationship to the alleged misstatements*, as in *Amedisys* and *Gilead*, ***and the great effort needed to locate and analyze it***, as the shareholders allege here. Courts must assess these and other factors on a case-by-case basis. ***We therefore decline to categorically disqualify the Seeking Alpha blog posts as potential corrective disclosures***.

*In re BofI Holding, Inc. Sec. Litig.*, 2020 WL 5951150, at *10 (emphasis added).  Importantly, the Ninth Circuit acknowledged that while the *Meyer* case relied on by Defendants is the law of the Eleventh Circuit, it is contrary to Ninth Circuit precedent and would not be extended.  *Id.* at *10 n.5.

While Defendants continue to point to the fact that the Plainview Report relied on publicly available sources of information, the Complaint pleads that the market was unaware of the misleading outlier-driven nature of the 30-fold increase claim, and the misrepresentations about the dosing schedule, until the Plainview Report was published (which is the only explanation for the drop in share price that immediately followed).  The Complaint explains that the market was unaware because Defendants hid the fact that only outlier data, which also misrepresented the dosing schedule, supported the 30-fold increase claim.  *See supra* Sec. II.  The Ninth Circuit credited similar allegations in *BofI*, as some of the blog posts similarly "required extensive and tedious research involving the analysis of far-flung bits and pieces of data."  *In re BofI Holding, Inc. Sec. Litig.*, 2020 WL 5951150, at *11.  The Ninth Circuit concluded that "[t]he time and effort it took to compile this information make it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available."  *Id.*  Here, the allegations are analogous given the pleadings that no market participant was able to follow Defendants' breadcrumbs (which required connecting public statements made in the United States to a single data point buried in a poster presented in Spain) before the Plainview Report was released.

In *BofI*, the Ninth Circuit ultimately found that the blog posts did not constitute a corrective disclosure because they had only a tangential relationship to the alleged false statements about the bank's conservative underwriting standards.  *Id.* at *10-11 (detailing the lack of a direct relationship).  Whereas here, it is alleged that the Plainview Report directly

1    demonstrated that the 30-fold increase statements (which are the statements at issue in this case)

2    were false because they relied on outlier data.  *See supra* Sec. I.  This is a direct rather than

3    tangential relationship that easily meets the standard established by the Ninth Circuit.  While the

4    Ninth Circuit also noted that market participants would take the information with a "grain of

5    salt" because the authors maintained a short position, that is not dispositive where, as here, the

6    allegations are comparably strong that no market participant previously made the connections the

7    Plainview Report made and the information it revealed to the market bears on the exact content

8    of the false and misleading statements.

9         This recent holding extends a tradition where courts of this circuit have rejected the

10   *Meyer* line of cases.  *See, e.g.*, *Provenz v. Miller*, 102 F.3d 1378, 1492–93 (9th Cir. 1996)

11   ("[B]efore the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the

12   information that was withheld or misrepresented was 'transmitted to the public with a degree of

13   intensity and credibility sufficient to effectively counterbalance any misleading impression

14   created by insider's one-sided representations.'"); *see also Gilead S.*, 536 F.3d at 1058 (it was

15   plausibly alleged for loss causation purposes that warning letters sent to physicians would be

16   understood by physicians before the public); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.

17   Supp. 2d 1132, 1160 (C.D. Cal. 2008) (rejecting truth-on-the-market defense at pleading stage

18   given complexity of prospectus documents that supposedly rebutted public misrepresentations

19   about mortgage-backed securities).

20        If Defendants prevail on this ground, it will allow future manipulative conduct so long as

21   a securities fraud defense is manufactured by releasing data in a piecemeal and confusing manner

22   so it delays the time when (if ever) the market can digest it.  That Plainview was the first market

23   participant to finally unravel the web and grasp the misleading nature of Defendants' false and

24   misleading statements is to their credit.  What matters is not that these investors took a short

25   position, as was prudent given their discovery, but instead that the share value of Nektar

26   plummeted when they published their findings and the market learned the truth of Defendants'

27   false and misleading statements.

28

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. If this Court grants it, in whole or in part, Plaintiffs respectfully request leave to amend under Fed. R. Civ. P. 15(a) to cure any defects.


Dated: October 15, 2020                                    Respectfully submitted,


By: */s/ Thomas A. Dubbs*
Thomas A. Dubbs (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Marisa N. DeMato (*pro hac vice*)
James E. McGovern (*pro hac vice*)
Thomas G. Hoffman (*pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
mcanty@labaton.com
mdemato@labaton.com
jmcgovern@labaton.com
thoffman@labaton.com
*Attorneys for Plaintiffs*

James M. Wagstaffe (#95535)
WAGSTAFFE, VON LOEWENFELDT,
BUSCH & RADWICK, LLP
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 371-0500
Email: wagstaffe@wvbrlaw.com

*Liaison Counsel for the Class*