1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    JOHN MULQUIN,                          Case No. 18-cv-06607-HSG

8                  Plaintiff,               **ORDER GRANTING MOTION TO DISMISS**

9          v.                               Re: Dkt. No. 86

10   NEKTAR THERAPEUTICS, et al.,

11                 Defendants.

12

13         This is a consolidated securities class action brought by Plaintiffs Oklahoma Firefighters

14   Pension and Retirement System and El Paso Firemen & Policemen's Pension Fund (together,

15   "Lead Plaintiffs") against Defendant Nektar Therapeutics ("Nektar" or "the Company") and

16   Howard W. Robin, President and Chief Executive Officer; Stephen K. Doberstein, Senior Vice

17   President and Chief Scientific Officer, and later Chief Research and Development Officer; and

18   Jonathan Zalevsky, Senior Vice President of Research Biology and Preclinical Development, and

19   later Chief Scientific Officer ("Individual Defendants," and collectively with Nektar,

20   "Defendants").  The Court previously dismissed Plaintiffs' Consolidated Class Action Complaint

21   with leave to amend.  *See In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004,

22   at *1 (N.D. Cal. July 13, 2020) ("Order"); *see* Dkt. No. 54 ("CCAC").  In their Second

23   Consolidated Class Action Complaint, Plaintiffs allege violations of Sections 10(b) and 20(a) of

24   the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated

25   thereunder. Dkt. No. 80 ("SAC") ¶¶ 223–237.  Pending before the Court is Defendants' motion to

26   dismiss the SAC, for which briefing is complete.  Dkt. Nos. 86 ("Mot."), 87 ("Opp."), and 88

27   ("Reply").  For the following reasons, the Court **GRANTS** Defendants' motion to dismiss, this

28   time **WITHOUT LEAVE TO AMEND**.

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.   BACKGROUND

Plaintiffs bring this securities action "on behalf of a class of purchasers of the common stock of Nektar who bought their shares between January 10, 2017, and September 28, 2018, inclusive (the 'Class Period')." SAC at ¶ 1. The following facts are taken from the SAC.

Nektar is a research-based biopharmaceutical company with a "research and development pipeline of new investigational drugs [that] includes treatments for cancer, autoimmune disease, and chronic pain." *Id.* at ¶ 13. At issue in this case is Nektar's development of its "flagship" drug, NKTR-214. *Id.* at ¶ 2. NKTR-214 was "a modified version of Interleukin-2," a human protein that "triggers the body's production of cancer-fighting cells." *Id.* at ¶¶ 3–4. While Interleukin-2 "has long been an approved cancer therapy," a patient would need "significant quantities of native [Interleukin]-2 to get any kind of effect, and at that point it's wildly toxic." *Id.* at ¶ 3 (quotations omitted). The Company designed NKTR-214 to address this problem and "produce significant quantities of cancer-fighting cells without affecting the production of immunosuppressive cells." *Id.* at 4 (quotations omitted).

### A.   EXCEL Clinical Trial

#### i.   Trial Data

"In December 2015, Nektar announced that the first human patients had been dosed with NKTR-214 in a Phase I clinical trial, EXCEL, for patients with advanced solid tumors." *Id.* at ¶ 50. EXCEL was a 28-patient monotherapy trial which dosed participants once every two to three weeks. *Id.* at ¶¶ 68, 107. "On January 10, 2017, Defendant Robin gave a presentation at the annual JP Morgan Healthcare Conference," displaying results from the EXCEL clinical trial. *Id.* at ¶ 50. "One slide showed that cancer-fighting cells increased by an average of 30-fold in tumors of purportedly ten patients dosed with NKTR-214 every three weeks, with very little change in their immunosuppressive Treg cells." *Id.* at ¶ 51. This chart, the "30-fold increase chart," forms the basis of Plaintiffs' securities claims. *Id.* at ¶¶ 105, 109, 113. This 30-fold increase chart was then presented in a similar or identical form at numerous subsequent conferences. *Id.* at ¶ 53.

#### ii.   Plainview Report

"On October 1, 2018, Plainview [LLC] published a report titled 'NKTR-214: Pegging the Value at Zero' (the 'Plainview Report' or the 'Report')." *Id.* at ¶ 64. "Plainview acknowledged in

United States District Court
Northern District of California

the Report that its authors 'have short positions in and may own option interests on the stock of [Nektar] and stand to realize gains in the event that the price of the stock decreases.'" *Id.* at ¶ 75. The Report concluded that NKTR-214 is "too weak to work," and found that "Nektar's frequently cite[d . . .] 30-fold average change in tumor-infiltrating lymphocyte (TIL) CD8+ . . . is distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ [(cancer-fighting cells)] but saw no clinical benefit." *Id.* at ¶ 64–65. This finding referred to the 30-fold increase chart. The Report also contended that "the [purported] source of the '30-fold' increase claim was a single line chart from a poster that Nektar displayed at a February 2017 American Society of Clinical Oncology [ASCO] symposium." *Id.* at ¶ 66. The line chart identified in the Report was Figure 6 of the February 2017 ASCO poster. *Id.* at ¶ 67. Pointing to Patient 14 in Figure 6, the Report explained:

> Nektar ran a 28-patient Phase 1 EXCEL trial, during which Nektar evaluated the change in tumor-infiltrating CD8+ T cells. None of the patients actually saw a 30-fold change in TIL CD8+: one single patient saw a ~300x increase, and this skewed the average. The reported average barely exceeded the standard error and was not even close to statistical significance; tell-tale signs of data driven by variation rather than efficacy.

*Id.* at ¶ 68 (emphasis omitted). Plaintiffs allege that through the Report's disclosure of the purported source of the data for the 30-fold increase chart, *id.* at ¶ 71, "investors finally had the opportunity to study the relevant line chart . . . as well as the patient information to the right of the [chart]," *id.* at ¶ 72. From the chart, investors deduced as follows:

> The lines for Patients 2, 4, 6 are orange and the lines for Patients 14 and 15 are purple. That means that Patients 14 and 15 were on a two-week dosing schedule, not a three-week dosing schedule as Nektar had said. The information to the right of the line chart makes clear that patients whose lines are purple are dosed "q2w" or every two weeks, and that patients whose lines are orange are dosed "q3w" or every three weeks. This shows that forty percent of the patients Nektar claimed to be on a three-week schedule were actually being dosed more often than Nektar claimed.

*Id.* at ¶ 73. Thus, if the analysis was truly based on the "three patients dosed every three weeks— Patients 2, 4, and 6—the fold change" was "~1.8 fold, a dramatically lower multiple that undermines the central message Nektar repeatedly delivered during the Class Period." *Id.* at ¶ 74.

"On Friday, September 28, 2018, Nektar's stock closed at $60.96. The Plainview Report

was published before the marked opened on Monday, October 1, 2018, and by the time the market closed, Nektar was trading at $56.65—a one day drop of 7% on heavy trading volume." *Id.* at ¶ 76.

### B.   PIVOT-2 Clinical Trial

"In February 2018, Nektar and [Bristol-Myers Squibb ("BMS")] announced a 'Global Development & Commercialization Collaboration' to evaluate NKTR-214." *Id.* at ¶ 58. This second clinical trial, known as PIVOT-02, tested a combination of NKTR-214 and Opdivo, a cancer immunotherapy drug developed by BMS. *Id.* at ¶¶ 55, 62. "In connection with that collaboration, BMS agreed to pay Nektar $1.85 billion upfront, comprised of $1.0 billion in cash and the purchase of ~8.28 million shares of Nektar stock at $102.60 per share." *Id.* at ¶ 58.

Plaintiffs allege that "Nektar personnel, including Tagliaferri and Gergel, or others working at their direction, would reach out to PIVOT-02 investigators . . . to obtain data directly from study sites for the purpose of including new, good data in medical conference posters and presentations and investor presentations." *Id.* at ¶ 187. "[B]ad patient data would be excluded when the data was received after a predetermined cut-off time, but . . . good patient data would be included in presentations via an extension of the deadline." *Id.* "On November 11, 2017, Nektar hosted an 'Investor Meeting' to coincide with the Society of Immunotherapy of Cancer ('SITC') annual meeting at which limited data concerning the PIVOT-02 clinical trial was presented." *Id.* at ¶ 55. "Following the November 2017 SITC meeting, Nektar's stock price rose in part because 'Management . . . unveiled impressive early-stage trial data for NKTR-214, a wholly owned immuno-oncology drug that's being studied for use alongside [BMS's] multibillion-dollar drug Opdivo.'" *Id.* at ¶ 57.

On June 2, 2018, "MD Anderson physician and Nektar consultant Dr. Adi Diab presented PIVOT-02 clinical trial data concerning NKTR-214 and Opdivo at the ASCO annual meeting in Chicago." *Id.* at ¶ 59. Reports from the event allegedly concluded:

> According to the new ASCO data set, for melanoma, the [overall response rate ("ORR")] is now 50% (14 of 28 patients in stage 2)—down from 85% last November when 11 of 13 patients responded. Similarly, for renal cell carcinoma, the ORR went down from 64% (seven of 11 patients) to 46% (12 of 26) in stage 2.

United States District Court
Northern District of California

1   *Id.* (alterations in original).  "Following this news, Nektar's stock fell from $90.35 at the close

2   from the previous Friday, June 1st, to $52.57 at the close of Monday June 4, 2018, a decline of

3   41.82%."  *Id.* at ¶ 60.  Despite these reports on the PIVOT-2 data, at the Jeffries 2018 Healthcare

4   Conference on June 6, 2018, "Zalevsky reemphasized the EXCEL data that the market still did not

5   know was misleading."  *Id.* at ¶ 63.

6       **C.    False and Misleading Statements**

7       Plaintiffs point to two primary aspects of the 30-fold increase chart that they allege were

8   false or misleading representations by Defendants:

9           (a)  The 29.8 figure is based on the misleading inclusion of an outlier
                 patient who saw a unique increase in CD8 cancer-fighting cells;
10

11          (b)  The "Week 3 / predose" fold-change represents that all patients
                 in the population sample were dosed every three weeks when, in
12               fact, two of the patients whose data was included in the CD8
                 population sample—the outlier-patient and one other patient—
                 were dosed every two weeks.
13

14  *Id.* at ¶ 106(a)–(b).  Similar versions of this chart were presented at numerous investor

15  conferences, and Plaintiffs make the same allegations as to all presentations.  *See id.* at ¶¶  105–06,

16  109–110, 113–14, 117–18, 121–22, 128–29, 133–34, 135–36, 139–40, 145–46.

17      Plaintiffs additionally point to statements made at many of the same conferences where

18  Individual Defendants provided commentary on a version of the 30-fold increase chart.  On

19  January 10, 2017, Defendant Robin presented at a JP Morgan Investor Event.  *Id.* at ¶ 105.

20  Plaintiffs allege that Robin stated:

21          We've designed a new IL-2 molecule with a biased action to the beta,
            gamma receptors and not that alpha receptor.  And consequently,
22          there you can produce significant quantities of CD8 positive T cells
            without affecting the production or the proliferation of regulatory T
            cells.
23          The other thing we've done is made a pro-drug, because one of the
            problems you have with native IL-2 is, when you administer a native
24          IL-2, it releases immediately in plasma and you get this massive
            unwanted immune response. It's very short-lived, but it has very, very
25          serious side effects in terms of cytokine storm, et cetera.  And what
            we've done is, designed a molecule where the biological linkers
26          release in the tumor microenvironment and you don't see – and
            therefore, you get the full effect of the cytokine in the tumor, not in
27          circulation.  So with that, you're also able to achieve antibody-like
            dosing.  So we're dosing NKTR-214 once every three weeks in an
28          outpatient setting.

> So here's some data from the Phase 1 trial, demonstrating – and these are 10 patients where we have tumor biopsies. And you can clearly see that we had a significant increase in CD8 positive T-effector cells with no increase in T-reg cells. And interestingly enough, we also see a great increase in PD-1 positive CD8 T cells. So, very, very pleased with these results. The Phase 1 study was designed to show these biomarkers and this is clearly what we set out to do; cause the proliferation of T-effector cells and not cause the proliferation of regulatory T cells.

*Id.* at ¶ 107 (emphasis omitted). Similarly, on March 7, 2017, Defendant Doberstein represented the Company at a Cowen & Company Healthcare Conference. *Id.* at ¶ 109. Plaintiffs allege Doberstein stated:

> Now what we found in patients from NKTR-214 is that first, as a monotherapy, it does pretty much exactly what we designed it to do. You can see a 30-fold increase in CD8 cells inside the tumors of patients from tumor biopsies who've received NKTR-214 with almost no increase in Tregs. And that's exactly the way that we designed the medicine to act.

*Id.* at ¶ 111 (emphasis omitted). "On June 3, 2017, Dr. Adi Diab of the MD Anderson Cancer Center and Co-Chair Scientific Advisory Board for PIVOT Program," *id.* at ¶ 117, displayed the same 30-fold increase chart with the following commentary:

> And so to summar[ize], this—the most important, as you can see when you look at the left column here, and you can see what we've been talking about, and I reemphasize that point because this is a very important marker, not only mobilizing of the T cells in the tumor microenvironment, but you're also mobilizing CD8 more than Tregs, achieving very high CD8-to-Treg ratio of—in the tumor microenvironment, that's very impressive. That's very beneficial for the patients.
> . . .
> And NKTR-214, in addition of mobilizing the CD8 cells, there is also increasing in the number of NK cells, the natural killers. This happens without an increase of the T regulatory cells, and that's a—lead to the high ratio of CD8 to Tregs.

*Id.* at ¶ 119 (emphasis omitted).

Plaintiffs allege that "[o]n November 11, 2017, the Company hosted an 'Investor Meeting' to coincide with the SITC annual meeting at which limited data concerning the PIVOT-02 clinical trial was presented." *Id.* at ¶ 125. Defendant Zalevsky allegedly stated:

> For one thing, we know that in the presence of [NKTR-]214 there's such a high amount of activated immune cells. Different clones of immune cells recognizing multiple antigens increasing the tumor killing army.

6

*Id.* at ¶ 126 (emphasis omitted).  Again, on November 15, 2017, at a Jefferies Healthcare Conference, Defendant Zalevsky allegedly stated:

> We know that with NKTR-214, it can fill the gap of actually replenishing the patient's own immune system.  In fact as a T cell growth factor, it acts like an engine to grow armies and armies of antigen-specific tumor reactive T cells.  These T cells can infiltrate into the body, they can enter the tumor microenvironment and they can go to work, attacking the tumor cells . . . .
> We profiled NKTR-214 in a monotherapy clinical trial and we reported these results over the last year and a half.  Now the key with this monotherapy study was that we wanted to prove the mechanism of action in the patient's tumor itself.
> And so we collected a number of biopsies both pretreatment and on-treatment and we use those biopsies to characterize the functions of NKTR-214, shown here in this slide is the fact that NKTR-214 has on inducing T cell infiltrates into the tumor.  And you can see there's a 30-fold increase in the amount of CD8 T cells that entered into the tumor and because of the biased signaling, you can see there's no change in T regs.  So this is very much skewed and dominated tumor killing cytotoxic T cell response.

*Id.* at ¶ 130 (emphasis omitted).  At the January 9, 2018 JP Morgan Healthcare Conference, Defendant Robin allegedly explained the 30-fold increase chart as follows:

> So what we've done is, using our technology, we have a biased receptor binding in such a way that we cause the proliferation of effector T cells and we don't cause an increase in regulatory T cells.  And because of that, you can give very low doses of NKTR-214 dosed on an antibody-like schedule once every 3 weeks on an outpatient basis.  You see nominal side effects, and you get a profound stimulation of the immune system.  So in patients, just to demonstrate this.  Here you could see the chart on the left, a great—significant increase in effector T cells with no increase in regulatory T cell.  Also, very important, in the left chart, you see that NKTR-214 also increases PD-1 expression.  We take patients who are PD-L1 negative and turn them PD-L1 positive, another very, very important aspect of treating patients in the immunotherapy world.

*Id.* at ¶ 137 (emphasis omitted).  Plaintiffs allege that all these statements were false or misleading for the same three reasons the 30-fold increase chart is false or misleading.  *See, e.g.*, *id.* at ¶ 138.

Outside of statements made at investor conferences, Plaintiffs also allege that a June 2018 video released by Nektar included false and misleading statements.  *Id.* at ¶ 143.  The video had "a voice superimposed over a graphical representation of cancer-fighting cells being created by NKTR-214 without a corresponding growth of regulatory cells inside a tumor."  *Id.*  The video stated:

7

> Cancer immunotherapies are designed to enable a patient's own immune system to attack tumor cells, but existing therapies do not work for most patients, in part due to an insufficient number of cancer-fighting cells, and too many suppressive cells, which can blunt tumor-killing.  What is needed is an immunotherapy that expands, mobilizes and accumulates these powerful cancer-fighting cells, namely CD8-positive effector T-cells and NK cells, within tumors – without expanding unwanted suppressive regulatory T-cells.
>
> NKTR-214 selectively grows cancer-fighting cells, with the goal of making cancer immunotherapy more effective.  Administration of this biologic prodrug is by infusion once every three weeks.  In the body, active conjugates emerge slowly over time, which avoids overstimulation of the immune system.  Activated NKTR-214 targets CD122 receptors found on the surfaces of cancer-fighting cells, which in turn drives their proliferation and accumulation inside the tumor.
>
> In clinical studies, treatment with NKTR-214 resulted in increases in cancer-fighting cells of up to 30-fold.

*Id.* (emphasis omitted).

## II.   REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice of or consider incorporated by reference the following 11 documents: (1) SEC filings (Exs. 10, 11); (2) investor presentation transcripts (Exs. 1, 2, 4, 5, 6); (3) investor presentation slide decks (Exs. 3, 7, 8); and (4) an article (Ex. 9). Dkt. No. 86-14 at 1–3; Dkt. No. 86-2 ("Wechkin Decl."), Exs. 1–11.  Plaintiffs filed no objection to Defendants' request for judicial notice.

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine. 899 F.3d 988 (9th Cir. 2018).  Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citation and quotations omitted).  The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document.  *Id.*  Separately, the incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. *Id*. at 1002.  This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims.  *Id*.  However, it is

1   improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled

2   allegations in the complaint." *Id.* at 1014.

3          The Court will consider the investor presentation transcripts and investor presentation slide

4   decks that Plaintiffs allege contain false and/or misleading statements for the purpose of

5   determining what was disclosed to the market.  Because "the plaintiff refers extensively to the

6   document[s] [and] the document[s] form[ ] the basis of the plaintiff's claim," the Court **GRANTS**

7   the motion as to Exhibits 1, 2, 3, 4, 5, 6, 7, 8, finding these documents incorporated by reference.

8   *Khoja*, 899 F.3d at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)); *see*

9   *also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice

10  of press releases); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979–80 (N.D.

11  Cal. 2010) (taking judicial notice of slide presentations to analysts).

12         The Court will also consider the Plainview article that Plaintiffs allege disclosed

13  Defendants' alleged misstatements.  Given Plaintiffs' extensive reliance on this document to detail

14  the bases for the alleged falsity in Defendants' statements, the Court finds it incorporated by

15  reference, and **GRANTS** the request as to Exhibit 9 on this basis.  *See* SAC ¶¶ 9, 64–76, 77, 152,

16  158, 196; *see also Khoja*, 899 F.3d at 1002 (quoting *Ritchie*, 342 F.3d at 907).

17         Because the SAC relies on Exhibits 10–11 (each a Form 4) to support "a scienter

18  inference" as to Defendants Doberstein and Robin, the Court will consider these documents as

19  evidence that the stock sales reflected in them occurred.  *See* SAC ¶¶ 207–208.  The Supreme

20  Court has instructed "courts [to] consider the complaint in its entirety, as well as other sources

21  courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

22  documents incorporated into the complaint by reference, and matters of which a court may take

23  judicial notice" when determining whether the allegations in a securities complaint "give rise to a

24  strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23

25  (2007).  Because Exhibits 10–11 are publicly filed SEC documents that are expressly referenced in

26  the CCAC, the Court **GRANTS** Defendants' request for judicial notice as to these exhibits.  *Azar*

27  *v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) ("Courts

28  in this circuit have routinely taken judicial notice of Forms 4 to determine whether insider stock

United States District Court
Northern District of California

sales raise an inference of scienter to support a § 10(b) action.").

### III.   LEGAL STANDARD

#### A.   Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

#### B.   Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b).  Under this section, the SEC promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).  At the

United States District Court
Northern District of California

pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020); *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). The PSLRA's requirements were "enacted in 1995 as part of Congress's desire to 'curb perceived abuses of the § 10(b) private action—nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Nguyen*, 962 F.3d at 414 (quoting *Tellabs*, 551 U.S. at 320). Specifically, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

## IV.  DISCUSSION

Plaintiffs allege that Defendants made false and misleading statements to the public regarding the EXCEL trial in violation of Section 10(b) and Rule 10b–5(b). SAC at ¶¶ 223–32. To prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008). The Court previously dismissed Plaintiffs' false statement claim due to Plaintiffs' failure to adequately plead falsity, scienter, and loss causation. Order at *9–13, 16–19. Defendants contend that Plaintiffs have again failed to sufficiently plead these elements. *See generally* Mot.

A.    **Falsity**

"Falsity is alleged when a plaintiff points to [a] defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quotations and alterations omitted). Misleading statements "must be 'capable of objective verification.'" *Id.* (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). "For example, 'puffing'—expressing an opinion rather than a knowingly false statement of fact—is not misleading." *Id.* Finally, an actionable representation must be material. "For the purposes of a 10b–5 claim, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

The Court previously held that the CCAC "fail[ed] to adequately allege that any of the statements in the [] categories identified by Plaintiffs were false or misleading." Order at *11. Plaintiffs had pointed to the Figure 6 line graph to detail the reasons that the challenged statements concerning the 30-fold increase chart were false or misleading. *Id*. at *9. Concerning the first claimed basis that the statements were based on the inclusion of an outlier patient, the Court found that Plaintiffs failed to adequately show that the Plainview Report identifying the Figure 6 line graph supported their falsity allegations. *Id.* Specifically, the Court pointed to "Plainview's disclosures detailing that it stood to benefit from a poor performance in Nektar's stock price and the lack of any information establishing why Plainview's opinions on the highly-technical matters at issue here are reliable." *Id.* at *10. Though Plaintiffs also relied on CW #2's claim that outlier patient data was included in the 30-fold increase chart, the Court found that CW #2's statements "failed to support Plaintiffs' assumption" that the Figure 6 line graph was the source of the 30-fold increase chart. *Id.* The Court further identified a more fundamental issue, noting that "Plaintiffs fail to explain why the inclusion of the 'outlier data' in the EXCEL trial, or the failure to disclose

United States District Court
Northern District of California

United States District Court
Northern District of California

1    its inclusion, necessarily made the 30-fold figure false or misleading, which is inadequate under

2    the PSLRA's heightened pleading standards." *Id.* The Court explained that "disagreements over

3    statistical methodology and study design are insufficient to allege a materially false statement."

4    *Id.* (quoting *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012)). With respect

5    to the claimed basis concerning dosing, the Court similarly found that Plaintiffs failed to support

6    "the assumption that the Figure 6 line chart provided the source data for Nektar's EXCEL clinical

7    trial representations." *Id.* at *11.

8         As noted, Plaintiffs again allege that the challenged statements regarding the 30-fold

9    increase figure are false or misleading on similar grounds: (1) the 30-fold figure is based on the

10   inclusion of an "outlier" patient, and (2) the "Week 3/predose" chart descriptor suggests that all

11   patients in the population sample were dosed every three weeks when two of the five patients were

12   dosed every two weeks. *See* SAC ¶ 106(a)–(b). Plaintiffs argue that additional allegations

13   attributed to CW #2 and expert analysis indicate that the EXCEL data was outlier driven. *Id.* at

14   ¶¶ 84, 87. Defendants maintain that Plaintiffs' outlier and dosing allegations do not show that the

15   challenged statements were materially false or misleading. Mot. at 11.

16        Plaintiffs again rely on CW #2 for his "confirm[ation] that the outlier patient from the

17   EXCEL trial whose data was included in the Company's '30-Fold' increase bar chart was

18   discussed at Executive Committee meetings," where "[r]egular attendees" included the three

19   individual Defendants. SAC ¶ 184. As in the previous complaint, CW #2 indicates that

20   Defendant Robin "instructed that the data from the outlier patient be included in public

21   presentations." *Id.* Plaintiffs additionally allege that "CW #2 confirmed that Patient 14 referenced

22   in Figure 6 . . . was the single outlier patient who experienced a unique increase in cancer-fighting

23   cells" and that "no other patient in the study had a similar reaction to the drug." *Id.* at ¶ 84. CW

24   #2 also stated that "many individuals at Nektar were concerned that it was misleading to present

25   trial data that was so skewed by the inclusion of an outlier patient" and "expressed concerns to

26   management." *Id.* at ¶ 85. CW #2 "characterized this disagreement as one between the scientists

27   and business-focused individuals, including Defendant Robin." *Id.* The Court agrees with

28   Defendants that some of these statements lack the required specificity, most notably in failing to

13

United States District Court
Northern District of California

1  allege when these alleged disagreements involving these unnamed individuals occurred.[1]  *See* Mot.

2  at 12.

3      Additionally, Plaintiffs include expert allegations to support their falsity allegations.  To

4  analyze the 30-fold increase claim, Expert #1 assumed Patient 14's Figure 6 results were included

5  in the 30-fold increase figure and further assumed that Patient 14's "CD8+ fold change was

6  approximately 250."  SAC ¶ 88, 90.  Expert #1 then generated three "scenarios in which Patient 14

7  had a fold-change of 250 and the other nine patients shared the remaining contribution of 50."  *Id.*

8  at ¶ 90.  Based on this analysis, Expert #1 opined that "utilizing data from Patient 14 in a 10-

9  patient dataset to support Defendants' 30-fold increase claim was highly misleading."  *Id.* at ¶ 97.

10  Expert #1 contended that including Patient 14 was improper even if Patient 14 was dosed every

11  three weeks.  *Id.* at ¶ 100.  Expert #1 stated that "industry and scientific standards were violated"

12  by Defendants' alleged conduct because "industry and scientific standards caution against

13  presenting data when it is (1) highly incomplete or (2) outlier driven."  *Id.* at ¶ 101.  Expert #1

14  noted that "individuals familiar with pharmaceutical research typically assume" that these

15  standards are followed.  *Id.* at ¶ 102.

16      Defendants argue that Expert #1's "conclusion is defective" because it relies on the "vague

17  invocation of unspecified 'standards.'"  Mot. at 13.  Plaintiffs respond that Expert #1 stated that

18  "there are clear industry and scientific norms against both the presentation of 'highly incomplete'

19  and 'outlier-driven' data."  Opp. at 9.  The Court agrees with Defendants that the first standard is a

20  "meaninglessly vague" and the second is a "tautology."  Reply at 5.  The Court finds that neither

21  Expert #1 nor Plaintiffs adequately detail these standards as required to meet the PSLRA's

22  heightened pleading standards.

23      Defendants further argue that Plaintiffs have not adequately pled facts showing that the

24  Figure 6 data was included in the 30-fold increase bar chart.  Plaintiffs' outlier and dosing

25

26  _____

27  [1] Citing no case, Plaintiffs argue that providing the names of the employees and scientists is not
required, but they still fail to address the lack of detail concerning the timing of the alleged
arguments.  *See* Opp. at 12 n.7.  The Court similarly does not credit CW #2's inherently

28  speculative assertions that "attendees at the ASCO conference appeared to be misled by Nektar's
presentation" and "left with [unsupported] optimism."  *Id.* at ¶ 84.

1    allegations rely on the central assumption that Figure 6 is the source data for the 30-fold increase

2    chart.  Defendants argue that alleging "Patient 14 was the 'single outlier' does not show that the

3    CD8 results shown for Patient 14 *in Figure 6* were included in the [30-fold increase] bar chart."

4    Mot. at 12 (emphasis in original).  And Defendants correctly note that Plaintiffs plead no

5    additional facts showing that patients dosed every two weeks were included in the 30-fold increase

6    chart.  *Id.* at 11; Reply at 7. The Court finds that Plaintiffs again have failed to adequately allege

7    facts establishing that the Figure 6 line chart data was incorporated into the 30-fold increase chart.

8    Having failed to adequately support that assumption, Plaintiffs have not sufficiently pled that the

9    challenged statements were false or misleading for either of the two categories.

10   And even assuming that Plaintiffs did adequately support the assumptions that the Figure 6

11   line chart provided the source data for Nektar's EXCEL clinical trial representations, and that the

12   outlier patient and patients dosed on a two-week schedule were thus included in the 30-fold

13   increase chart, the Court still finds Plaintiffs' falsity allegations insufficient.  Specifically,

14   Plaintiffs have not alleged facts sufficient to show that the inclusion of these patients made the 30-

15   fold increase chart materially false or misleading.  Instead, Plaintiffs' allegations amount to a

16   disagreement with Nektar's statistical methodology, and such a disagreement is insufficient to

17   allege falsity.  *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012).

18   In *Rigel*, the Ninth Circuit considered "whether statements concerning statistical results of

19   a clinical trial may be considered false or misleading under Rule 10b–5 because the statistical

20   methodology that produced those results was not the best or most acceptable methodology," and

21   concluded that "merely alleging that defendants should have used different statistical methodology

22   in their drug trials is not sufficient to allege falsity."  697 F.3d at 878.  And contrary to Plaintiffs'

23   assertion, the dispute in *Rigel* was not "merely whether one of several reasonable . . .

24   methodologies should have been used."  *See* Opp. at 10.  *Rigel* was a fraud case, in which the

25   plaintiffs, like Plaintiffs here, alleged that the particular statistical methodology used by the

26   defendants rendered the challenged statements false.  *Rigel*, 697 F.3d at 877–79.  And as in *Rigel*,

27   Plaintiffs' allegations here "concern two different judgments about the appropriate statistical

28   methodology to be used by Defendants," instead of "allegations . . . about false statements."  *See*

United States District Court
Northern District of California

15

*id.* at 878.

Plaintiffs argue that *Rigel* does not apply because "Defendants presented inaccurate and outlier-driven data that would mislead anyone versed in industry and scientific standards," which reflects "far more than an academic disagreement." Opp. at 10. The Court rejects Plaintiffs' attempt to distinguish *Rigel* based on unspecified standards that purportedly are "*customarily* followed in such trials" and that "individuals familiar with pharmaceutical research *typically* assume are followed." *See* SAC ¶ 102 (emphasis added). It is insufficient to allege that the challenged statements regarding the 30-fold increase chart were false or misleading because the Defendants did not use Plaintiffs' preferred statistical methodology. "Because Plaintiff[s] do[] not allege that Defendants misrepresented their own statistical methodology, analysis, and conclusions, but instead criticize[] only the statistical methodology employed by Defendants, Plaintiff[s] did not adequately plead falsity with respect to statistic results." *See Rigel*, 697 F.3d at 879. Because the SAC fails to adequately allege that any of the challenged statements were materially false or misleading, the Court **GRANTS** Defendants' motion to dismiss for failure to plead falsity.

### B. Scienter

Under the PSLRA, whenever intent is an element of a claim, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The required state of mind is one of at least "deliberate recklessness," which "is more than '*mere* recklessness or a motive to commit fraud.'" *Nguyen*, 962 F.3d at 414 (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (emphasis in original)). "It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Id.* (quoting *Schueneman*, 840 F.3d at 705) (emphasis in original)).

The Court previously found the CCAC's scienter allegations insufficient to survive dismissal, explaining that "Plaintiffs fail[ed] to provide specific allegations that Defendants

United States District Court
Northern District of California

United States District Court
Northern District of California

1    presented the 30-fold increase chart with knowledge and intent to mislead or conceal the true

2    EXCEL clinical trial results." Order at *12.  As with the falsity allegations, the Court stated that

3    "Plaintiffs fail[ed] to provide critical allegations necessary to transform the false and misleading

4    statements claim into more than a statistical disagreement." *Id.*  The Court again finds Plaintiffs'

5    scienter allegations insufficient to survive dismissal.

6            Plaintiffs include additional allegations attributed to CW #2 and Expert #1 to support their

7    scienter allegations, *see* Opp. at 11–13, the bulk of which were included in the CCAC.  *See* SAC

8    ¶¶ 170-208  But these additional allegations do not cure the previous deficiencies.[2]  For example,

9    the Court previously noted that CW #2's allegations concerning Defendant Robin's instruction

10   that purported outlier data be included in public presentations did not "explain why this action was

11   wrong or indicative of scienter." *Id.*  Plaintiffs again cite these allegations to argue that, given the

12   Defendants' backgrounds, it is "inconceivable" that they were not aware that this conduct would

13   mislead the public.  *Compare* CCAC ¶ 145 *with* SAC ¶ 170, 172.  To bolster this allegation,

14   Plaintiffs rely on Expert #1 for the contention that Defendants "would possess the requisite

15   understanding to realize" that their presentation of data "would violate the industry and scientific

16   standards against using data that is (1) highly incomplete or (2) outlier driven." SAC ¶ 171.  As

17   detailed above, Plaintiffs' reliance on these vague standards is inadequate.

18           Plaintiffs also argue that CW # 2's new allegations, concerning CW #2's recollection of

19   the disagreement among "scientists and business-focused individuals, including Defendant

20   Robin," *see id.* at ¶ 85, shows that "the Company's own scientists protested to Defendants that it

21   would be misleading to include the outlier data." *See* Opp. at 12.  In addition to arguing that this

22   allegation fails for lack of specificity, Defendants contend that disagreement among employees is

23   insufficient to establish scienter.  Mot. at 19 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552

24   _____

25   [2] The Court also finds the previous allegation concerning purportedly "buried" error bars
     insufficient to support an inference of scienter.  Specifically, Plaintiffs again allege that in
26   September 2017 Nektar presented a poster in Spain at the ESMO conference that included a figure
     showing an error bar,  SAC ¶ 147, and allege that "these error bars were hidden from the investing
27   public when Nektar made its 30-fold increase claims." *Id.* at ¶ 95 n.28.  Plaintiffs now
     acknowledge that Nektar's presentation during the 2017 ASCO conference also contained an error
28   bar.  SAC ¶ 175; *see* Opp. at 14–15.  That an error bar was included in some, but not all
     presentations, does not sufficiently allege intentional fraud.

F.3d 981, 999 (9th Cir. 2009) (holding that "disagreement among employees . . . is not enough to establish a cogent or compelling scienter allegation"). Tellingly, Plaintiffs do not clearly address this argument or distinguish any of the supporting cases cited by Defendants. *See* Opp. at 10–12. The Court agrees with Defendants that, without more, these claimed disagreements occurring on unspecified dates concerning decisions about statistical methodology do not adequately allege intentional fraud.[3]

Plaintiffs have also repurposed allegations from their previous scheme liability claim regarding the PIVOT-02 clinical trial to support an inference of scienter. *Compare* CCAC ¶ 39 *with* SAC ¶ 181  These include allegations concerning allegedly improper phone conversations to PIVOT trial sites to obtain unverified data from PIVOT, *compare* CCAC ¶ 39  *with* SAC ¶ 181, and to adjust data cut-off times depending on whether patients were doing well. *Compare* CCAC ¶ 44 *with* SAC ¶ 187.[4]  Plaintiffs also include allegations that Nektar halted recruitment of patients from Poland who Dr. Mary Tagliaferri "thought were too sick." *Compare* CCAC ¶ 49 *with* SAC ¶ 194. Defendants note that these allegations "relate exclusively to the PIVOT trial" and "are almost entirely divorced from the three individual Defendants." Mot. at 20; Reply at 13.

The Court agrees that these allegations fail to plausibly show that any of the individual Defendants were involved in the alleged misconduct in the PIVOT trial. For instance, it is not alleged that any of the individual Defendants made any of the calls or directed employees to make them; the closest link alleged is that CW # 2 heard Tagliaferri tell Imperiale and Ziola, who made the calls concerning the cut-off dates, to "do it" because Defendant Robin "wants it." SAC ¶ 189;

---

[3] Defendants also argue that the allegation is contradictory because "top Nektar scientists" Doberstein and Zalevsky "were plainly aligned with Robin" and often presented the 30-fold increase figure. Mot. at 19. Plaintiffs argue that these scientists "profited from the fraud by making stock sales during the Class Period," Opp. at 9, but Defendants correctly note that "Plaintiffs allege no stock sales by Zalevsky and only non-discretionary sales by Doberstein." Reply at 9–10. In any event, the Court agrees that Plaintiffs fail to plausibly plead the asserted divide between "scientists" and "business-focused individuals."

[4] Plaintiffs allege the first category of phone calls were made by "Nektar personnel, including Tagliaferri and Gergel," and the second category of phone calls were made by "Nektar employees Dr. Michael Imperiale and Dr. Margaret Ziola." SAC ¶ 189. The SAC additionally alleges that CW # 2 "was present with the data management team when many of the[] [calls] were made," *id.* at ¶ 189, that CW # 3 "confirmed that these calls were sometimes placed by Imperiale and Ziola," and that CW # 3 "felt that [the conduct] was improper." *Id.* at ¶ 191.

United States District Court
Northern District of California

*see* Opp. at 16.  The Court rejects Plaintiffs' effort to use this tenuous allegation to show "a pattern of intentional conduct by Defendant Robin of selectively releasing positive data."[5]  *See* Opp. at 16. Moreover, Plaintiffs have not alleged how any purported misconduct in the PIVOT trial is plausibly connected to the statistical methodology used in presenting the relevant EXCEL trial data, on which the false statement claim is based.  *See* Mot. at 20.

Lastly, Plaintiffs allege that Defendants' funding concerns and insider trades show motive to commit fraud.  The allegations regarding funding are repeated verbatim from the CCAC, and the SAC also includes the same allegations concerning insider trades by Defendants Robin and Doberstein.[6]  *Compare* CCAC ¶ 155–161 *with* SAC ¶ 202–208.  Plaintiffs acknowledge that the Court previously found neither motive sufficient to support an inference of scienter.  Opp. at 17.

Because Plaintiffs' allegations again fail to support a strong inference of scienter, individually and when viewed holistically, the Court also **GRANTS** Defendants' motion to dismiss on this ground.

### C.    Loss Causation

"[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)).  This "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'"  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)).  However, this is not the only way to meet

---

[5] The Court similarly finds the new allegation concerning Defendant Robin's approval of a trip inadequate.  Specifically, CW #2 states that Tagliaferri traveled to a "central read facility" called Bioclinica, on a trip approved by Defendant Robin, and Tagliaferri later "boasted to management that she had been able to persuade them to reclassify two tumor scans."  SAC ¶ 190.  Even if true, this allegation does not constitute strong (or any) evidence of scienter as to the EXCEL trial.
[6] Because Plaintiffs removed the allegations concerning trades by Gergel and Nicholson, the Plaintiffs now allege that Defendants sold "more than 67 million in Nektar common stock," instead of $100 million.  *Compare* CCAC ¶ 159 *with* SAC ¶ 206.

United States District Court
Northern District of California

the pleading burden.  Instead, "loss causation is simply a variant of proximate cause," and "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Id.* at 1210.  In other words, plaintiffs must show that the "the earlier misrepresentation" accounts for the loss, as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

The Court previously held that Plaintiffs failed to establish loss causation as to either of the two alleged corrective disclosures.  *See* Order at *17-18.  Plaintiffs alleged that corrective disclosures leading to stock price declines occurred (1) on June 2, 2018, when Nektar reported mid-stage results from the PIVOT clinical trial, and (2) on October 1, 2018, when the Plainview Report was published.  *See* CCAC ¶¶ 128, 132.  Plaintiffs raise the same two alleged corrective disclosures in the SAC.  *See* SAC ¶¶ 154, 158.  Noting that "Plaintiffs have made virtually no amendments to their loss causation allegations," Defendants argue that Plaintiffs again fail to establish loss causation as to either the June 4, 2018 or the October 1, 2018 stock price decline.  Mot. at 2.

### i.    June 2, 2018 Announcement

The Court previously rejected the allegations concerning the June 4, 2018 stock price decline:

> As alleged, the data that was revealed on June 2, 2018 related only to the PIVOT-02 trial.  Each of the allegedly false statements pled in the Consolidated Class Action Complaint relates exclusively to the EXCEL trial, specifically the 30-fold increase chart.  Plaintiffs allege nothing to connect the June 4, 2018 stock price drop from mid-stage results in the PIVOT-02 trial with the challenged statements regarding the 30-fold increase chart beyond the conclusory argument that "the concealed risk from both the false statements about the EXCEL trial ... and manipulation of PIVOT-02 data ... worked together to create unrealistic expectation for future NKTR-214 results." Opp. at 23. This does not meet the standard required by the PSLRA: nothing in the Complaint plausibly establishes that Defendants' misstatements about the EXCEL clinical trial, as opposed to some other fact, caused Plaintiffs' June 4, 2018 loss.

United States District Court
Northern District of California

Order at *18.  The relevant allegations remain largely identical.[7]  But Plaintiffs contend that the previous deficiencies are now "addressed by the new allegations establishing that false and misleading statements inflated the Company's share price by introducing the false 30-fold increase narrative to the market."  Opp. at 18.  Defendants argue that Plaintiffs' contention fails because "[t]he Supreme Court held in *Dura* that the inflation of stock price by means of allegedly false or misleading statements is not sufficient to establish loss causation."  Reply at 13 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005)).

> The Court's previous discussion of *Dura* controls again here:
>> In *Dura Pharmaceuticals*, the Supreme Court rejected the premise that "plaintiffs need only establish, *i.e.*, prove, that the price on the date of purchase was inflated because of the misrepresentation." 544 U.S. at 342 (internal quotation and citation omitted).  Instead, the Supreme Court found that even where "the inflated purchase price suggests that the misrepresentation . . . 'touches upon' a later economic loss . . . it is insufficient" to plead loss causation. *Id.* at 343.

*See* Order at *17.  Having failed to connect Defendants' alleged misstatements about the EXCEL trial to the June 2, 2018 announcement concerning mid-stage results from a different trial, Plaintiffs have not adequately pled that the challenged statements foreseeably caused the June 4, 2018 stock decline.

### ii.   October 1, 2018 Plainview Report

The Court previously rejected the allegations concerning the October 1, 2018 stock price decline because it found that the Plainview Report did not constitute a corrective disclosure. Order at *18.  The Court reasoned that the Report could not "constitute new information unknown to the market" because "Plainview indicated that the Report was prepared with publicly-available data."  *See id.*  Though Plaintiffs' allegations with respect to the Report remain identical, *compare* CCAC ¶ 132–36 *with* SAC ¶ 158–62, Plaintiffs rely on recent authority from the Ninth Circuit to argue that the Report constituted a corrective disclosure.  *See* Opp. at 19–22.

In *In re BofI Holding, Inc. Securities Litigation*, the Ninth Circuit held that "[a] disclosure

---

[7] For example, Plaintiffs again argue: "Defendants' false '30-fold increase' claim with respect to the EXCEL trial created an undisclosed risk that future trial results that were accurately reported and not manipulated would not be so rosy and would therefore disappoint the market."  *Compare* CCAC ¶ 129 *with* SAC ¶ 155.

based on publicly available information can, in certain circumstances, constitute a corrective disclosure." 977 F.3d 781, 795 (9th Cir. 2020). In *BofI*, the district court had found that the plaintiffs failed to plausibly allege that "eight blog posts published by anonymous authors on Seeking Alpha, a crowd-sourced online resource for investors," constituted corrective disclosures, because each "relie[d] entirely on publicly available information." *Id.* at 788–89, 795. "Each post stated that it was based on information derived from publicly available sources and that the author was 'short' BofI." *Id.* at 788. The Ninth Circuit explained the framework for assessing whether a disclosure based on publicly available information constitutes a corrective disclosure:

> The ultimate question is again one of plausibility: Based on plaintiffs' particularized allegations, can we plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price? The fact that the underlying data was publicly available is certainly one factor to consider. But other factors include the complexity of the data and its relationship to the alleged misstatements, . . . and the great effort needed to locate and analyze it . . . Courts must assess these and other factors on a case-by-case basis.

*Id.* at 795. In analyzing the blog posts, the Ninth Circuit stated that some posts "required extensive and tedious research," noting that the "time and effort it took to compile this information make it plausible that the posts provided new information to the market." *Id.* at 797. But it nonetheless concluded that "it [was] not plausible that the market reasonably perceived these posts as revealing the falsity of BofI's prior misstatements, thereby causing the drops in BofI's stock price on the days the posts appeared." *Id.* The Ninth Circuit reached its conclusion because "[t]he posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article.' " *Id.* It explained that "[a] reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt." *Id.* Accordingly, it held that the plaintiffs failed to plausibly allege that any of the blog posts constituted corrective disclosures. *Id.*

Applying the *BofI* framework, the Court concludes that Plaintiffs have failed to plausibly allege that the Plainview Report constituted a corrective disclosure. Though the public availability of the data is a factor, the Court does not "categorically disqualify" the Plainview Report as a

1    potential corrective disclosure on this basis.  *See id.* at 795.  Concerning the effort to analyze the

2    data, Plaintiffs argue that Plainview "was the first market participant . . . to grasp the misleading

3    nature of Defendants' false and misleading statements" because Plainview had to "connect[]

4    public statements made in the United States to a single data point buried in a poster presented in

5    Spain."  *See* Opp. at 21-22.  These allegations concerning the "effort it took to compile this

6    information make it plausible that the [Plainview Report] provided new information to the

7    market."  *See BofI*, 977 F.3d at 797.

8         But even if the Report disclosed new information, the Plainview Report, like the blog posts

9    in *BofI*, was published by an "anonymous short seller who had a financial interest in driving

10   Nektar's stock price down and who disclaimed any 'representation, express or implied, as to the

11   accuracy, timeliness, or completeness of any such information or with regard to the results

12   obtained from its use.' "  *See* Reply at 14 (quoting Dkt. No.86-11, Ex. 9 at 2).  The Court thus

13   concludes that "it is not plausible that the market reasonably perceived" the Plainview Report "as

14   revealing the falsity of" the challenged statements.  *See BofI*, 977 F.3d at 797.

15        Plaintiffs seek to distinguish *BofI*, arguing that the Plainview Report has a "direct rather

16   than tangential relationship" to the alleged false statements.  Opp. at 22.  It is true that the

17   relationship between the data and the alleged misstatements is a factor to consider.  *See BofI*, 977

18   F.3d at 795.  And in considering this factor, the Court agrees with Plaintiff that there is more than

19   a tangential relationship between the data and the alleged misstatements, because, as alleged by

20   the Report, the Figure 6 line graph was the source of the data for the 30-fold increase chart.  *See*

21   SAC ¶ 71–72.

22        But the nature of the relationship between the data and the alleged misstatements does not

23   change the Court's conclusion that Plaintiffs have failed to plausibly allege the Report constituted

24   a corrective disclosure.  "[A] reasonable investor reading" the Report written by an anonymous

25   short seller disclaiming the accuracy or completeness of its analysis "would likely have taken [its]

26   contents with a healthy grain of salt."  *See BofI*, 977 F.3d at 797; *see also Grigsby v. BofI Holding,*

27   *Inc.*, 979 F.3d 1198 (9th Cir. 2020) (concluding article written by anonymous short-seller whose

28   analysis was derived from publicly available information, required no specialized skills, and

United States District Court
Northern District of California

23

included disclaimers about the accuracy and completeness of the information did not constitute a corrective disclosure).

Because Plaintiffs fail to establish loss causation, the Court also **GRANTS** Defendants' motion to dismiss on this ground.

## V.    CONCLUSION

The Court **GRANTS** Defendants' motion to dismiss all of Plaintiffs' claims.[8]  Because Plaintiffs were previously granted an opportunity to remedy these flaws but failed to do so, the claims are now dismissed **WITHOUT LEAVE TO AMEND**.[9]  The clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated:  12/30/2020

*Haywood S. Gill Jr.*

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

---

[8] Plaintiffs' claim under Section 20(a) of the Securities Act is expressly premised on the Section 10(b) claims. SAC ¶¶ 233–237. Since Plaintiffs fail to allege a cognizable Section 10(b) claim against Defendants for the reasons noted above, the Section 20(a) claim must be DISMISSED. *See Zucco*, 552 F.3d at 990.

[9] *See Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is 'particularly broad.'") (citation omitted); *Zucco Partners*, 552 F.3d at 1007 (affirming dismissal without leave to amend where court advised plaintiff of pleading deficiencies but plaintiff failed to correct those deficiencies in amended pleading).